UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Vadim Mikhlyn, Inga Mikhlyn, and
ABC All Consulting, Inc.

                Plaintiffs,          08-CV-3367
                                       (CPS)(RER)

    - against -

                                     MEMORANDUM OPINION
Ana Bove, Polina Dolginov,            AND ORDER
Anna Bove Company, LLC, Anna Bove
Collections, Inc., and Anna Bove
Embroidery Supplies, Inc.

                Defendants.

----------------------------------------X

Ana Bove, Anna Bove Company, LLC and
Anna Bove Embroidery Supplies, Inc.

                Counter-Plaintiffs

    - against -

Vadim Mikhlyn, Inga Mikhlyn, and
ABC All Consulting, Inc.

                Counter-Defendants

----------------------------------------X

      Vadim Mikhlyn ("plaintiff Vadim"), Inga Mikhlyn ("plaintiff

Inga"), and ABC All Consulting, Inc. (collectively, "plaintiffs")

bring this action against Ana Bove ("defendant Ana"), Polina

Dolginov ("defendant Polina"), Anna Bove Company, LLC, Anna Bove

Collections, Inc., and Anna Bove Embroidery Supplies, Inc.

(collectively, "defendants").  Plaintiffs' complaint alleges that

defendants engaged in (1) trademark infringement, in violation of

15 U.S.C. § 1125(a); (2) unfair competition, in violation of 15

U.S.C. § 1125(a); (3) unfair competition, in violation of New
York General Business Law ("N.Y.G.B.L."), Section 349; (4) libel
per se; and (5) conversion. Defendants Ana, Anna Bove Company,
LLC, and Anna Bove Embroidery Supplies, Inc. (collectively,
"counterclaimants") bring counterclaims against plaintiffs,
alleging (1) copyright infringement; (2) trademark infringement,
in violation of 15 U.S.C. § 1125(a); (3) unfair competition, in
violation of 15 U.S.C. § 1125(a); (4) cybersquatting, in
violation of 15 U.S.C. § 1125(d); (5) trademark infringement and
unfair competition, in violation of New York Law; (6) violation
of the right to privacy, in violation of Article 5, Section 50 of
the New York Civil Rights Law and New York common law; (7)
bailment and conversion, in violation of New York General
Business Law Section 349; (8) breach of contract; (9) unjust
enrichment; (10) "money had and received" violations; and (11)
unspecified further violations of New York General Business Law
Section 349. Counterclaimants also seek (12) an accounting of
ABC Inc.; (13) the imposition of a constructive trust; (14)
declaratory judgment that defendant Ana is the exclusive owner of
all relevant intellectual property and an injunction barring
plaintiffs from using defendant Ana's intellectual property in
any way.

Presently before this Court are plaintiffs' and
counterclaimants' cross motions for a preliminary injunction

against each other.[1]  Plaintiffs seek an order (a) directing that
the web sites ABC-Cross-Stitch-Patterns.Com and ABC-Embroidery-
Designs.Com be returned to plaintiff Vadim's control; (b)
enjoining defendants from using or claiming exclusive ownership
of the names "Anna Bove Collections," "ABC-Cross-Stitch-
Patterns.com" and "ABC-Embroidery-Designs.Com,"; (c) enjoining
defendants from using the names "Anna Bove Collections," "ABC-
Cross-Stitch-Patterns.com" and "ABC-Embroidery-Designs.Com" as
keywords in search engines to steer customers to defendants' web
sites; (d) prohibiting defendants from using such names as
keywords in search engines to steer customers to their new sites;
(e) prohibiting defendants from selling design files that were
taken from the ABC sites and/or created and paid for by ABC Inc.;
and (f) prohibiting defendants from stating that plaintiffs'
sales of designs from the ABC Sites are unlawful, pending the
trial of this action.  Counterclaimants seek an order: (a)
enjoining plaintiffs from infringing defendant Ana's copyright
No. VA 1-639-284; (b) enjoining plaintiffs from using any of the
"ANNA BOVE," "ANNA BOVE COLLECTIONS," "ABC EMBROIDERY DESIGNS,"
and "ABC EMBROIDERY" trademarks or similar trademarks; (c)
enjoining plaintiffs from using any domain name employing "abc"

---

[1] Counterclaimants also discuss their entitlement to an order of
attachment in their memorandum in support of their motion for a preliminary
injunction.  Defendants-Counterplaintiffs' (Counterclaimants') Memorandum in
Support of the Motion for a Preliminary Injunction ("Def.'s Memo.") at 21-27.
Because they have not requested such relief in their notice of motion or their
proposed order, however, I decline to address the subject at this time.

or "Anna Bove" or any variant thereof and directing plaintiffs to turn over control of such domain names to defendant Ana; (d) directing plaintiffs to turn over to the Court or defendant Ana all property owned or possessed by plaintiffs that infringes upon counterclaimants' copyrights; (e) directing plaintiffs to turn over all packaging and advertising materials bearing the marks "ANNA BOVE," "ANNA BOVE COLLECTIONS," and "ABC EMBROIDERY DESIGNS," or similar marks, along with the tools to duplicate those designs; (f) directing an accounting of the "abc embroidery businesses conducted by the [plaintiffs] since on or about July 2007"; (g) directing plaintiffs to provide an accounting to counterclaimants regarding the disputed intellectual property and the transfer of "ABC" business-related internet business accounts such as PayPal; (h) directing plaintiffs to file with the Court and serve on defendant Ana a report setting forth how plaintiffs have complied with the injunction; and (i) granting attorneys fees and costs to counterclaimants, all presumably pending the trial of this action.

Upon the findings of fact and conclusions of law set forth below, plaintiffs' motion is granted in part and denied in part and counterclaimants' motion is denied.

## BACKGROUND

The following is derived from the Complaint, as well as the parties' filings and affidavits submitted in connection with this

action and oral argument before the undersigned on September 25, 2008.  Disputes are noted.  Having considered the need for an evidentiary hearing in this matter, I conclude that none is necessary as the parties do not dispute that any evidence that would be introduced at such a hearing is already before this Court in the form of affidavits and exhibits.  The inferences to be drawn from such evidence are set forth herein.

In 2002, defendants Ana and Polina established a web-based business selling embroidery designs together as partners. Declaration of Ana Bove ("Ana Decl.") ¶ 14; Declaration of Vadim Mikhlyn ("Vadim Decl.") ¶ 5.  Both defendants Ana and Polina resided in Israel at the time, where they were neighbors.  Vadim Decl. ¶ 4, Ana Decl. ¶ 11.  Defendant Ana was in charge of creating the original embroidery designs, and defendant Polina assisted her by creating and maintaining websites to sell the designs.  Ana Decl. ¶¶ 13-14, 16.  In 2002-03, defendants Ana and Polina registered two domain names for this purpose, ABC-Cross-Stitch-Patterns.Com and ABC-Embroidery-Designs.Com, and created websites under those names.[2]  Vadim Decl. ¶ 5.  In addition, they registered an e-Bay store called "ABC-embroidery-designs."  Ana Decl. ¶¶ 15, 27; *see also id.* Ex. A (business records demonstrating existence of eBay store since 2002).

---

[2] Defendant Ana states that she and her "Israeli employees" registered at least seven "ABC" domain names between 2002-03.  Ana Decl. ¶ 27.

In 2004, defendant Ana states, and plaintiffs Vadim and Inga dispute, that she and Polina hired Ana's cousin-in-law, plaintiff Inga, and thereafter in 2007, Inga's husband and Ana's cousin, plaintiff Vadim, to run the U.S. operations of the business. Ana Decl. ¶ 6; Ana Bove's Second Supplemental Declaration ("Ana Supp. 2d Decl.") ¶ 6. Defendant Ana states that plaintiffs needed employment and a source of income at the time, and that she provided it. *Id.* ¶ 44. By contrast, plaintiffs Vadim and Inga state that soon after January of 2004, they agreed to enter into a partnership with defendants Ana and Polina. Vadim Decl. ¶ 8;[3] Declaration of Inga Mikhlin ("Inga Decl.") ¶ 2.[4]

In June of 2004, plaintiffs Vadim and Inga incorporated ABC All Consulting, Inc. ("ABC Inc.") in New York State, which they state, and defendants dispute, was created to serve as the business entity for the alleged partnership.[5] Vadim Decl. ¶ 9; Ana Decl. ¶ 25. According to defendant Ana, ABC Inc. was created

---

[3] In support of his contention that the parties conducted business as if they had formed a partnership, plaintiff Vadim submits a set of emails and chat logs documenting the history of communications between plaintiffs and defendants. Declaration of Vadim Mikhlyn in Further Support of Preliminary Injunction and In Opposition to Cross-Motion for Preliminary Injunction ("Vadim Supp. Decl.") ¶¶ 4-5; *id.* Exs. A-B.

[4] In her declaration, plaintiff Inga expressly adopts the statements made by her husband, plaintiff Vadim, in his declaration. Inga Decl. ¶ 2. For the purposes of this motion, I cite only plaintiff Vadim's declaration to refer to statements made or adopted by both individual plaintiffs.

[5] New York Department of State records reflect the initial filing for ABC All Consulting, Inc. on June 14, 2004, and lists plaintiff Vadim as Chairman or Chief Executive Officer and plaintiff Inga as Principal. Defendant Ana's and defendant Polina's names do not appear. *See* http://appsext8.dos.state.ny.us/corp_public/corpsearch.entity_search_entry (search for "ABC All Consulting") (last visited Sept. 18, 2008).

to facilitate plaintiff Vadim's computer consulting work
unrelated to the embroidery design business. Ana Decl. ¶ 25.
Defendant Ana concedes, however, that plaintiffs ultimately used
ABC Inc. as a vehicle for running the embroidery business, Ana
Decl. ¶ 26, and also appears to contend that she is the owner and
sole proprietor of ABC Inc.[6] Plaintiffs Vadim and Inga each
received 100 shares of ABC Inc., and they state that no other
shares were ever issued or authorized. Vadim Decl. ¶ 9; *see also*
*id.* Ex. A (share certificates showing plaintiffs' holdings and
demonstrating that only 200 shares of ABC Inc. were authorized).

Plaintiffs state that in the alleged partnership, no one
partner acted like, or was, the employer or boss of any other
partner. *Id.* ¶ 13. According to plaintiffs, each partner had a
principal area of responsibility and worked cooperatively with
the other partners.[7] *Id.* By contrast, defendants argue that

---

[6] Counsel for defendant Ana makes this assertion in a May 12, 2008 cease
and desist letter to plaintiffs, but attaches no documentary support.
Declaration of Inga Mikhlin ("Inga Decl.") Ex. A at 2. Counsel for defendant
Ana further states that "[i]n betrayal of trust and violation of fiduciary
duties, in an attempt to convert Ana's business and property to [themselves,
plaintiffs] added [their] personal names to legal documents and filings that
[plaintiffs] promised to file in Ana's name." *Id.*

[7] According to plaintiffs, defendant Polina was responsible for issuing
weekly newsletters to the customers and submitting websites to search engines.
Vadim Decl. ¶ 13. Defendant Ana was responsible for finding public domain
designs and arranging for them to be digitized by outside contractors. *Id.*
Plaintiff Inga was responsible for bookkeeping, customer support, shipping,
tracking inventory, and website maintenance. Vadim Decl. ¶ 13. Plaintiff
Vadim was responsible for all computers, technical and programming issues,
dealing with Customs, and arranging for the transportation and delivery of
imported embroidery supplies. *Id.*
    Defendant Ana disputes plaintiffs' characterization of her work in the
business, arguing that her creative work resulted in copyrightable embroidery
designs. According to defendant Ana, "the production of high quality

plaintiffs were essentially their employees, Declaration of
Polina Dolginov ("Polina Decl.") ¶ 3; Ana Decl. ¶¶ 6, 22, and
that defendant Ana paid plaintiffs "regular salaries."  Ana Decl.
¶¶ 22, 24. Plaintiffs state that neither defendant ever paid
plaintiffs or controlled payments to them.[8]  Vadim Decl. ¶ 10.

By October of 2005, plaintiffs state that almost all of the
money from the embroidery business flowed through ABC Inc.'s bank

_____

embroidery designs requires creativity, skill, expertise, experience and
artistic choices.  In preparing such works an artist must analyze an image and
divide it into objects and layers in order to select colors and shading that
best portray the image or reflect a particular mood.  Moreover, an artist must
select fabric and embroidery threads that are most suitable for a particular
design. . . . Once a design-image is created, it is the turn of the digitizing
process to begin.  The process of digitizing does not include any creativity
or artistic choices . . . the digitizer is analogous to a printing press that
prints an original novel written by an author."  Ana Decl. ¶¶ 30-32.  *See also*
Supplemental Declaration of Ana Bove ("Ana Supp. Decl.") ¶¶ 15-19.
    Plaintiff Inga, however, submits that defendant Ana's description is an
inaccurate overstatement of defendant Ana's involvement in the creation of the
embroidery designs.  According to plaintiff Inga, to make the embroidery
designs, defendant Ana -- and sometimes others, including plaintiff Inga --
would simply select pre-existing illustrations which were then digitized by
outside contractors.  Supplemental Declaration of Inga Mikhlyn ("Inga Supp.
Decl.") ¶ 13.  When color addition was necessary, the digitizers would often
add the color themselves.  *Id.* ¶ 15.  In addition, plaintiff Inga states that
defendant Ana's thread and fabric selections were merely recommendations to
customers, not part of the embroidery designs.  *Id.* ¶ 16.  Finally, plaintiffs
state that ABC Inc. paid for the digitization of many of the designs.  Vadim
Decl. ¶ 48; *see also id.* Ex. J (ABC Inc. accounting records related to payment
for digitizing services).

    [8] When plaintiffs withdrew compensation, plaintiffs state that they
wrote checks to themselves from the ABC Inc. bank account.  Vadim Decl. ¶ 12.
Plaintiffs state that they sometimes wired money to defendants Ana and Polina,
and defendants Ana and Polina sometimes took money directly from a related
PayPal account.  *Id.*
    Defendant Ana contends that certain transactions recorded on various
statements correspond to salary payments to plaintiffs. Ana Supp. Decl. ¶ 11;
*see also id.* Ex. A.  Plaintiff Vadim denies that these transactions were
salary payments, stating that they "represent Ana's reimbursement to
[plaintiffs] for [plaintiffs'] payment of [defendant Ana's] tuition at an
Israeli college and money she wanted [plaintiffs] to pass through to
[defendant Ana's] parents."  Vadim Supp. Decl. ¶¶ 6-8.  I note, however, that
the bank and PayPal records do not themselves make clear the purpose of the
transactions -- i.e., whether the transaction constituted an expenditure for
supplies, payment to a vendor, a salary expense, etc.

account, for which plaintiffs state only they had signing authority.[9]  *Id.* ¶ 10.  Defendant Ana concedes that "to [her] detriment, [she] . . . entrusted [her] cousins with maintaining records for the company and managing the company's bank accounts."[10]  Ana Decl. ¶ 23.  By 2006, plaintiffs Vadim and Inga state that they worked full time in the alleged partnership, which had become their only source of income.  *Id.* ¶ 12.  They further state that they contributed nearly $200,000 of their income from plaintiff Vadim's consulting work to the business.  Inga Supp. Decl. ¶ 10; *id.* Ex. E (ABC Inc. accounting records and bank deposit receipts showing deposits of funds allegedly derived from plaintiff Vadim's consulting business and deposited into ABC

---

[9] When customers paid for purchases with credit cards, the payments were forwarded to the ABC Inc. bank account.  *Id.*  Plaintiffs and defendants all had access to the websites, however, as well as to the related PayPal and merchant accounts set up to receive payments from customers.  *Id.*

[10] Together with their applications, plaintiffs and counterclaimants submit ABC Inc. and PayPal account business records in an effort to demonstrate how funds flowed through the business.  *See, e.g.*, Vadim Decl. Exs. D, J; Ana Decl. Ex. I, Ana Supp. Decl. Exs. A, B, F.  Defendant Ana provides a somewhat confusing account of the interrelation between the ABC Inc. bank accounts and the PayPal accounts, appearing to assert that most business transactions occurred between the various PayPal accounts rather than through the intermediary of ABC Inc.'s bank accounts, which plaintiffs control.  *See* Ana Supp. Decl. at ¶¶ 3-11.  In her supplemental declaration, plaintiff Inga attempts to clarify the financial and accounting structure of the business.  Inga Supp. Decl. ¶¶ 2-9.  I note, however, that PayPal accounts are not bank accounts, and that the use of a PayPal account requires the use of a bank account.  To withdraw money from a PayPal account, the account holder must request either a check or electronic transfer of the money into a linked bank account.  *See generally* www.paypal.com (click on "help," then "how do I receive money?") (last visited on Sept. 18, 2008).  Deposits into a PayPal account work in a similar way:  money may be electronically transferred into a PayPal account either from a bank account or by use of a credit card. *See id.* (click "send money") (last visited on Sept. 18, 2008).  Therefore, I find that it is entirely consistent that identical transactions at times appear both on ABC Inc.'s bank statements and on various associated PayPal accounts.

Inc.'s bank account). Defendant Ana also states that she and defendant Polina contributed $146,566.32 to the business. Ana Supp Decl. ¶ 27; *see also id.* Ex. F (spreadsheet of unknown origin tracking alleged capital contributions from defendants, along with PayPal money transfer confirmations and Spanish-language money order receipts allegedly documenting capital contributions). Plaintiffs and defendants dispute the nature, validity and amount of each other's capital contributions to the business. Ana Supp. Decl. ¶ 27; Ana Supp. 2d Decl. ¶ 7; Inga Supp. Decl. ¶ 11.

In June of 2004, plaintiffs state that along with defendants, they decided to expand the business to include embroidery supplies as well as designs.[11] Vadim Decl. ¶ 16. Plaintiffs state that they took all the steps necessary to set up this new line of business, from sourcing the supply, to warehousing, transportation, packaging and shipping. *Id.* ¶ 17. In connection with this new line of business, plaintiffs state that they filed for and obtained the trademark "ThreaDelight," registering all four individual plaintiffs and defendants as

---

[11] Defendant Ana states that the embroidery supplies side of the business was not new in 2004. According to defendant Ana, the business expanded to include the sale of embroidery supplies in 2003, while the business was run from Israel and before she had made "any work contact with the [plaintiffs]." Ana Decl. ¶¶ 19-21. She does not dispute, however, that plaintiffs managed the United States presence of the business and ultimately warehoused all embroidery supplies sold over the Internet. Ana Decl. ¶ 23.

joint owners.[12]  *Id.* ¶ 18.  Until the events giving rise to this lawsuit, plaintiffs and defendants agree that the sale of embroidery supplies represented about 70% of the income of the business.  *Id.*; Ana Supp. Decl. ¶ 29.

Plaintiffs allege that the online embroidery business grew dramatically, establishing a favorable reputation and a loyal following.  Complaint dated August 18, 2008 ("Compl."), ¶ 22. The alleged partnership spent over $41,000 advertising the "ABC" domain names between 2004 and 2008, and sales tripled during that time.  *Id.* ¶ 23.  The business now has more than 250,000 registered users in its database.  *Id.*  Plaintiffs allege that most of these users have become accustomed to using the business through the "ABC" domain names.  *Id.* ¶ 24.

Due to concern about potential legal conflicts with other "ABC" businesses, plaintiffs state, and defendants dispute, that plaintiffs and defendants decided to come up with a new trade name which would nevertheless maintain an association with the existing and popular "ABC" brand.  Vadim Decl. ¶¶ 20-21. Plaintiffs state that they quickly realized that the letters "ABC" corresponded to defendant Ana's initials, and that although defendant Ana was initially hesitant to have her name associated

---

[12] Defendant Ana appears to contend that she is the sole owner of the trademark "ThreaDelight."  Inga Decl. Ex. A at 2.  United States Patent and Trademark Office records show, however, that all four individual plaintiffs and defendants are listed as owners of the mark, which was registered as of May 9, 2006.  *See* http://tess2.uspto.gov/bin/showfield?f=doc&state=n443fv.2.1 (last visited Sept. 18, 2008).

with the web site, she eventually agreed to the use of the name "Anna Bove Collections."[13]   *Id.* ¶ 22.   Plaintiffs state that they and defendants decided to change "Ana" to "Anna" because they thought that "Anna" was the more common and appealing spelling of the name in their target market.   *Id.;* Inga Decl. Ex. A at 1. Plaintiffs then registered two new domain names, AnnaBoveCollections.com and AnnaBoveCollection.com, and plaintiffs and defendants thereafter began to advertise and promote the business and its products under the name "Anna Bove Collections."   Vadim Decl. ¶ 23.   Plaintiff Vadim states that he is the registered owner of the two "AnnaBove" domain names, and that he also registered "Anna Bove Collections" as a d/b/a name for the corporation, ABC Inc.[14]   *Id.; see also id.* Ex. C (filing receipt for registration of "Anna Bove Collections" as assumed

---

[13] Counsel for defendant Ana disputes plaintiffs' version of the facts, stating that the "[l]etters ABC, prominent in the domain names were intended as abbreviation of Ana's name and mark 'Anna Bove Collections.'"   Inga Decl. Ex. A at 1; *see also* Def.'s Memo at 20 ("Anna [sic] Bove started using her name identifying herself as the designer before the [plaintiffs] got involved.").   Notably, defendant Ana herself does not state in her declarations that she used "Anna Bove" in connection with the "ABC" business before plaintiffs became involved, nor have the parties submitted any evidence that there was use of the name in the "ABC" business prior to plaintiffs' involvement.   For their part, plaintiffs state that the use of "ABC" in the first domain names registered for business, ABC-Cross-Stitch-Patterns.Com and ABC-Embroidery-Designs.Com, did not signify an abbreviation for "Anna Bove Collections."   Vadim Decl. ¶ 19.   They state that names like "ABC" or "123" are popular for web-based businesses because they are likely to be part of search engine queries and, therefore, are likely to steer potential customers to the sites.   *Id.*

[14] Defendant Ana states that plaintiffs "misled [her] into believing that they incorporated Anna Bove Collections, Inc. for [defendant Ana's] benefit," Ana Decl. ¶ 26, and did not inform her that they had registered "Anna Bove Collections, Inc." as a d/b/a name for ABC Inc.   Ana Supp. Decl. ¶ 6.

name for ABC Inc., listing plaintiff Vadim as filer).  However,
plaintiff Vadim further states that plaintiffs consider the
"AnnaBove" domain names to be the property of the alleged
partnership.  *Id.* ¶ 28.  Although the alleged partnership used
the name "Anna Bove Collections" for the business and its
products going forward, it kept the two "ABC" web sites open
because of their popularity and, until the events leading to this
action, plaintiffs state that they were the largest source of
income for the alleged partnership.  Cplt. ¶ 30.

Plaintiffs state that defendant Ana's parents lived with
them from 2004 to May 2008, and that defendant Ana moved from
Israel into their house in Brooklyn in March 2006.  Vadim Decl.
¶ 29.  In 2006 and again in 2007, plaintiffs state that they and
their children became aware that defendant Ana was using illegal
drugs.[15]  *Id.* ¶¶ 30-31.  During this time, plaintiffs state that
defendant Ana's appearance and behavior changed dramatically.
*Id.* ¶ 32.  She became extremely thin and prone to periods of rage
and paranoia that "frightened everyone in the house including her
own parents." *Id*.  She also became less productive and involved
in the business.  *Id.*

In June of 2007, plaintiffs state, and defendants dispute,
that defendant Polina decided to leave the partnership to start a

---

[15] Defendant Ana denies this allegation but does not otherwise respond
to it.  Defendants' Answer, Affirmative Defenses and Counterclaims ("Answer")
¶¶ 34-35.

new, unrelated business.[16]  *Id.* ¶ 25.  Plaintiffs state that they

and defendants agreed to a buyout amount for defendant Polina of

$30,000, with a payment schedule of $1,000 per month.  *Id.*

Plaintiffs state that as part of the buyout agreement, defendant

Polina also agreed to transfer the "ABC" domain name

registrations to plaintiff Vadim.  *Id.* ¶ 26. In support of their

statements, plaintiffs attach an alleged invoice showing $30,000

owed by ABC Inc. to defendant Polina as of July 1, 2007, for

"leave the company settlement, including domain transfers," and

noting "[s]ettlement amount to be paid $1000 per month."  *Id.* Ex.

D (ABC Inc. invoice and ABC Inc. accounting statements allegedly

relating to buyout amount and payment schedule).  Defendants

protest that plaintiffs have falsified the alleged invoice.[17]

---

[16] Defendants maintain that defendant Polina has been working with
defendant Ana since the inception of the business, and that she is still
working with defendant Ana.  Polina Decl. ¶ 2; Ana Decl. ¶ 14; Supplemental
Declaration of Polina Dolginov ("Polina Supp. Decl.") ¶ 3 (stating that "The
[plaintiffs'] claims that [defendant Polina] left the business and that
[defendant Polina] sold [her] share of the business are both patently false").

[17] Defendant Polina states that she "did not prepare the invoice listed
in Exhibit D of Plaintiff Vadim Mikhlyn's Affidavit, nor did [she] authorize
anyone to do so on [her] behalf."  Polina Decl. ¶ 4.  She also points out that
the address on the invoice contains two vital errors, which she "would not
make," and that the street address on the FedEx envelope she received from
plaintiffs' attorney contains the exact same errors, leading her to believe
that plaintiffs were the authors of the allegedly forged invoice.  *Id.* ¶¶ 5-7.
She further states that the errors were so egregious that "FedEx had to call
[her] to obtain [her] correct address, given that they could not find [her]
apartment based on the address they were given."  *Id.* ¶ 8.
    In response, plaintiff Vadim states that "the invoice, as with others
just like it, is an internally generated document for tax purposes.  It was
created when [defendant] Ana negotiated the separation payment deal with
[defendant] Polina.  Similar invoices from the business going back to 2006
have the same address for [defendant] Polina."  Vadim Supp. Decl. ¶ 13, *see
also id.* Ex. F (ABC Inc. invoice dated July 10, 2006, showing same address in
Israel for defendant Polina).
    I note, however, that the alleged invoice, even if authentic, is

Ana Decl. ¶ 36; Polina Decl. ¶ 4. Plaintiffs also attach an

email (the original of which is in Russian) that appears to have

been sent from defendant Polina to plaintiff Inga on March 29,

2008, asking plaintiff Inga to pay her "compensation a bit

faster, otherwise [she would have] no resources left for

developing new business." Vadim Decl. Ex. F. Defendants contend

that plaintiffs are attempting to mislead the Court by

selectively translating the email chain; a previous email from

plaintiff Inga to defendant Polina allegedly demonstrates that

plaintiff Inga was to pay defendant Polina for past work, not

pursuant to a buyout agreement.[18] Ana Decl. ¶ 38.

Plaintiffs state that following the buyout agreement,

defendant Polina gave defendant Ana the user names and passwords

to the "ABC" sites, and that defendant Ana then forwarded them to

plaintiff Vadim. Vadim Decl. ¶ 26; *see also id*. Ex. E (chat log

dated June 22, 2007 between plaintiff Vadim and defendant Ana

---

inadmissible hearsay. Unlike the document in Exhibit F of Plaintiff Vadim's
supplemental declaration -- which on its face, since it concerns various "web
development" and "web optimization" charges, appears to relate to a regularly
conducted business activity and to have been made in the ordinary course of
business -- the invoice relating to the alleged partnership buyout agreement
does not concern a regularly conducted business activity. Therefore, it would
not fall within the business records exception to the hearsay rule. *See* Fed.
R. Evid. 803(6).

[18] Defendants attach a translation of the missing portion of the email
chain. Ana Decl. Ex. M. The email from plaintiff Inga to defendant Polina
states, in relevant part: "Polina, [i]t was you who originally discussed and
negotiated the separation with Ann. All payment instructions for your work
and your mother's work were given to me by Ann." *Id*. The translator notes
that the word translated as "separation" above, "raskhod," can be translated
either as "separation" or "expenses." The translator does not specify why she
chose to translate the word as "separation" in this context. *Id*.

demonstrating Ana's knowledge and acceptance that Vadim had "taken over all the domains"). Plaintiff Vadim states that with the passwords and usernames provided by Polina, he transferred the "ABC" domain names to his web hosting account, where he also kept the "AnnaBove" domain names. *Id.* ¶ 27. Plaintiff Vadim further states that although the "ABC" domain names were transferred to his control, he considered them to be the property of the alleged partnership. *Id.* ¶ 28. By contrast, defendant Ana states that the "ABC" domain names belong to both herself and defendant Polina. Ana Decl. ¶¶ 14, 41.[19]

Plaintiffs state that in February 2008, they warned Ana that she had to stop her drug use or leave the house. Vadim Decl. ¶ 33. Defendant Ana allegedly promised to stop, but did not. *Id.* Thereafter, in late March 2008, plaintiffs state, and defendants dispute, that defendant Ana abruptly decided to leave the business to start her own line of embroidery monogramming, which would not be competitive with the partnership business.[20] *Id.* ¶ 34; *see also id.* Ex. F (March 29, 2008 email (original in Russian) from defendant Polina to plaintiff Inga stating "[n]ow

_____

[19] Defendant Ana states that the username and passwords for the "ABC" domain names were given to plaintiffs "for the sole purpose of transferring the websites to a new platform," Inga Decl. Ex. B at 3, but that plaintiffs used the usernames and passwords to "lock [defendant Ana] out of the domains." Ana Supp. Decl. ¶ 22. Thereafter, defendant Ana states that the username, passwords, and all contact information for the "ABC" domain names were changed without either her or defendant Polina's knowledge or consent. Inga Decl. Ex. B at 3; Ana Supp. Decl. ¶ 22, 24.

[20] Defendant Ana denies this allegation. Answer ¶ 37.

Anna [sic] told me that she's leaving the business," and that "therefore, [plaintiff Inga is] the one [defendant Polina] should be talking to now" concerning payment). As compensation for her share of the business, defendant Ana allegedly "demanded 50% of all gross design sales indefinitely." *Id.* Plaintiffs state that while defendant Ana's demand was "exorbitant and unrealistic," they were willing to resolve their disagreement through mediation, but defendant Ana refused. *Id.* ¶ 35.

Defendant Ana states that in March of 2008, she became aware that plaintiffs had "misappropriated" defendants' business activities by gaining sole control of the business Internet sites in June of 2007. Ana Decl. ¶¶ 41-42. In addition, defendant Ana states that plaintiffs removed her profile from the e-Bay store and "locked her out." *Id.* ¶ 43. According to plaintiff Vadim, however, on the evening of March 31, 2008 plaintiff Vadim discovered that defendant Ana had changed the password on the business' eBay account. *Id.* ¶ 37. Although he called customer service to restore it, he states that defendant Ana's actions disrupted service to the alleged partnership's customers for a whole day. *Id.* On the same day, plaintiff Vadim learned that defendant Ana had registered a new domain name, Anabove.com. *Id.* ¶ 38. On April 1, 2008 plaintiffs state that they asked defendant Ana to move out of their house. *Id.* ¶ 39.

In May of 2008, Ana registered another domain name,
AnnaBoveEmbroidery.com, and created two New York business
entities, Anna Bove Company, LLC and Anna Bove Collections, Inc.
*Id.* ¶ 41. The latter company name is the same as the d/b/a name
plaintiffs had registered for ABC Inc. in June 2005. *Id.* In
July of 2008, defendant Ana created one more New York
corporation, Anna Bove Embroidery Supplies, Inc. *Id.*

On May 14, 2008, plaintiffs received a "cease and desist"
letter from counsel for defendant Ana, demanding the cessation of
all activities of the business, payment to Ana of "at least one
million dollars ($1,000,000)" and an accounting of ABC Inc. *Id.*
¶ 42; *see also* Inga Decl. Ex. A (copy of letter dated May 12).
In the letter, counsel for defendant Ana also states that
"[b]eing the original creator," defendant Ana is the "owner of
the proprietary copyright and trademark rights in the entire
content of [the 'ABC' and 'AnnaBove'] domain names, including,
but not limited to, the domain names, website designs and code,
embroidery designs, stitch patterns and marks, including the
'ThreaDelight' mark." Inga Decl. Ex. A at 1. Plaintiffs dispute
this claim, stating that defendant Ana's claimed copyright in the
embroidery designs is contradicted by the records of ABC Inc.,
which show that all of the business' design work was contracted
out by ABC Inc. to third parties in China and paid for by ABC
Inc. Vadim Decl. ¶ 48; *see also id.* Ex. J (2004-08 ABC Inc.

accounting records relating to payment for digitizing services).
Defendant Ana counters that plaintiffs fundamentally
misunderstand the process of creating design patterns, which
involves substantial creativity before the manual implementation
is contracted out to others.  Ana Supp. Decl. ¶¶ 15-18, *see also*
*supra* n.7.  It is undisputed, however, that no copyright has been
registered for the embroidery designs.[21]

On June 27, 2008, plaintiffs received notice that defendant
Ana had commenced an arbitration before the National Arbitration
Forum ("NAF"), the arbitration venue for domain name disputes,
seeking control of the "ABC" domain names.  *Id.* ¶ 44.  The
arbitration petition was dismissed, but plaintiffs state that
through the proceeding, defendant Ana discovered that defendant
Polina was still the owner of record of the two "ABC" domain
names.  *Id.* ¶ 45.  Plaintiff Vadim states that after taking all
other steps necessary to assume control of the "ABC" domain
names, he forgot to substitute his name for defendant Polina's as
the registered owner.  *Id.*  Plaintiffs state that defendant Ana
"must have struck a deal with Polina because Ana has obtained
control of the ABC sites."  *Id.* ¶ 46.  Plaintiffs further state
that the e-mail address of record for the "ABC" sites was changed
from plaintiff Vadim's to defendant Polina's, and that both

---

[21] Defendant Ana has recently registered a copyright for the design of
the "ABC" website that displays the embroidery designs, as set forth in more
detail below.

domains were transferred to Polina's web hosting account. *Id.;*
*see also id.* Ex. G (email receipt confirming change of e-mail
address of record and hosting account transfer). Defendant Ana
does not dispute that she regained control of the "ABC" domains
following the filing of the NAF complaint, Ana Decl. ¶ 47, but
argues that her actions were intended "to take back [defendants']
business." *Id.* ¶ 46.

On August 18, 2008, plaintiffs filed their Complaint in this
action. On August 25, 2008, a copyright was registered in the
names of "Anna Bove" and "Anna Bove Company, LLC," Ana Decl. Ex.
E, in connection with the web design of the "ABC" sites. *Id.* ¶
34. Plaintiffs contend that this copyright registration is
invalid, as defendant Ana misrepresented key facts to the United
States Copyright Office.[22]

---

[22] The copyright registration states that defendant Ana is the author of
"2-D artwork" and the "text." Ana Decl. Ex. E. Plaintiffs state that
defendant Ana's knowledge of the English language is limited, however, and
assert that the text was actually written by plaintiff Inga and defendant
Polina. Inga Supp Decl. ¶ 19. Plaintiff Inga also states that she created
the layout of the site pages describing the individual products for sale, as
well as elements of the home page. *Id.* ¶ 20. Further, the registration
certificate lists the date of first publication of the website as March 25,
2008, but as plaintiffs point out, the website has existed since 2003.
Plaintiffs' Reply Memorandum of Law ("Pl.'s Reply Memo.")at 11. In addition,
at oral argument on September 25, 2008, counsel for plaintiffs pointed out
that the CD-Rom submitted to the United States Copyright Office in support of
defendant Ana's application for her website copyright contains images of other
CD-Roms, which were sent to "ABC" customers, that bear a copyright notice
indicating that ABC All Consulting Inc. is the copyright holder. Transcript
of September 25 Proceedings ("Tr.") at 6; *see also* Ana Decl. Ex. G (copy of
CD-Rom submitted to the Copyright Office). Finally, counsel for plaintiffs
also pointed out that in archived copies of the "ABC" websites, as available
via www.webarchive.org, plaintiff Inga's name appears in the "About Us"
section. Tr. at 8-9.
    Counterclaimants respond to some of these allegations in their brief,
though not in their affidavits. They maintain that plaintiff Inga's only
possible contribution to the website design was suggesting the addition of the

Defendant Ana states that she now realizes that plaintiffs had been planning to steal her business, *id.* ¶ 40, and that plaintiffs had been using business funds "for their personal benefit including to pay their mortgages, home improvements and two cars." *Id.* ¶ 36. She states that shortly after defendants gained control of the "ABC" domains, plaintiffs began giving away "ABC" designs for free on other sites under plaintiffs' control. *Id.* ¶ 48. Because plaintiffs maintain control of the business inventory of embroidery supplies, defendant Ana states that plaintiffs profit to her detriment by selling embroidery supplies to customers who have downloaded free "ABC" designs. *Id.* Moreover, defendant Ana states that plaintiffs have contacted "ABC" customers and asserted that plaintiffs own the company. *Id.* ¶ 51. Defendant Ana argues that plaintiffs should be stopped from using any of the "ABC" designs, as well as from using her name or the "ABC" designation on any sites under their control. *Id.* ¶¶ 52-53. She further argues that many of plaintiffs' websites are copied from the website that is the subject of her

---

"most popular design" feature on the home page, but note that defendant Ana denies that plaintiff Inga ever made such a suggestion. Counterclaimants' Responsive Memorandum of Law ("Def.'s Reply Memo") at 3. They maintain that the date of first publication is accurate, as "March 2008 is the date the last collection was added to the website and therefore is the correct publication date of the catalogue as a whole." *Id.* at 4 n.4. Finally, they state that the "ABC All Consulting Inc." copyright notice on the CD-Rom was listed on a CD-Rom containing embroidery files, not on the website, which is the subject of the copyright registration. *Id.* at 4.

registered copyright, and that plaintiffs' use of the sites constitutes copyright infringement.

For their part, plaintiffs state that defendant Ana, with defendant Polina's cooperation, has not only taken over the "ABC" sites that belong to the alleged partnership, but is also using her power to defame plaintiffs and to destroy the "ABC" sites' goodwill by redirecting all would-be visitors to the "ABC" sites to defendant Ana's newly registered sites. Vadim Decl. ¶ 47. Defendant Ana's new website describes plaintiffs as her "ex staff, who attempted to grasp the sites and business, and it has been under their full control for several months." *Id.* ¶ 47; *see also id.* Ex. H (copy of first page of AnnaBoveEmbroidery.com, dated Aug. 14, 2008). In an email to customers, defendant Ana stated that plaintiffs attempted to "take illegal control of [her] websites and businesses" and are distributing her designs "illegally." *Id.* ¶ 47; *see also id.* Ex. I (copy of July 29, 2008 email from "AnnaBoveEmbroidery.com" to "truth_truth@hotmail.com" containing quotations cited *supra*); Ex. L (guestbook on AnnaBoveEmbroidery.com in which customers congratulate defendant Ana and exhort her to "[k]eep fighting, don't let the 'bad guys' win"). Plaintiffs state that contrary to defendant Ana's assertions, the only thing that changed in the last several months was plaintiffs' eviction of defendant Ana from their home

and defendants' "surreptitious and unlawful seizure of the ABC sites." *Id.* ¶ 50.

Plaintiffs state that defendant Ana's claim that she owns all domain names, sites, and intellectual property rights related to the business have caused significant confusion among "ABC" customers. *Id.* ¶ 51; *see also id.* Ex. J (customer emails expressing confusion as to whether defendant Ana's new websites are related to the "ABC" sites). They further state that if defendants are not stopped immediately, they will destroy the "ABC" sites' goodwill, plaintiffs' personal goodwill with customers, and plaintiffs' rights in the business. *Id.* ¶ 54. Accordingly, plaintiffs seek a preliminary injunction against defendants, and counterclaimants cross move for a preliminary injunction against plaintiffs.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 65(a), a preliminary injunction is appropriate if the movant shows (a) irreparable harm and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Gold v. Feinberg*, 101 F.3d 796, 800 (2d Cir. 1996).

Irreparable Harm

Irreparable harm is an "injury for which a monetary award cannot be adequate compensation." *Jayaraj v. Scappini,* 66 F.3d 36, 39 (2d Cir. 1995) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).  Irreparable harm "must be shown by the moving party to be imminent, not remote or speculative."  *Reuters Ltd. v. United Press Intern, Inc.,* 903 F.2d 904, 907 (2d Cir. 1990) (citing *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 972 (2d Cir. 1989)).  The movant is required to establish not a mere *possibility* of irreparable harm, but that it is "*likely* to suffer irreparable harm if equitable relief is denied."  *JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990) (emphasis in original).  "Likelihood sets, of course, a higher standard than 'possibility.'" *Id.*

Plaintiffs allege that they will be irreparably harmed if defendants continue to destroy the "ABC" sites' goodwill and to defame plaintiffs by claiming exclusive ownership of the "ABC" sites, as well as claiming that plaintiffs' sales of designs paid for by ABC Inc. are unlawful.  It is true that the loss of customer goodwill constitutes an irreparable injury.  *Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F.Supp.2d 525, 532 (S.D.N.Y. 2004).  As the Second Circuit has explained, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client

that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69-70 (2d Cir. 1999); *see also Velo-Bind, Inc. v. Scheck*, 485 F.Supp. 102, 109 (S.D.N.Y. 1979) ("What is at stake here is plaintiff's good will built up over the years, which is not, contrary to defendant's assertion, monetarily ascertainable."). However, for reasons explained *infra*, I conclude that plaintiffs have not established that they have rights to the "ABC" sites. Therefore, they have not shown that destroying the "ABC" sites' goodwill would likely constitute irreparable injury to them. I note, however, that plaintiffs also own and control a number of competing sites that sell "ABC" designs, and I find that defendants' public statements asserting that plaintiffs' operations on those sites are illegal are likely to harm the goodwill of those sites. Accordingly, plaintiffs have shown that they are likely to suffer an irreparable injury absent injunctive relief.

Counterclaimants, for their part, note that a prima facie case of copyright infringement will give rise to a presumption of irreparable harm, *ABKCO Music, Inc., v. Stellar Records, Inc.*, 96 F.3d 60, 64 (2d Cir. 1996), as will the demonstration of likelihood of confusion on a trademark infringement claim. *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 735-35 (2d Cir. 1978). As set forth *infra*, however, because

counterclaimants have not made out a prima facie case for copyright or trademark infringement, I conclude that they have not demonstrated a likelihood that they will suffer irreparable injury absent equitable relief.

Likelihood of Success on the Merits

Plaintiffs assert that they are likely to succeed on the merits of their claims of trademark infringement, unfair competition under the Lanham Act, and conversion. Counterclaimants argue that they are likely to succeed on the merits of their claims for copyright infringement, trademark infringement, and cybersquatting. I consider each of these claims in turn below.

*1. Plaintiffs' Claim for Trademark Infringement*

Plaintiffs' claims of trademark infringement are brought under the federal trademark law for false designation of origin, 15 U.S.C. § 1125(a). Section 1125(a)(1) protects unregistered marks against infringement. *Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir. 1997). To prevail on a claim of trademark infringement, "the plaintiff must show, first, that its mark merits protection, and second, that the defendant's use of a similar mark is likely to cause consumer confusion" as to the origin, sponsorship, or affiliation of the defendant's goods. *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 129-30 (2d Cir. 2004) (quoting *Gruner + Jahr USA Publ'g v.*

*Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993)). As a threshold matter, plaintiff must also establish its ownership of -- or superior right to use -- the mark in question. *See P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.*, 462 F.2d 134, 136 (2d Cir. 1972); *Pan Am. World Airways, Inc. v. Flight 001, Inc.*, No. 06 Civ. 14442, 2007 WL 2040588, at *7-11 (S.D.N.Y. 2007).

Here, plaintiffs have not established that they own or have a superior right to use the "Anna Bove" and "ABC" collection of marks. Plaintiffs rest their claim on an allegation that these marks are the property of an alleged partnership between themselves and defendants. Defendants, however, assert that while the two defendants were indeed partners, plaintiffs were defendants' employees.

In New York, when there is no written partnership agreement between putative partners, the Court must analyze the different facets of the parties' relationship to determine existence of a partnership in fact. *Brodsky v. Stadlen*, 526 N.Y.S.2d 478, 479 (2d Dept. 1988). Among the characteristics the Court may consider are (1) the intention of the parties, (2) the sharing of profits and losses, (3) joint management and control of the business, (4) compensation, (5) contributions of capital, and (6) ownership of partnership assets. *Id.* The party alleging a partnership bears the burden of proof on this issue. *See Blaustein v. Lazar, Borck & Mensch*, 161 A.D.2d 507, 508 (1st

Dept. 1990). The existence of a partnership can be inferred through circumstantial evidence. *See Sacco v. Iselin*, No. 84 Civ. 877, 1986 WL 14908, at *3 (S.D.N.Y. Dec. 19, 1986).

With respect to the parties' intentions, the parties dispute whether they intended to form a partnership. Neither party has made any showing of statements or actions consistent only with the intent to form or the existence of a partnership. While the parties' history of email and chat communications shows that the parties worked closely together, it does not establish that they intended to form a partnership.

With respect to the sharing of profits and losses, almost all of the money flowing into and out of the business passed through the bank account of ABC Inc., over which only plaintiffs had authority. Plaintiffs wrote checks to themselves from the ABC Inc. account, and defendants Polina and Ana sometimes took money from associated PayPal accounts as compensation. There is no evidence, however, that the parties ever agreed to share losses. While a profit-sharing arrangement should be considered, "[i]t is not decisive. It may be merely the method adopted to pay a debt or wages, or interest on a loan or for other reasons." *Martin v. Peyton*, 246 N.Y. 213, 218 (N.Y. 1927).

On the subject of ownership and control, plaintiffs point to their ownership of ABC Inc. and its bank accounts as evidence of their control of the business, as well as the joint registration

of the "ThreadDelight" trademark, which lists all four individual
plaintiffs and defendants as holders.  Plaintiffs also rely on a
document purporting to reflect an agreement to convey defendant
Polina's interest in the "ABC" websites to plaintiff Vadim.  The
document is, however, inadmissible hearsay.  *See* *supra* n.17.
Finally, both sides point to the absence of documentary evidence
(such as tax records, W2's, etc.) supporting either defendants'
contention that defendants own and control the business, or
plaintiffs' claim to ownership or control.  Defendant Ana
concedes, however, that she allowed plaintiffs to handle funds
and accounting for the company, and that to this extent they
managed the business.

    With regard to compensation, neither defendants nor
plaintiffs were compensated as salaried employees.  Defendants
point to certain transactions in company records and allege that
they are salary payments to plaintiffs, but the records
themselves do not corroborate defendants' allegation.

    Both plaintiffs and defendants have alleged that they
contributed monetary capital to the business, supporting their
statements with documentary evidence.  Both dispute the nature,
amount of, and existence of each others' capital contributions.

    Finally, with regard to ownership of assets, plaintiffs
maintain that they alone own and control ABC Inc., and defendant
Ana contends that she and her companies alone hold a copyright

registration certificate in connection with the web design of the "ABC" sites.  The only evidence of joint property is the "ThreaDelight" trademark, which is registered to both plaintiffs and defendants.

Considering all of the above elements together, I find that plaintiffs have not met their burden of establishing the existence of a partnership in the absence of a written agreement.[23]  Because plaintiffs have not established that a partnership exists, they likewise have not shown that they have rights to the "Anna Bove" and "ABC" marks.  Therefore, plaintiffs have not established a likelihood of success on their claim for trademark infringement.

---

[23] Defendants contend that even if a partnership existed between plaintiffs and defendants, that partnership was dissolved when defendant Ana allegedly expressed her intent to leave the partnership.  *Forbes v. Six-S Country Club*, 12 A.D.3d 1049, 1051, 2004 N.Y. Slip Op. 08363, at *2 (4th Dept. 2004) ("[A]n oral agreement to form a partnership for an indefinite period creates a partnership at will.  Such a partnership at will may be dissolved at any time by any partner, when any of the partners expresses an intent not to continue longer") (internal citations omitted).  Because I find that plaintiffs have not shown a likelihood of establishing the existence of a partnership, I need not consider this argument.  Apart from defendants' submission on the partnership dissolution issue, both parties have had an equal opportunity to address partnership issues in their moving and reply papers on their own motions and their opposition papers on the motions against them.  Accordingly, plaintiff's October 6, 2008 request for a further opportunity to respond to defendants' partnership arguments is denied.

I note, however, that neither party addresses the impact -- if any -- the incorporation of ABC Inc. had on the existence of the alleged partnership.  "[T]he rule is well settled" in New York "that a joint venture may not be carried on by individuals through a corporate form."  *Weisman v. Awnair Corp. of Am.*, 3 N.Y.2d 444 (N.Y. 1957).  Indeed, when parties form a corporation to carry out the business of a partnership, they cease to be partners.  *Berke v. Hamby*, 719 N.Y.S.2d 280, 281 (2d Dep't 2001); *Notar-Francesco v. Furci*, 539 N.Y.S.2d 800, 801 (2d Dep't 1989).  However, because I find that plaintiffs have not met their burden of establishing the existence of a partnership, I need not address this issue.

*2. Plaintiffs' Claim for Unfair Competition*

In order to establish unfair competition under the Lanham Act,[24] a plaintiff must show that a defendant:  (1) made false or misleading factual representations regarding the nature, characteristics, or qualities of plaintiff's goods or services; (2) used the false or misleading representations "in commerce"; (3) made the false or misleading representations in the context of commercial advertising or commercial promotion; and (4) made the plaintiff believe that it was likely to be damaged by the false or misleading factual representations.  *Towers Fin. Corp. v. Dun & Bradstreet, Inc.,* 803 F.Supp. 820, 823 (S.D.N.Y. 1992) (citing *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1548-49 (2d Cir. 1991)).

Plaintiffs argue that defendants have made false or misleading factual representations about them and their business services because they have "portrayed, and continue to portray, plaintiffs' goods and services as unlawful and in violation of defendants' rights."  Plaintiffs' Memorandum of Law in Support of

---

[24] 15 U.S.C.A. § 1125(a) provides in relevant part:

(1) Any person who, on or in connection with any goods or services, . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which- . . .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Their Motion for a Preliminary Injunction ("Pl.'s Memo.") at 17.

Although plaintiffs do not specify how defendants have portrayed

their goods and services as unlawful in their memorandum of law,

they have submitted evidence that one or more defendants have

posted the following on the AnnaBoveEmbroidery.com website:

> I apologize for any inconvenience regarding the temporarily
> missing embroidery supplies -- they will be available again
> soon.  There is a short delay with them, because of a
> 'detective story' with some of my ex staff, who attempted to
> grasp the sites and business, and it has been under their
> full control for several months.  Please notice -- all
> designs on annaboveembroidery.com are copyright protected.
> Any other web site offering my designs . . . WITHOUT
> carrying my name AND without being listed as an official
> dealer on annaboveembroidery.com, does NOT have any rights
> to distribute those designs, and is doing so illegally.

Vadim Decl. Ex. H.

Defendants' statement above was posted on the homepage of a

commercial website, amid other statements made for the purpose of

advertising the website's products.  Therefore, it was made "in

commerce" and in the context of commercial advertising.  In

addition, plaintiffs argue that not only did defendants'

statements cause them to believe that they were likely to be

damaged, but that plaintiffs "already know they have been

damaged."  Pl.'s Memo. at 17.

The remaining issue is whether defendants' statements were

false or misleading.  Although I have concluded that plaintiffs

have not established a likelihood that a partnership exists

between themselves and defendants, it does not follow that

plaintiffs' sales (or free giveaways, as the case may be) of any designs that are also offered on sites controlled by defendants is illegal.  The only possible way plaintiffs' sales of the embroidery designs could be illegal is if they constitute trademark or copyright infringement.  Therefore, to succeed on their claim for unfair competition, plaintiffs must prove that their sales do not constitute trademark or copyright infringement.

One element of the prima facie cases for both trademark and copyright infringement is ownership of or a superior right to use a trademark or copyright.  *P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.*, 462 F.2d 134, 136 (2d Cir. 1972) (trademark); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985) (copyright).  As discussed in more detail *infra*, defendants have not shown a likelihood of establishing that they are the employers of plaintiffs, so that any intellectual property rights in the business would inure to them.  However, as discussed *supra*, neither have plaintiffs shown a likelihood of establishing the existence of a partnership between plaintiffs and defendants, so that the intellectual property rights in the business belong to the alleged partnership.  The ownership of the "ABC" business intellectual property is thus unclear.  One possibility is that plaintiffs and defendants jointly own the "ABC" trademarks and copyrights -- as is the case with the ThreaDelight trademark, the

one "ABC" business trademark that is registered.  The record
evidence shows that both plaintiffs and defendants used the "ABC"
family of trademarks in commerce over a period of several years,
with no evidence of any objection prior to the events leading to
this lawsuit.  Defendants registered the "ABC" sites in 2003 and
continue to use them commercially.  Plaintiffs also used the
"ABC" sites, and at one point plaintiff Vadim was the
administrator of those sites.  In addition, copyright notices for
ABC Inc., which plaintiffs control, appear on portions of the
"ABC" websites, as well as portions of the CD-Rom submitted to
the United States Copyright Office in connection with defendant
Ana's copyright application.  The record evidence also shows that
the creation of the website and embroidery designs was, to some
extent, a collaborative effort involving both plaintiffs and
defendants.  Defendant Ana selected and performed any artistic
work necessary on many of the embroidery designs, but ABC Inc.,
plaintiff's company, often paid for the digitizing of those
designs.  Plaintiff Inga maintains that she also selected some of
the designs.  It is possible, therefore, that the "ABC"
trademarks and copyrights are jointly owned by both plaintiffs
and defendants.  In that case, plaintiffs' use of the "ABC"
intellectual property would not constitute trademark or copyright
infringement, and accordingly, plaintiffs' use of the "ABC"

intellectual property would not be illegal and defendants'
statement to the contrary would be false or misleading.

Considering the above factors relevant to the question of
whether plaintiffs' sales of "ABC" designs are illegal, I
conclude that plaintiffs have raised serious questions going to
the merits on their unfair competition claim.  In addition, the
balance of hardships tips toward plaintiffs on this point, as
permitting defendants to continue to characterize plaintiffs'
operations as "illegal" to the public harms plaintiffs more than
requiring defendants to desist would harm defendants.

*3. Plaintiffs' Claims for Conversion*

Conversion is the tort of unauthorized assumption and
exercise of the right of ownership over goods belonging to
another to the exclusion of the owner's rights.  *State v. Seventh
Regiment Fund, Inc.*, 98 N.Y.2d 249, 259 (N.Y. 2002).  A website
is a form of property that can be converted.  *See Astroworks,
Inv., Astroexhibit, Inc.*, 257 F.Supp.2d 609, 618 (S.D.N.Y. 2003).
In general, "equity will not enjoin torts where the remedy at law
is adequate, as it often is." *Galella v. Onassis*, 353 F.Supp.
196, 235-36 (S.D.N.Y. 1972), aff'd in part, rev'd in part on
other grounds, 487 F.2d 986 (2d Cir.1177).  However, where
factors such the imminent threat of continued harm and the
difficulty of evaluating the injury in monetary terms weigh in

favor of the conclusion that a remedy at law is inadequate, a tort may be enjoined. *Id.* at 235-37.

Although it is difficult to value the goodwill of the "ABC" sites in monetary terms, there is certainly precedent for the monetary valuation of the worth of a business. *See, e.g., Lippe v. Bairnco Corp.,* 288 B.R. 678 (S.D.N.Y. 2003) (discussing reliability of expert testimony on monetary valuation of businesses); *Thompson v. C.I.R*, 499 F.3d 129 (2d Cir. 2007) (discussing monetary valuation of businesses for tax purposes). In this case, by the parties' own admissions, control of the "ABC" sites translates to control of the majority of the "ABC" business, at least in terms of revenue. Accordingly, there is an adequate remedy at law for plaintiffs' claim for conversion and injunctive relief is inappropriate on this claim.

*4. Counterclaimants' Claim for Copyright Infringement*

Counterclaimants argue that plaintiffs have engaged in copyright infringement with regard to (1) defendant Ana's "ABC" website, the design for which is the subject of a registered copyright, and (2) the individual "ABC" embroidery designs, for which no copyright has been registered. In order to make out a prima facie case of copyright infringement, the movant must establish (1) ownership of a valid copyright, and (2) that defendants have engaged in unauthorized copying or a violation of one of the other exclusive rights afforded copyright owners

pursuant to the Act.  *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*,
780 F.2d 189, 192 (2d Cir. 1985); *Sandoval v. New Line Cinema
Corp.*, 973 F.Supp. 409, 412 (S.D.N.Y. 1997).  Although a
copyright need not be registered to be valid, *see* 17 U.S.C. §
408(a), with certain exceptions not relevant here, registration
of the copyright is a pre-requisite to an action for copyright
infringement.  17 U.S.C. § 411(a).

With regard to the "ABC" website design, there is no dispute
that defendant Ana obtained a copyright registration as of August
25, 2008.  In general, certificates of copyright registration
constitute prima facie evidence of the validity of copyrights.
17 U.S.C.A. § 410(c).; *see also Boisson v. Banian, Ltd.*, 273 F.3d
262, 268 (2d Cir. 2001).  However, the presumption of validity
afforded a copyright registration may be rebutted by proof of the
registrant's deliberate misrepresentation.  *See Whimsicality,
Inc. v. Rubie's Costume Co.*, 891 F.2d 452, 455 (2d Cir. 1989).
Here, plaintiffs have offered such rebuttal evidence.  Although
the registration certificate states that defendant Ana was the
author of "2-D artwork" and "text," plaintiffs allege that
defendant Ana's knowledge of the English language is limited, and
assert that the text was actually written by plaintiff Inga and
defendant Polina.  Plaintiff Inga also states that she created
the layout of the site pages describing the individual products,
as well as elements of the home page.

Pursuant to statute, "[t]he authors of a joint work are co-owners of copyright in the work."  17 U.S.C. § 201(a).

Counterclaimants point out that all contributions by putative joint authors must be independently copyrightable.  *Medforms, Inc. V. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 114 (2d Cir. 2002) (citing *Childress v. Taylor*, 945 F.2d 500, 507 (2d Cir. 1991)).[25]  However, counterclaimants do not explain how texts that plaintiff Inga states that she wrote or layouts she claims to have designed are not copyrightable, if indeed they are not.  Counterclaimants also incorrectly argue that "to be a joint work the authors must intend that."  Def. Reply Memo. at 4.  In fact, a joint work is defined as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of the unitary whole."  17 U.S.C. § 101; *Zitz v. Pereira*, 119 F. Supp. 2d 133, 144 (E.D.N.Y. 1999).  There is no allegation here that the "ABC" web design was not a "unitary whole," nor that plaintiffs did not intend that their contributions should be merged into inseparable or interdependent parts of it.

---

[25] Counterclaimants' assertion that each author's work must be "substantial" misstates the law.  In *Medforms*, the Second Circuit held that a jury instruction that "each author's contribution to the copyrighted work had to be 'substantial,' making it clear that the authors' contributions had to be more than de minimus" was not fundamental error, as it "touched on the purpose behind the copyrightability requirement."  *Medforms*, 290 F.3d 115.  The court noted, however, that it was error for the trial court not to instruct the jury on the copyrightability requirement.  *Id.* at 114-15.

In light of plaintiffs' evidence that the "ABC" web design was a joint creative effort that evolved over a period of several years, I find that counterclaimants have not established a likelihood of success on their copyright infringement claim relating to defendant Ana's copyright registration. With respect to the embroidery designs themselves, I conclude that because no copyright has been registered for the designs, and because registration is a necessary prerequisite to an action for copyright infringement, counterclaimants have not demonstrated a likelihood of success with regard to their claim for copyright infringement relating to the embroidery designs.

*5. Counterclaimants' Claim for Trademark Infringement*

Counterclaimants argue that defendants, since at least 2004, have been aware of defendant Ana's marks "ANNA BOVE," the "abc" family of domain names and the "ABC" family of marks, and that they have been using such marks without authority and in contravention of defendant Ana's rights. Answer ¶¶ 25-26. As with plaintiffs' claims for trademark infringement, counterclaimants' claims are brought under the federal trademark law that protects unregistered marks against infringement, 15 U.S.C. § 1125(a). The standards for prevailing on such a claim are set forth *supra.*

Counterclaimants' claim rests upon defendant Ana's assertion that she employed plaintiffs beginning in 2004, under which

theory all intellectual property rights in the "ABC" business
(with the apparent exception of the "ThreaDelight" mark,
registered to all four individual plaintiffs and defendants)
would allegedly inure either to defendant Ana or to both
defendant Ana and Polina as partners.  I conclude, however, that
defendant Ana has not established a likelihood of success on her
claim that she or she and defendant Polina employed plaintiffs.
Even if plaintiffs were in some way "hired" by defendants, the
question as to whether a "hired" person is an employee requires
consideration of a number of factors, on which defendants offer
little evidence.  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S.
318, 323-24 (1992) (citing relevant factors such as "the skill
required; the source of the instrumentalities and tools; the
location of the work; the duration of the relationship between
the parties; whether the hiring party has the right to assign
additional projects to the hired party; the extent of the hired
party's discretion over when and how long to work; the method of
payment; the hired party's role in hiring and paying assistants;
whether the work is part of the regular business of the hiring
party; whether the hiring party is in business; the provision of
employee benefits; and the tax treatment of the hired party").  I
note, in this regard, the absence of any written agreement or
other documentary evidence of an employer-employee relationship,
such as tax forms, between defendants and plaintiffs.  In

addition, although defendants allege that they paid "regular
salaries" to plaintiffs, they point only to a few account
transactions which do not, by themselves, corroborate defendants'
claim.

Even assuming that defendant Ana could establish ownership
of or a priority right to use the "ANNA BOVE" or "ABC" family of
marks, however, the doctrine of laches and/or acquiescence is
likely to apply. It is well settled that in the context of
trademark actions, "[w]here a person entitled to exclusive use of
a trademark is guilty of unreasonable delay in asserting his
rights against an infringer . . . , or acquiesces in the latter's
use, . . . a court of equity has the discretionary power . . . to
deny injunctive relief or an accounting." *Carl Zeiss Stiftung v.
VEB Carl Zeiss Jena*, 433 F.2d 686, 703 (2d Cir. 1970) (citations
and internal quotation marks omitted). Findings of delay and
prejudice are central to both defenses of laches and
acquiescence. The elements of acquiescence are: "(1) the senior
user actively represented that it would not assert a right or a
claim; (2) the delay between the active representation and
assertion of the right or claim was not excusable; and (3) the
delay caused the defendant undue prejudice." *Times Mirror
Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 395
(2d Cir. 2002) (internal quotation marks omitted). Similarly, to
prevail on the affirmative defense of laches, a defendant must

prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action. *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996).

The record evidence shows that while defendants began to use the "ABC" marks in connection with the online sale of embroidery designs sometime in 2002, both plaintiffs and defendants have been using the "ABC" and "Anna Bove" family of marks, with mutual consent, since some time in 2004 until recent months. Given the delay between that time and the filing of this counterclaim, as well as the prejudice to plaintiffs that would result from requiring them to refrain from using the marks, I conclude that the doctrines of laches or acquiescence render it unlikely that defendants will prevail on their claim of trademark infringement upon the trial of this matter.

*6. Counterclaimants' Claim for Cybersquatting*

Counterclaimants argue that plaintiffs' use of domain names that employ the "abc" or "AnnaBove" marks infringes upon their rights under the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).[26] The ACPA was passed "to provide

_____

[26] 15 U.S.C. § 1125(d)(1)(A) provides:

A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person-

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that--

clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks -- a practice commonly referred to as 'cybersquatting'." S. Rep. No. 106-140, at 4. To make out a claim under the ACPA, courts in this circuit consider (1) whether the mark is distinctive or famous; (2) whether the domain name is identical or "confusingly similar" to the mark; and (3) whether the domain name registrant acted with a "bad faith intent to profit" from the mark when it registered the domain name. *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489 (2d Cir. 2000).

As a threshold matter, however, before they may succeed on any ACPA claim, counterclaimants must establish that they own or have a priority right to use the disputed trademarks. Counterclaimants have not satisfied this initial requirement, as set forth *supra*. Therefore, I conclude that counterclaimants have failed to demonstrate a likelihood of success on their ACPA claim.

---

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; . . .

**Conclusion**

For the reasons set forth above, plaintiffs have demonstrated irreparable harm and serious questions going to the merits along with a balance of hardships that tips in their favor on their unfair competition claim.  Counterclaimants have failed to demonstrate irreparable harm and a likelihood of success on the merits of any of their claims.  Accordingly, and as set forth in the accompanying order, plaintiffs' motion is granted in part and denied in part and counterclaimants' motion is denied.  The clerk is directed to transmit a filed copy of the within to all parties and the magistrate judge.


SO ORDERED.

Dated :   Brooklyn, New York
          October 14, 2008

                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge