UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


MIKHLYN, et al.,                    * Case No. 08-CV-03367(CPS)
                                    *
            Plaintiffs,             * Brooklyn, New York
                                    * June 18, 2009
        v.                          * 10:40 a.m.
                                    *
BOVE, et al.,                       *
                                    *
            Defendants.             *
                                    *
* * * * * * * * * * * * * * * * *   *


TRANSCRIPT OF CIVIL CAUSE FOR PRETRIAL CONFERENCE
BEFORE THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiffs:         DANIEL AKSELROD, ESQ.
                            ERIC WERTHEIM, ESQ.
                            Van Mandel P.C.
                            80 Wall Street, Suite 1115
                            New York, NY  10005

For the Defendants:         BORIS KOGAN, ESQ.
                            Boris Kogan & Associates
                            277 Broadway, Suite 701
                            New York, NY  10007


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**67Elaine Drive**
**Shelton, Connecticut 06484 (203)929-9992**

Dockets.Justia.com

1            (Proceedings commenced at 10:40 a.m.)

2                 MR. AKSELROD:  -- that we initially just let slip

3       through the cracks, too.

4                 THE COURT:  Okay.

5                 MR. AKSELROD:  That was an issue that Mr. Kogan

6       had raised.

7                 THE COURT:  Okay.  Let's --

8                 MR. AKSELROD:  But --

9                 MR. KOGAN:  Your Honor, there are some outstanding

10      issues that --

11                MR. AKSELROD:  Yes.

12                MR. KOGAN:  -- we could probably resolve now, but

13      -- and there are some issues that we would -- I think a

14      conversation might --

15                THE COURT:  Okay.

16                MR. KOGAN:  -- might help and --

17                MR. AKSELROD:  Great.

18                MR. KOGAN:  -- one -- if I may begin putting some

19      issues on the agenda that we could resolve today --

20                THE COURT:  Sure.

21                MR. KOGAN:  -- if that's okay?

22                THE COURT:  I was -- what I was going to do is go

23      one by one and say what are your outstanding issues and what

24      are your outstanding issues.  Let's work through them, get

25      them done so we can tee this case up for Judge Sifton to

1    decide.

2         MR. AKSELROD:  Your Honor, I believe there are

3    three broad categories of documents that are important and

4    in contention that are an issue between us.

5         One has to do with communications between and

6    among the parties, and in particular, e-communications; that

7    is, chats and emails.  That would be communications between

8    the sides during the course of their business relation and I

9    guess between each side meaning my client -- my clients who

10   are husband and wife, between them, and between Ana Bove and

11   Polina, the individuals on the two sides of the cases.

12        THE COURT:  Your clients were talking by email and

13   chat?

14        MR. AKSELROD:  Well, the reason why there's a

15   great deal of chat -- no, not with --

16        THE COURT:  Don't they --

17        MR. AKSELROD:  -- not so much --

18        THE COURT:  Okay.

19        MR. AKSELROD:  -- with each other.

20        THE COURT:  All right.

21        MR. AKSELROD:  I mean, that's what it's come down

22   to; people --

23        THE COURT:  Okay.

24        MR. AKSELROD:  -- sitting next to each other

25   writing each other emails, but not so much between them, but

1    there was a regular course of chat and email principally

2    because Polina is in Israel.

3           So obviously they're not getting on the phone to

4    Israel every day and spending the money, so there's kind of

5    this group discussions that were going on every day between

6    and among the various parties on the computer.

7           THE COURT:  Emails shouldn't be a problem.  I

8    mean, you'd think that you could -- I don't know what the

9    retention policy is of their email providers, but you should

10   be able to go back as far as you can --

11          MR. AKSELROD:  Well, let me --

12          THE COURT:  -- and get them produced, but chats I

13   don't know.

14          MR. AKSELROD:  Let me contrast the productions.

15   We produced about, I think, 1,500 pages of chats that

16   involve some combination of our people and their people --

17          THE COURT:  How do you get chats?

18          MR. AKSELROD:  They're on chat -- chat is like

19   real time discussion; MSN chat, where people are actually --

20          THE COURT:  And they keep -- MSN keeps --

21          MR. AKSELROD:  Well, it's on your -- it's from our

22   computer.  I don't think --

23          THE COURT:  Oh.

24          MR. AKSELROD:  -- they went to MSN.  It just -- it

25   records.  There's a log that's created.  It becomes data on

5

1    your computer, just like other things.  Okay?

2              THE COURT:  Okay.

3              MR. AKSELROD:  We got that from our clients.  We

4    produced it before we even reviewed it.  We also produced

5    several hundred emails between my individual clients.  They

6    produced, I think, four pages of chats and no emails between

7    them.

8              You should note, Your Honor, we actually produced

9    several emails between them, Ana and Polina.  They produced

10   none.

11             Now there's something wrong with that on several

12   fronts.  One is we're talking about at least two computers

13   on their side.  Polina's in Israel.  Ana's here for much of

14   the time.  This stuff is on computers.  It's mirrored on all

15   the computers.

16             There's no reason why there shouldn't be thousands

17   of chats and emails on one or both of their computers.  Even

18   if they, you know, purported to delete it, it's still on the

19   computer and it's questionable whether they can say they

20   deleted it because they found things over the course of the

21   case that they, you know, either like or have produced in

22   the case.  If you have that, where's the rest of it?

23             This is going to be -- you know, this has to be

24   resolved in some way either by if we have to go into the

25   hard drives or we're going to get into spoliation practice

6

1    because the communications are critical in this case.  This

2    was a family business, there's no real contracts, and you

3    have to go through this to get the flavor of what both the

4    nature of the relationship was and what did or did not

5    happen during key parts in the chronology of events.  It's

6    just not right that we produce 1,500 pages and they produce

7    four.

8            THE COURT:  Mr. Kogan?

9            MR. KOGAN:  There are a couple things that are

10   important to note, Your Honor.  One is that when -- in April

11   of 2008 when my client was kicked out of the business, my

12   client walked out with a computer.

13           Then she received a phone call from their attorney

14   saying it's our computer, you got to bring it back and

15   returned that computer.  That computer is the computer from

16   which they were able to produce all these emails and chats.

17   That's our computer.  That would have been -- we would have

18   produced those.

19           The fact that that computer was used for the bulk

20   of the communication is the reason why these documents are

21   in existence.  So the reason why it was there -- the emails

22   specifically I'm talking about -- is because that's -- on

23   that computer that's all through 2008.

24           Now, my --

25           THE COURT:  That was --

1          MR. KOGAN:  My client is Ana --

2          THE COURT:  That was --

3          MR. KOGAN:  -- Ana Bove.

4          THE COURT:  Okay.

5          MR. KOGAN:  Ana -- Ana's -- Ana had a computer

6     which she was using in -- she was living at the Mikhlyns'

7     home, if Your Honor recalls, and when -- she took the

8     computer in April of '04 and then they demanded the return

9     of that computer so they have it.  That's the computer on

10    which the majority of the -- of their production came from.

11         Now, that's -- I'm -- that deals with emails.  The

12    chats are actually more interesting.  It appears that the

13    Mikhlyns have been recording those chats, logging them in

14    all along.  They were planning this.

15         My clients were not planning anything and had no

16    reason to activate this feature.  I asked them about this

17    issue and they did not intentionally record any chats and

18    did not intentionally maintain a log of communications,

19    unlike the Mikhlyns who have been doing this for quite a

20    while.

21         THE COURT:  This log that you discussed, is that

22    something that automatically happens or is it something that

23    you have to activate?

24         MR. AKSELROD:  I don't know the answer, but they

25    produced some chats.  Why those are there and not others, I

1    don't understand.

2         It also -- you know, this -- it may be that Ana

3    Bove returned the computer.  There's email saying it belongs

4    to you, I'm returning it.  But Polina Dolginov is in Israel.

5    She has a computer.  Certainly, the emails between Ana and

6    Polina have to be produced.

7         These people were in constant communication with

8    each other on computers.  There's -- you know, this stuff --

9    it cannot be that they don't have -- we have -- we produced

10   emails between them.  And yet they --

11        MR. KOGAN:  Well, that's because that's the

12   computer that was used for those communications and of

13   course those -- all those communications are on that

14   computer.

15        THE COURT:  So she didn't use -- Ana didn't use

16   any other computer?

17        MR. KOGAN:  No, Ana did use another computer in --

18   from what I understand, she had a computer from 2001 and in

19   2007 she got married and left that computer in Israel.  And

20   that computer was given away.  It was not -- she doesn't

21   have it anymore.

22        And the majority of the communications that she

23   had -- well, I mentioned the other computer that primarily

24   was used by -- at the Mikhlyns' home.

25        THE COURT:  Okay, so the only two computers she

1    had during the period were the first computer that was left

2    in Israel and given away and then the other computer that

3    she returned?

4              MR. KOGAN:  And I believe that there was another

5    laptop that was more -- of more recent vintage.  I'm not

6    sure exactly when.

7              I think it was around either 2007 or 2008 after

8    that computer was left in Israel, and that's the computer

9    from which the bulk of the -- the bulk of our production

10   came from.

11             And we produced many, many thousands of emails.

12   Those emails that we did produce, the records which were --

13   my client intentionally made an effort to maintain and

14   preserve their -- those were communications with clients.

15         Those were all saved and there were, I would say, tens

16   of thousand of emails that were preserved because they had

17   been client oriented or vendor oriented or customer oriented

18   and these folks, both sides, made it their business to make

19   sure that all of that was preserved for the benefit of good

20   customer relations.

21             Customer returns an item or customer asks a

22   question about an item, all of that was preserved and

23   everybody made an effort to do that.

24             My client had no purpose -- no reason -- I'm

25   making an inquiry trying to find out if there are any other

1    places where something was saved intentionally or

2    unintentionally other than the computer that we have.

3              THE COURT:  Or any other computers were used?

4              MR. KOGAN:  Right.

5              THE COURT:  What about Polina?

6              MR. KOGAN:  Polina did not -- the records that we

7    produced were either Polina had the same records or if she

8    had something that supplemented, we produced that as well.

9              I'm -- in other words, and Polina did also have --

10   I don't have the exact dates on which she replaced her

11   system, but she had computer failures that -- throughout

12   these years.  This is from 2002 until now.

13             Several times her computer was replaced and we're

14   trying to find out if there were any incidents of backing up

15   or hard drive that was replaced or any of that.  I don't

16   know have the chronology of that, but I'm trying to find out

17   if there are any other additional records.

18             I do know that there -- I have some objection to

19   generalizing and saying that all communications between

20   Polina and Ana are subject to disclosure because I don't

21   think that all communications between the Mikhlyns are

22   subject to disclosure.  They're husband and wife and my

23   clients are friends.

24             There are plenty of communications that do not

25   relate to the subject matter of this lawsuit, the business.

1    They if -- and to the extent that they do not, I do not

2    believe that they're appropriate to be for disclosure.

3              THE COURT:  You're not asking for them, are you?

4              MR. AKSELROD:  Not -- well, here's the problem,

5    Your Honor.  It's tricky with respect to the communications

6    to draw lines --

7              THE COURT:  Well, I --

8              MR. AKSELROD:  -- because -- and I'll give you

9    examples --

10             THE COURT:  I don't think he's -- I know what

11   you're going to say.  You're going to -- you know, they

12   could start on a different topic --

13             MR. AKSELROD:  Right.

14             THE COURT:  -- in an email and go into the

15   business --

16             MR. AKSELROD:  It's not just that.  There are

17   things that are subtle that a person reviewing their

18   client's documents in good faith might not realize the

19   significance of and I'll give you an example.  Okay?

20             Part of our story, our clients -- and we've

21   produced chats and/or emails that are -- we think support

22   this.  We did it in the injunction practice and in

23   discovery.

24             We say there came a time in 2007 that Polina was

25   bought out.  Her share of the business was bought out and we

1  have some both chats and Ana was actually forwarding our

2  clients' emails about what was being talked about with

3  Polina.  Then later on we say Ana left the business,

4  basically left it to us.  They denied both of those things.

5  Okay?

6          Now obviously if you're looking at emails and the

7  emails are talking about that, and I think there were emails

8  about that because Ana was telling our clients, that's

9  obvious.  There was also comes a time where there's emails

10  from Polina to my clients saying where's Ana, I can't find

11  Ana, I'm trying to reach Ana.

12          Well, if they were still in business together and

13  these things never happened, why are they emailing my

14  clients -- why is she emailing my clients looking for Ana?

15  It kind of suggests they're not together in business if she

16  can't even find the woman.

17          It's supportive of the idea that, A, Polina left

18  the business and later on Ana left the business and they're

19  not operating and working together, or else why would she be

20  sending my clients these emails?  It's that kind of thing

21  that I have trouble with.

22          THE COURT:  Well, you --

23          MR. KOGAN:  If I could respond, Your Honor.  Ana

24  lived in the Mikhlyns' house.  Calling the person whose

25  house it is -- or emailing have you -- do you know where Ana

1    is, I've been trying to get in touch with her is -- it

2    doesn't prove anything and to claim somehow that my client

3    -- Ana -- there -- these two claims that Polina was bought

4    out or that Ana abandoned the business or walked out, the

5    second one has no legal significance in that if it is a

6    partnership, if you walk out of a partnership, the

7    partnership dissolves by law.  And they don't agree that the

8    business dissolved by law and it had to be liquidated.

9        And if it is a corporation, you can't abandon a

10   corporation.  You can't say I'm walking out of my shares.

11   I'm a shareholder, I'm an owner of the company, and I walked

12   out.  A week later I come back and I say I did not walk out.

13   I changed my mind.

14       There's no legal significance so the claim --

15   there's no colorable claim.  There are few of these claims

16   are being made here that they have -- they want to go into

17   an inquiry into communications between my client -- clients

18   which do not involve the subject matter of the lawsuit --

19              THE COURT:  Well, you see --

20              MR. KOGAN:  -- in a fishing expedition and --

21              THE COURT:  This is precisely why you need to

22   talk, as opposed to write emails and letters.  Okay.  You're

23   not entitled to all of the emails.  They could be talking

24   about planning a trip to Cancun.  You don't need to see

25   that.

1          MR. AKSELROD:  Okay.

2          THE COURT:  But there's the -- the subtleties

3     you're talking about that arguably have a bearing on the

4     case, you need to make Mr. Kogan aware of that.  That's why

5     you talk --

6          MR. AKSELROD: Okay.

7          THE COURT:  -- and you try to focus.  I mean,

8     that's putting aside the issue of whether we could even get

9     to these emails --

10         MR. AKSELROD:  Right.

11         THE COURT:  -- whether they exit anymore.  From

12    what I'm hearing, just dealing with Ana, I don't know that

13    there's anything I can do.

14         MR. AKSELROD:  I think --

15         THE COURT:  If the computer was given up and you

16    have that computer, if this other computer in Israel is

17    wherever it is and there are no other computers, what can we

18    do?

19         MR. AKSELROD:  I think what I will have to do is -

20    - and again, it will be subject to a procedure if they're

21    going to be allowed to, you know, eliminate certain ones is

22    we'll have to subpoena the service providers.  I think

23    that's what you were getting at earlier on.  We'll just --

24         MR. KOGAN:  And that should --

25         MR. AKSELROD: At least with respect to emails --

15

1          MR. KOGAN:  -- should be done.  That would

2     circumvent any -- there's no reason for us to spend

3     resources on attempting to excavate something from a dead

4     computer, perhaps.  Perhaps, I don't know.

5          THE COURT:  Identify the service providers --

6          MR. KOGAN:  I think they know who they are.

7          MR. AKSELROD:  Yes.

8          MR. KOGAN:  Everybody knows who they are.

9          MR. AKSELROD:  We do.

10         MR. KOGAN:  There are only one or two providers

11    and we can just subpoena them and then everything is

12    produced.  There's no secrets and there's no reason to go

13    fishing.

14         At that point only -- the other objection they

15    had.  You know, then we would have to come up with a

16    reasonable procedure in which we would -- I don't want to

17    know about their personal life any more than they're

18    entitled to know about my clients' emails that do not have

19    to do with --

20         THE COURT:  Well let's think that through.

21    Obviously your clients have spousal privilege.

22         MR. AKSELROD:  Yes.

23         THE COURT:  Right?

24         MR. AKSELROD:  Yes.

25         THE COURT:  I don't know that your clients have

16

1    any friend privilege?  I don't know how to -- there's no

2    protective order in this case, is there?  That's one of --

3              MR. KOGAN:  We -- actually, we're negotiating

4    one --

5              MR. AKSELROD:  We slowly -- at a turtle's pace

6    we've --

7              MR. KOGAN:  We can -- actually, we're close on

8    that and I could articulate I -- I'd like Your Honor's

9    participation in that.  We're very close to it.  There's one

10   phrase and --

11             THE COURT:  Okay.  We'll get to that then.

12             MR. KOGAN:  -- we're a minute away from there.

13             THE COURT:  Subpoena the service providers.

14             MR. AKSELROD:  Okay.

15             THE COURT:  Share obviously with Mr. Kogan what

16   you get from them, and if we haven't worked out the

17   protective order before you get the documents from the

18   service providers, you will treat them confidential

19   attorney's eyes only.  You don't even show them to your

20   clients.

21             MR. AKSELROD:  Okay.

22             THE COURT:  And if in reviewing the emails and

23   chats there's anything of a nature such that your clients

24   don't -- it's unrelated to this case, your clients don't

25   want even the attorneys to have it, we'll all proceed with

Fiore Transcription Service, Inc.    203-929-9992

1    the assumption that, you know, you'll let them know and then

2    you will give that back and to keep no copies.

3            It's got to be -- you know, it's got to be

4    clearly, you know, in left field and have nothing bearing on

5    this case.

6            MR. AKSELROD:  We will talk about and I guess come

7    up with a list --

8            THE COURT:  Like a -- like some sort of clawback

9    type of thing.

10           MR. KOGAN:  From both sides.  I guess we need all

11   email addresses that we use for the communications.  There

12   had to -- there has to be --

13           THE COURT:  Yes.

14           MR. KOGAN:  -- some cooperation in order to --

15           THE COURT:  Yes.

16           MR. KOGAN:  -- be able to --

17           MR. AKSELROD:  Okay, turning -- should we get to

18   category two now, Judge?  I know it's --

19           THE COURT:  Yes, please.

20           MR. AKSELROD:  -- going to take a while.

21           A second category is copyrights.  You may recall

22   that obviously we had motion practice about whether they

23   were going to be able to amend their complaint to add

24   numerous copyrights for specific designs and they were

25   allowed do that.

1          I have been repeatedly asking for the copyright

2     applications and registrations and while nobody says no and

3     objects, I don't have them yet.

4          You may recall when this case up and we had a -- I

5     think a telephone conference about the motion, you know, you

6     said I wasn't going to be prejudiced on the discovery front

7     about that -- about, you know, these additions of -- you

8     know, there was one copyright in the original pleading of

9     theirs.  Now there's, I don't know, 4,200 -- I don't know

10    how many there are.  Okay?

11         They were doing it on an ongoing basis, they told

12    you.  There were applications pending.

13              THE COURT:  And some of them have since been --

14              MR. AKSELROD:  Some have been --

15              THE COURT:  -- approved, right?

16              MR. KOGAN:  Yes.

17              MR. AKSELROD:  Now, it's hard to understand why I

18    don't have them.

19         One, not only are they not objected to and they're

20    obviously central to the cases, I would have thought, first

21    of all, one of the law firms would have had them as a basis

22    for their pleadings and I inferred, maybe incorrectly, that

23    they were involved in actually filing them because it was

24    happening during the case, yet I don't have anything.

25              THE COURT:  What's the deal with the copyrights?

1          MR. KOGAN:  Your Honor, it's very interesting the

2     nature -- the process here -- if I can take a moment to

3     explain the process by which the business is -- has

4     developed.

5          My client, as your -- as the Court may recall, is

6     a graduate of Israel's premier design school.  She's a --

7     and she has been a designer her entire life and she is --

8     she has traveled throughout Europe, spent six figures on

9     identifying designs that are in the public record -- that

10    are in the public domain that are not copyrightable from

11    publications from the 1800s, had then improved on those

12    designs, making them unique and copyrightable, as the

13    copyright office has -- that the PTO has confirmed that

14    really it is -- she does have a copyright in those.

15         Now, the fact that my client elaborated and

16    improved on those original designs is something that at this

17    moment is being disputed by the plaintiffs who claim that

18    these designs are not copyrightable altogether.  And the

19    problem that we have in producing the applications and the

20    registrations, we don't want to give them the -- what they

21    don't have.

22         And that is what my client took is the originals,

23    spent six figures on buying and then improving on, and once

24    they have that, they can go ahead and plagiarize to their

25    heart's content --

1              THE COURT:  Well --

2              MR. KOGAN:  -- in both ways.

3              THE COURT:  No, if something is copyrighted, there

4     is a notice -- or, PTO has it and anybody can take a look

5     and see what it is.  This -- she has this copyright.

6              You know, I understand maybe the underlying

7     application has additional information in it, but that can

8     be cured by producing it for attorney's eyes only.

9              MR. AKSELROD:  Well, I --

10             THE COURT:  You're not a design person, are you?

11             MR. AKSELROD:  I got to tell you, Your Honor, I

12    mean, if that's your ruling, I'll take attorney's eyes only.

13             I have to say respectfully the idea that it's

14    somehow secrecy that's blocking this is absurd.  You're

15    talking about a copyrighted -- first of all, you've made

16    copyright claims and on a number of fronts, not just

17    copyrightability, we challenge it.

18             First of all, we challenge in a number of

19    instances who actually did the so-called improvement, the

20    digitizing.  That's number one.

21             MR. KOGAN:  Perfect.  That's exactly --

22             MR. AKSELROD:  Okay?  Who actually did it is an

23    issue.  That's -- I don't even know what's in your -- I

24    don't know which things --

25             MR. KOGAN:  That's exactly -- that is exactly the

1    issue, Your Honor.  I would like everybody to produce now

2    simultaneously to Your Honor under seal in a box --

3              THE COURT:  I'm not doing it.

4              MR. KOGAN:  Okay, so somebody has to do that under

5    seal.  Maybe we can do that simultaneously to -- but I don't

6    want them to produce after I've produced my clients' -- my

7    client demonstrate this is how we improved on these original

8    designs, they come back and say no, no, this was our idea.

9              Let them produce now these original designs and

10   how they've improved on them simultaneously; everybody does

11   it at the same time, because what we believe they intend to

12   do is after our production, they will come back and say yes,

13   this was my idea.

14             I'm the one who came up with the idea of

15   elaborating on this 1800 -- the 1880s magazine and changing

16   this particular alphabet font from two dimensional to three

17   dimensional, for instance.

18             We would like that to be done simultaneously so

19   they cannot thereafter come up with a claim that this was

20   their idea and this is how they did it, because we're going

21   to be able to substantiate that at this point that it was

22   uniquely our idea, our design.

23             MR. AKSELROD:  Your Honor, this is not rational.

24   You heard from counsel, which is correct, the process here

25   is to go get either a public domain image from these public

22

1    domain websites or magazines or in some instances, I believe

2    actually from a not public domain where images were licensed

3    under limited terms.  You take it, you put it into the

4    computer, you digitize it, quote, unquote, and then you

5    press buttons that like you press a button and it maybe adds

6    a color in an area that was black.  That's the process.

7    It's called digitizing.

8           I just -- how -- the actual end product is out

9    there because they're selling it on their website and we're

10   selling it on our website.  There's no secret about what the

11   improved image or whatever you want to call it is.  It's out

12   there being sold by both of us.  We have it on our

13   computers, they have it on their computers --

14          THE COURT:  Yes, but --

15          MR. AKSELROD:  -- because they took it, and the

16   original thing is some public domain thing --

17          THE COURT:  So what's the problem with

18   simultaneous production of copyright registrations and --

19          MR. AKSELROD:  I don't have any -- we didn't

20   register any copyrights.  But I don't know how you can file

21   something in a public office, get a copyright, and then say

22   it's like secret.  I don't understand that.

23          We could probably go to Washington and get the

24   application.  How is this secret?  This is not secret stuff.

25   This is not some secret -- it's a copyright case.

23

1          How could you file copyright claims and say I'm

2     not going to give you the stuff?  It doesn't make any sense.

3          MR. KOGAN:  Your Honor, their objection did not

4     specify one issue and it's lacking in that one aspect.

5     Their -- they say we don't have anything -- any copyright

6     applications.  I understand that.

7          But do they have any claims that they have somehow

8     improved on those public domain designs -- if they can

9     substantiate that now and we have all the designs --

10    everybody has all the end result.  Everybody has that.

11         But what they don't have, because they didn't do

12    it, is the public domain designs themselves and the process

13    by which they were changed from public domain to this

14    improved image which was -- which is copyrightable.  They

15    don't have that and they can't produce it.

16         And if we're going to do simultaneous production,

17    there will be either nothing from their side and everything

18    from our side or maybe they'll come up with something and

19    which case the -- those -- there'll be a dispute about who

20    improved designs number 1 through 50, because they will have

21    the process by which they claimed to have improved them --

22         THE COURT:  Well, did you ask them in written

23    discovery request for documents establishing that they've

24    improved on these public domain designs?

25         MR. KOGAN:  Not in those words, but we've asked

24

1      for --

2                THE COURT:  I don't know that those are the

3      right --

4                MR. KOGAN:  -- the documentation -- right, we did

5      ask about the designs to which they make claim, how is it

6      that they are entitled to those designs.  So ultimately

7      that's -- in a roundabout way, that's what we were --

8                THE COURT:  Uh-huh.

9                MR. AKSELROD:  From our end, to the extent we have

10     -- you know, I'm not sure if counsel has the same

11     understanding as I do about how this stuff is even done.

12     Okay?

13               MR. KOGAN:  No, I don't, but I have a different

14     understanding because my client did it --

15               THE COURT:  Look if --

16               MR. AKSELROD: I'll produce that stuff --

17               MR. KOGAN:  -- and knows exactly how it's done.

18               MR. AKSELROD:  I'm willing to produce anything

19     that shows evidence of what our people created or people

20     other than Ana Bove created without -- this is not

21     attorney's eyes only stuff.

22               THE COURT:  So then what's the --

23               MR. KOGAN:  Absolutely --

24               THE COURT:  -- if -- then what's the harm with

25     simultaneous production?  I mean --

1          MR. AKSELROD:  Fine, I'll do it before.  I'll

2     produce -- if it's not already in our production whatever we

3     -- you know, we'll talk about it.  I'll produce it before.

4     I think we've produced some stuff already.

5          MR. KOGAN:  Your Honor, if we can come up with a

6     procedure for that, then it's not a problem.

7          MR. AKSELROD: I'll produce --

8          THE COURT:  All right.  So you're going to --

9          MR. AKSELROD:  That's fine.  Simultaneous

10    production, fine.

11         THE COURT:  Copyright applications and

12    registrations on the one hand and --

13         MR. AKSELROD:  Process --

14         THE COURT:  -- whatever else on the other.

15         MR. AKSELROD: Creative process --

16         MR. KOGAN:  Whatever they can claim -- whatever

17    they claim is the backup or the proof that they contributed

18    to the improvement --

19         THE COURT:  Okay.

20         MR. KOGAN:  -- of public domain designs.

21         THE COURT:  All right.

22         What's the third issue?

23         MR. AKSELROD:  The third issue is money, which is,

24    you know, finances, who got what, who paid what.  I know Mr.

25    Kogan I think in our early conferences and conversations

26

1    this was his primary issue.

2              We have sort of in pieces, because it's a lot of

3    stuff, been sort of systematically producing bank

4    statements, PayPal account records, eBay, there was a credit

5    card company called 2Checkout, and our internal -- you know,

6    QuickBooks, thousands of pages of financial records.

7              THE COURT:  Both --

8              MR. AKSELROD:  For the business.

9              THE COURT:  For the business?

10             MR. AKSELROD:  Now, there has been both ways.

11   We've been uncertain, frankly, and kind of dancing around

12   each other about the issue of quote, unquote personal

13   financial records.

14             And I told Mr. Kogan in my letter I've actually

15   come around to the view that there should be no such

16   distinction; that everybody -- because of the nature of the

17   way the business was run, that, you know, the personal  -- I

18   don't think they're personal.  He doesn't think things of

19   ours are truly personal.  Everything should be produced.

20             But the bottom line is we've made a systematic

21   production.  We have not gotten systematic financial records

22   from them.

23             In particular, records of a type that we've

24   produced showing them getting hundreds of thousands of

25   dollars, for example, straight from the credit card company

1    that accepted credit card payments, I asked for that stuff.

2    I didn't think it was in dispute from our early conferences.

3    I haven't received that.

4          Now, you know, one of the reasons why I'm saying

5    we got to get rid of this concept of personal was there was

6    a period of about a year or so where the girls were -- you

7    know, they set up these domain names and websites -- were in

8    the business and while my people were helping them in

9    various ways, consulting, we weren't in the business yet.

10   Okay?

11         Mr. Kogan says during that period they never had

12   separate quote, unquote business account.  Now there was no

13   corporation, so, you know, they didn't have like a DBA --

14   they just used their personal accounts.  And because they're

15   personal, Mr. Kogan says you can't get them.

16         My view is if that's the way you do business,

17   that's a business account as well as a personal account.

18   You got to produce the stuff.  You can't have everything

19   together and just say because I put my name on it, instead

20   of doing business as ABC Embroidery, it's personal.

21         Now -- and again, I'm saying this works both ways.

22   We've got to produce our personal -- there's a number of

23   reasons why I think we should.  That's just one of them.

24         I think we should just drop this idea of personal

25   and just get everybody's finances on the table.  I think we

1    have to.  It was just not run and managed in a kind of

2    airtight, you know, way that a big company would be run and

3    to get the complete picture, everybody's got to put their

4    bank accounts and stuff on the table.

5              MR. KOGAN:  From 2002 through 2004, it's

6    undisputed that the business belonged to my clients.  From

7    2004 until 2005, my clients say that the Mikhlyns were --

8    actually, it's the Mrs. was a designer.  Yes.

9              THE COURT:  2002 to 2004 --

10             MR. AKSELROD:  It was --

11             THE COURT:  -- undisputed that it was their --

12             MR. AKSELROD: Yes, late -- I don't know the extent

13   of -- you know, that's one of the things we're trying to

14   explore in discovery.

15             I don't know the extent of their sales whatever,

16   but it is true that the girls started this without us

17   initially.  They came up with domain names and they were at

18   some level of activity, upgrading the business from I think

19   like late 2002 through 2003 and we got involved in 2004.

20             THE COURT:  Okay.  So really what we're -- are you

21   looking for personal bank records from 2002 to 2004?

22             MR. AKSELROD:  Those are -- there is no

23   difference.  It's a hundred percent commingling.

24             THE COURT:  No --

25             MR. AKSELROD:  You know what I mean?

1          THE COURT:  No, but if your clients aren't

2     involved in the business, what do you need their --

3          MR. AKSELROD:  I'll tell you why.  There's two

4     reasons; one sort of factual about the stories each side is

5     putting up and one is legal.

6          They make it seem in their pleadings and in the

7     motion practice that they had already kind of established a

8     successful business and we were just hired as employees to

9     do some, you know, discreet task to -- for storage of thread

10    or something.  I don't remember what was said.  Maybe

11    different things were said in the various payments.

12          I mean, our view -- we doubt that, at a minimum,

13    upon information and belief.  We don't think the business

14    became successful until we got involved.

15          And I have no idea whether they had $10 worth of

16    sales or a hundred dollars worth of sales or a million

17    dollars worth of sales till we got involved.  So it has to

18    do with just the story of how this business came to be what

19    it is.  That's number one.

20          Number two, it goes right to the heart of their

21    trademark claims.  They repeatedly assert -- you know, they

22    make the allegations about how they were using all the

23    various trade names and website names on a regular basis and

24    established its success on the internet before we were

25    involved and among customers.

1              You know, for purposes of the trademark analysis,

2       certainly for secondary meaning -- for example, using your

3       name or using ABC -- the extent of your success, sales,

4       profits, that's a relevant factor to determine whether you

5       have established a trademark.  So that's the legal reason.

6              I'm not claiming the money.  This isn't a thing

7       where we say that's our money.

8              THE COURT:  With the records from 2002 through --

9       beginning of 2004 whenever it is, are you looking for

10      unredacted or redacted?

11             MR. AKSELROD:  I certainly want to see -- well,

12      certainly unredacted as to money coming in.  I don't care if

13      -- I don't care if they bought dresses or whatever, what

14      they spent their money on.

15             THE COURT:  Well --

16             MR. AKSELROD:  Although it's relevant because it

17      has to do with profitability --

18             THE COURT:  It's got --

19             MR. AKSELROD:  -- so it's hard to say.

20             THE COURT:  It's got -- well, the money coming in

21      has to be coming in from the business, not --

22             MR. AKSELROD:  Right.

23             THE COURT:  -- coming in from, you know --

24             MR. AKSELROD:  I'm not aware of them getting money

25      any other way.  I'm not sure that's an issue, but --

31

1        MR. KOGAN:  Your Honor, I --

2        MR. AKSELROD:  -- they can tell me.

3        THE COURT:  I have no idea.

4        MR. KOGAN:  -- I don't believe that he would be

5   entitled to anything other than something that would support

6   gross receipts, and that would be reflected on bank

7   statements, not -- and bank statements to the extent that

8   they show gross receipts.

9        In other words, at that point if our client spent

10  it on whatever, it really is irrelevant and I understand

11  that the key there would be gross receipts,  not --

12       THE COURT:  Well, I think -- I mean, he --

13       MR. KOGAN:  -- not profitability.  I wouldn't have

14  to show --

15       MR. AKSELROD:  Gross receipts and spending on

16  business.

17       MR. KOGAN:  Well, the spending on business I don't

18  know that he would be entitled to see every check that we

19  spent on the business.  At this point I think that the gross

20  receipts would address his concern --

21       THE COURT:  Whether it was a profitable company --

22  I mean, that's a fair point.

23       MR. KOGAN:  Is irrelevant really though.

24       THE COURT:  Whether is a profitable company or not

25  is -- doesn't go to secondary meaning.  I mean, you could

32

1   have a completely --

2           MR. AKSELROD:  Well, it doesn't go to secondary

3   meaning --

4           THE COURT:  -- you're spending it like Kozlowski

5   on, you know, thousands of dollars of ice sculptures --

6           MR. AKSELROD:  Right.

7           THE COURT:  -- for parties.  But if you're pulling

8   in, you know, a fair amount of money and just -- you're just

9   hemorrhaging it, that's not --

10          MR. AKSELROD:  But it does go to the first point

11  about whether did this business first become profitable when

12  my people got involved in it, which my people believe is the

13  case, but we don't know a hundred percent certain because

14  they're going to come into court and say these girls made

15  this great business and these people are just brought in to

16  do as menial, you know, ABC you do this.  And our position

17  is when we got involved this business took off.

18          There's actually some evidence of that because

19  profits quadrupled after -- or revenues quadrupled after we

20  got involved.

21          THE COURT:  Well, that's revenue.

22          MR. AKSELROD:  We're entitled --

23          THE COURT:  That's revenue.

24          MR. KOGAN:  That's all that matter, really.

25          THE COURT:  That's revenue.

33

1          MR. AKSELROD:  It's not all --

2          MR. KOGAN:  It's really all about revenue.

3          MR. AKSELROD:  It's not all that matters.  I think

4    profits matter too because if you're losing money --

5          THE COURT:  Does it --

6          MR. AKSELROD:  -- you don't have a good business.

7          THE COURT:  Is it really -- is -- look, I'm going

8    to give him the records.  The question is whether it's going

9    to -- whether and to what exact -- actually, to what extent

10   they're going to be redacted.

11         Is it really that big of a deal?  I mean, they're

12   going to show on their bank statements -- personal bank

13   statements, you know, whatever was coming in from PayPal,

14   whatever income from the business, and then, you know, what

15   was going out to support the business.  Is there really that

16   much?  I mean, I don't know how the business was structured.

17   Is it, you know --

18         MR. KOGAN:  I don't know.  I don't know.  I can't

19   say --

20         THE COURT:  And it could also -- you know, I mean,

21   part of it could be their efforts to promote the business.

22   Maybe they had expenditures to, you know --

23         MR. KOGAN:  And I do --

24         THE COURT:  -- advertise or --

25         MR. KOGAN:  I do have some other concern there

1    that I do know that my clients have expressed.  They spent

2    six figures on buying those public domain magazines from the

3    1800.

4              They traveled all through Europe to college these

5    items and I don't want to disclose all my sources to -- in

6    other words, they sought these out, they're not easy to

7    locate, they are -- this information is not out there.  They

8    don't --

9              THE COURT:  But --

10             MR. KOGAN:  They can't go out there today and buy

11   what my client has bought.

12             THE COURT:  But there's got to be a way of --

13             MR. KOGAN:  So -- I could redact --

14             THE COURT:  -- redacting and identify -- you know,

15   somehow identifying that this is, you know, business

16   promotion or whatever you want to call it.

17             MR. KOGAN:  I can do that.  I'm just saying I

18   would like to be able to redact certain specific information

19   that would allow them to -- it goes to the protective order,

20   really.  That portion I'd like to be able to redact --

21             THE COURT:  I mean, I think all these business

22   records are going to be attorney's eyes only unless there's

23   a strong need to show them to the clients and to --

24             MR. KOGAN:  But the -- I'd like to just to make

25   one issue clear.  At this point we're talking about my

1    clients' records that have to do with how they ran the

2    business from 2002 to 2004.

3          When we say all these records, there are some that

4    are very different in that we have only been discussing the

5    -- my clients' business records which are really personal

6    bank accounts through which they ran the business.  It was

7    not incorporated or set up as a separate entity.

8          The Mikhlyns have been commingling personal and --

9    they -- there was a corporation established, but they did

10   deposit sums in their personal bank accounts, none of which

11   -- not a single account has been disclosed despite what

12   counsel says.

13          THE COURT:  Well, I think he's --

14          MR. AKSELROD:  I'm coming around to the view that

15   all of us --

16          MR. KOGAN:  I understand, but I just --

17          MR. AKSELROD: -- have to do that now.

18          MR. KOGAN:  There was --

19          THE COURT:  It's a two -- it's always a two-way

20   street in this courtroom, so --

21          MR. KOGAN:  There was a discussion before that

22   somehow there was production.  Whatever was produced was

23   only business records and I only received the tax returns

24   two days ago.  I don't know if they're complete.  I don't

25   know if they're -- if this was an S Corp.  I don't know if

36

1      there are K-1's if they're included or not.

2             I know for a fact I did not receive any personal

3      tax returns and I know for a fact that they commingled to

4      such an extent that the business has been paying for

5      mortgage payments on their homes, for -- I think about $400

6      a month on liquor stores.  There are food expenses in the

7      thousands.

8             THE COURT:  All right.  Look, look --

9             MR. KOGAN:  There's, you know --

10            THE COURT:  -- we're not litigating the case here.

11            MR. KOGAN:  There's --

12            THE COURT:  You're going to produce --

13            MR. AKSELROD:  You want --

14            MR. KOGAN:  -- complete commingling --

15            MR. AKSELROD:  You want my answer or not?

16            THE COURT:  You're -- no, you're -- it's a two-way

17      street.

18            MR. AKSELROD:  Right.

19            THE COURT:  Personal bank records are fair game.

20     The only issue is to what extent you're going to redact

21     them.

22            MR. AKSELROD:  Okay.

23            THE COURT:  And you need to be careful on what you

24     argue because it may come back and bite you in the butt,

25     because you might not be able to redact that for your

37

1    client.  So I'm going to leave it to you to try to work out.

2    I think it's fair game though.

3           So that's 2002 to 2004 from you.  I mean, is there

4    any -- there's no issue with you for your clients' 2002 to

5    2004 because they weren't involved.

6           MR. AKSELROD:  Right.

7           THE COURT:  Is that right?

8           MR. KOGAN:  That's correct.

9           THE COURT:  Okay.  So then 2004 going forward I

10   don't see any reason to have a different rule, unless --

11          MR. KOGAN:  I'd like to point out that from 2004

12   were -- the only other concern -- I guess there -- no, they

13   would be the same.

14          THE COURT:  When did -- I mean, at some point --

15   no, no --

16          MR. KOGAN:  From '04 to '05, there's some period

17   of time in which -- through which my client says that Inga

18   Mikhlyn was worked only as a designer, meaning she had

19   specific tasks of design, not bookkeeping, nothing else, for

20   a period of time from '04 to '05 and after that some --

21   actually, I don't know, maybe it's during '04.

22          And then later on at some point they have Mikhlyns

23   run the operation in the U.S. in its entirety, meaning they

24   are -- they warehouse, they get the bookkeeping, they do --

25   they pay the vendors, all the payments are done through

38

1      them.

2              THE COURT:  Uh-huh.

3              MR. KOGAN:  Of course, the shots are called from

4      -- by my client, at least that's our story.  Their story is

5      that they -- that we're partners at that time.  So from 2004

6      until -- or some point in '04 through '08, I guess both

7      sides have personal financial records which are relevant.

8              THE COURT:  Okay.

9              MR. KOGAN:  And then --

10             THE COURT:  Same ruling.

11             MR. KOGAN:  -- from 2008 on we have a significant

12     dispute because while they concede that my client is -- was

13     a partner -- both my clients were partners in the company,

14     they claim one has abandoned or walked out and the other one

15     has been bought out.  Which by the way, they don't deny that

16     even in that buyout they did not pay the buyout amount that

17     they claim to have agreed on.

18             So the issue is they claim that we would have to

19     give them business records from 2008 on because they claim

20     that my clients have continued with the business.  From 2008

21     we have a split and that was the subject of motions before

22     Judge Sifton.  Neither side was able to demonstrate the

23     likelihood of success on the merits on that to Judge

24     Sifton's satisfaction to obtain a TRO at that point and a --

25             THE COURT:  Preliminary --

1    MR. KOGAN:  -- preliminary injunction.  And

2  without a colorable claim, I do not believe that they have

3  any entitlement to business records from 2008 on for our

4  businesses, while we do have the right to discovery on their

5  business from 2008 on because they acknowledged that we are

6  partners in their business.

7    So there is no -- it doesn't mirror -- from that

8  point on, there's a distinct split and if -- I believe there

9  should be a bifurcated process after which -- in other

10  words, if they prevail -- if we get to trial -- if they

11  prevail on -- and are able to show a colorable claim on

12  their entitlement somehow to our business going forward,

13  they would be entitled to discovery of financials on the

14  business from 2008 after the divorce, so to speak.

15    But at this point I do not believe that they have

16  made that colorable showing.  Judge Sifton --

17    THE COURT:  Well --

18    MR. KOGAN:  -- didn't think so.

19    THE COURT:  Well, this is on a preliminary

20  injunction.

21    MR. AKSELROD: Yes.

22    THE COURT:  It's not -- you know, it's not on the

23  merits.

24    Go ahead.

25    MR. AKSELROD:  First of all, Your Honor, we have a

40

1    corporate plaintiff, as well as our individuals.  This

2    business was run through a corporation, ABC All Consulting.

3    On paper, my clients are the only shareholders, officers,

4    directors, if you will, of the company.

5         They're a -- it's a complaining entity here

6    against what Ana -- the focus of our lawsuit, which we

7    started this case, was what happened after the divorce.

8         You know, Mr. Kogan and I talk about the divorce

9    and the marriage period.  That's the focus of our lawsuit.

10   He's more focused on what happened when we were together

11   because Ana claims that money's owed to her and we took more

12   of the money, whatever.

13        We're focused on what happened after.  We say you

14   went and basically misappropriated various business assets

15   to benefit your knew company and attacked us and defamed us,

16   et cetera.  The period after the divorce is the spotlight of

17   our claims.

18        Number two, this issue of partnership, you know,

19   Judge Sifton resolved -- this is one issue Judge Sifton

20   resolved and a small part of the decision on the

21   injunctions.  He said if you use the -- we did allege

22   partnership in our complaint.

23         But Judge Sifton said in his decision, and he

24   cited New York law and I'm aware of these cases now, that

25   when you use the corporate form, that's it.  You're not a

1       partnership.  It's a corporation.

2               Now they've added in their amended pleadings to, I

3       guess, tailor to that that since we're the only shareholders

4       of record, that Ana's a de facto shareholder.  Maybe she is,

5       maybe she isn't.  Okay?  But we're talking about a --

6       there's a corporate aspect to this.  I think the partnership

7       thing has largely fallen away despite our best pleading

8       efforts.

9               We're talking about a corporation that claims it

10      owned these things.  It owned the business and the assets

11      and the websites and that Ana walked off.

12               And after we tried to discuss a buyout for her

13      for her share of the business, whatever it was, she took

14      what we claim to be our assets to build her new competing

15      business, attacked us -- in fact, we did get relief from the

16      judge on this business of, you know, defamation attacking.

17      The only party that got relief in the injunction was us, and

18      the judge said she had to stop saying that basically we were

19      doing illegal things and didn't have rights in the stuff we

20      were selling.

21              We were injured very badly by that.  Our money --

22      you know, our income went down.  It took my clients a while

23      to climb back up.

24              So like in any case like this, we're saying we

25      were damaged.  We're saying they have unjust enrichment by

42

1    the behavior they engaged in, in those businesses.  That's

2    just --

3               THE COURT:  Okay.

4               MR. AKSELROD:  -- classic stuff that's subject to

5    discovery in a case like this.

6               THE COURT:  All right.  I'm --

7               MR. KOGAN:  Your Honor, I --

8               THE COURT:  Go ahead.

9               MR. KOGAN:  I'm sorry.  If the Court would like me

10   to brief this issue, I would like to take 10 days to brief

11   that.

12              I believe that the proper procedure for that kind

13   of a claim is for them to make a colorable claim, some kind

14   of a showing, and despite counsel's efforts at this time,

15   Judge Sifton had written an extensive decision and it is the

16   opposite of what he claims.  He's misreading the decision

17   specifically with respect to that finding by the judge.

18              The implication of there being a corporation and

19   no partnership is not that all of a sudden my clients' claim

20   is reduced to nil.  It's the contrary.

21              It's that it's showing that the plaintiffs' claim

22   is just inconsistent with the law and that they have treated

23   this business in a way that it cannot be interpreted

24   according to their interpretation.

25              THE COURT:  Okay.  Here's what we're going to do.

43

1    You have an uphill battle, but I'll take a letter brief no

2    more than five pages.  Hold on.

3              MR. AKSELROD:  Do I wait to respond to that, Your

4    Honor?

5              THE COURT:  Hold on, hold on --

6              MR. AKSELROD:  I don't know what the law is.

7              THE COURT:  -- hold on.

8              MR. AKSELROD:  Yes.

9              THE COURT:  June 26th, and then July 3rd is a

10   similar -- is the written response, same five pages.  No

11   reply.

12             All right.  That is the only outstanding issue --

13             MR. AKSELROD:  One last thing on our side --

14             THE COURT:  -- on the three categories.

15             MR. AKSELROD:  One last thing on our side is that

16   I think our second document request is -- the response is

17   about six weeks overdue.

18             MR. KOGAN:  Your Honor, that's the subject of this

19   issue.  They want post-divorce documents and we are

20   objecting to that.  That's really the subject of this --

21             THE COURT:  Okay.  I --

22             MR. KOGAN:  -- issue.

23             THE COURT:  I have bifurcated things, but it's not

24   my first reaction.  My first inclination, I should say.  And

25   as far as I see it, there's a lot of discretion.  I don't

44

1    know that there's any law that says I have to do it that way

2    or any -- so you got an uphill battle, but I'm keeping an

3    open mind.

4            MR. KOGAN:  Your Honor, can I proceed to my

5    issues --

6            THE COURT:  Yes.

7            MR. KOGAN:  -- for a moment?

8            With regard to the protective order, I think we're

9    going to be able to work that out and if we -- we had one

10   distinction that I would like to make -- counsel and I have

11   only disagreed about one item.  The commercially sensitive

12   documents, counsel wanted them to be attorney's eyes only.

13           I have some concerns with regard to personal

14   banking records.  I understand that.

15           But at the same time, his clients' business

16   records -- in order for me to analyze the business records

17   in their entirety, I have to look at his clients' personal

18   business records because there's so much commingling.  No,

19   it's his clients' --

20           THE COURT:  Personal records.

21           MR. KOGAN:  I'm sorry --

22           THE COURT:  You got to look at the personal

23   banking records and the business banking records --

24           MR. KOGAN:  In order to have the complete picture.

25           THE COURT:  -- together.

1          MR. KOGAN:  Correct.  And I need to be able to

2     review that with my client.  So if we mark that commercially

3     sensitive, attorney's eyes only, I don't get to review that

4     with my clients.

5          And I need that in -- because that is -- those are

6     the business records.  I can't not review the business

7     records with my client.  It hampers my preparation of the

8     case.

9          THE COURT:  If we're going to be redacting things

10    so the personal banking records are not going to reflect a

11    timeshare purchase in Boca or whatever --

12         MR. KOGAN:  Right.

13         THE COURT:  You know, it's just going to be

14    business related.  What's the problem?

15         MR. AKSELROD:  Just business related?  I don't

16    have a problem with just business related.  What --

17         MR. KOGAN:  Okay.

18         MR. AKSELROD:  I don't know -- I'm not sure even

19    what the argument is about since we haven't gotten there

20    yet.

21         MR. KOGAN:  Okay --

22         MR. AKSELROD:  This is just talking about the

23    language of the protective --

24         MR. KOGAN:  Right.

25         MR. AKSELROD:  We haven't had a fight about --

46

1          THE COURT:  No, no.  No, no, I think --

2          MR. AKSELROD:  -- whether some particular --

3          MR. KOGAN:  There was one comment that --

4          MR. AKSELROD:  -- bank record --

5          MR. KOGAN:  You made one comment and I'm trying to

6     resolve that one last comment so we could sign it today.

7     And that's the only thing that's standing in the way of

8     resolving it.  If we have -- if we redact the business

9     records as the Court is proposing, then --

10          THE COURT:  Personal records.

11          MR. KOGAN:  -- the personal records to take out

12     anything that's not business related, then you shouldn't

13     have a problem -- it will still constitute commercially

14     sensitive, in essence, but I'd like commercially sensitive

15     materials to be not attorney's eyes only.  Commercially

16     sensitive materials would be -- or at least let's have

17     the --

18          THE COURT:  How --

19          MR. AKSELROD:  I can't speak in the abstract about

20     --

21          THE COURT:  Let's carve out --

22          MR. AKSELROD:  -- what is and is not --

23          THE COURT:  -- carve -- I wouldn't --

24          MR. AKSELROD:  -- commercially sensitive.

25          THE COURT:  I wouldn't do that.  I would somehow

47

1    carve out these records --

2         MR. KOGAN:  As a separate category, okay.

3         THE COURT:  -- as a separate category so you can

4    show them to your clients in an effort to litigate the case.

5    I mean, so have them as a separate category, maybe.  Maybe

6    I'm --

7         MR. AKSELROD:  I'll tell you -- I mean, just --

8    again, I -- these two subjects weren't together in my mind

9    until right now, but I mean, it seems to me like, for

10   example, if in a quote, unquote, you know, personal bank

11   statement income from the business is shown, that to me is

12   not commercially sensitive.

13        You could show that to your client that there was

14   -- you know, that a deposit from the business, whether it's

15   payment, salary, whatever -- for both of us, that's not

16   commercially sensitive, nor is money going out that's

17   business related --

18        MR. KOGAN:  You know what?  So maybe we need --

19        MR. AKSELROD:  -- commercially sensitive.

20        MR. KOGAN:  Okay.

21        MR. AKSELROD:  We'll just talk about it.  I --

22        MR. KOGAN:  We need to talk about that because --

23        MR. AKSELROD:  Yes.

24        MR. KOGAN:  -- my -- okay.

25        MR. AKSELROD:  That's not --

48

1          MR. KOGAN:  We had a different understanding of

2     that --

3          THE COURT:  Okay.

4          MR. KOGAN:  -- and I thought that that's what you

5     were trying to accomplish by --

6          THE COURT:  All right.

7          MR. AKSELROD:  Okay.

8          MR. KOGAN:  -- changing the phrasing.

9          THE COURT:  You'll talk and you'll let me know if

10    you can't work it out.

11         MR. KOGAN:  The next issue for me was there was an

12    email list of customers that began -- there was an email

13    list of customers that began in 2002 when my clients started

14    the business.

15         At some point they had tens of thousands of

16    customers on that email list.  Later on they had a couple of

17    hundred thousand customers on that list.

18         There must be records that show that customer list

19    expanding throughout the years.  I don't have any of those

20    records.  They have those records, they have the customer

21    list, and they have whatever records show as it was expanded

22    throughout the years.

23         I don't have that at all.  They have the entire

24    list itself.  They have --

25         THE COURT:  Is this --

49

1          MR. KOGAN:  -- documentation on every customer --

2          THE COURT:  Is this an issue?

3          MR. AKSELROD:  Yes, it's a huge issue.

4          THE COURT:  Why?

5          MR. AKSELROD:  This is ground zero for us of

6     confidentiality and business sensitivity.  This is a -- you

7     know, a list of 250,000 customers with emails that obviously

8     I do not -- certainly do not want in Ana Bove's hands,

9     because it certainly has obvious competitive relevance.

10     Discovery relevance, I don't see it.

11          My clients don't want to produce it at all.  She's

12     in business.  She has lots of these customers because they

13     have control of the websites.

14          By the way, this is a repackaging of something

15     they sought and failed to get in the injunction part of the

16     case.  Make them give us the list of customers.  The court

17     wouldn't give that.

18          I don't want turning it over, A, because it's

19     sensitive and there's already a history of Ana doing extra

20     judicial things to interfere with our business.  She's done

21     things with the -- talked about the eBay store.  She tried

22     to do it once before.  I don't want to give her the list for

23     her to be able to use it competitively.

24          Now, at the end of the day if they win the case,

25     maybe that ends up being hers --

1          THE COURT:  What do you need the --

2          MR. AKSELROD:  -- on the merits.

3          THE COURT:  What do you need --

4          MR. AKSELROD:  I don't know.

5          THE COURT:  -- the list for?

6          MR. KOGAN:  Like I said, it's not so much the

7     snapshot of today, it's the list as it evolved throughout

8     the years.  They have all those records from the beginning.

9     In fact, they have records on every single customer and

10    every single purchase from the beginning.  It's like the

11    back-end record for each customer of a retail business.

12          So they --

13          THE COURT:  Can --

14          MR. KOGAN:  -- they have it all and we cannot

15    demonstrate how the business had grown without that.  And

16    they have that --

17          THE COURT:  Well --

18          MR. KOGAN:  -- in its entirety.

19          THE COURT:  So --

20          MR. AKSELROD:  That could be done without -- if

21    there -- if this is true, and I don't know if technically

22    it's this true, maybe we can proffer the growth -- some type

23    of growth data without giving you the emails of customers.

24          MR. KOGAN:  Why would they be entitled to do that

25    and we would not be entitled to hold back all of our bank

1    records from 2002?  They want to look at gross sales and be

2    able to verify it with their own eyes --

3              THE COURT:  Well, the --

4              MR. KOGAN:  -- and we would not be entitled to see

5    the customer list and the records of each customer --

6              MR. AKSELROD:  Customer lists are sensitive --

7              MR. KOGAN:  -- from 2002?

8              THE COURT:  That's --

9              MR. AKSELROD:  Customer lists are always --

10             MR. KOGAN:  It's our customers from 2002.

11             MR. AKSELROD:  -- always considered to be a

12   sensitive matter.

13             THE COURT:  Okay.  Well, that -- you might end up

14   getting that at the end of the day.  What you -- what the --

15   you -- the preface to this discussion was you wanted to see

16   the progression of the business, vis-a-vis the customer

17   list.  That can be done a number of ways.

18             It can be a proffer or it could be producing the

19   customer list without the email addresses, because

20   typically, at least with our -- my email systems both at

21   home and at work, when I send out emails, it'll have the

22   person's name and then it'll have the email address.  So you

23   can take off the email addresses.  Their concern is that

24   they'd be giving you their --

25             MR. AKSELROD:  An instant --

52

1        THE COURT:  -- their -- what they consider to be

2    their customer list now and over time, and then your clients

3    would then use that to solicit business.  And that's the

4    problem.

5        My preference would be, if possible, to give them

6    snapshots over time show -- to show how the customer list

7    has grown with the names of the customers and redact the

8    email addresses because the email addresses is the access.

9    I mean, they could -- theoretically I guess they could take

10   the names and then do a search somehow and try to find email

11   addresses and get to -- you know, but --

12       MR. AKSELROD:  Or -- yes, or maybe we could just

13   do like first initial and last -- I don't know, whatever.

14   The names --

15       THE COURT:  They're -- I think they're entitled to

16   the information --

17       MR. AKSELROD: Okay.

18       THE COURT:  -- in a way that can be controlled and

19   I think this definitely whether it -- however it's redacted

20   or produced is -- what was it --

21       MR. KOGAN:  Attorney's eyes?

22       THE COURT:  -- confidential business records or

23   whatever it is?

24       MR. KOGAN:  Commercially sensitive?

25       THE COURT:  Commercially sensitive documents.  So

53

1    we'll do it that way.

2              MR. AKSELROD: Okay.

3              THE COURT:  Now, do you want -- other than showing

4    how the customer list has grown, do you want underlying

5    emails to the customers?

6              MR. KOGAN:  I would like the underlying records

7    that show the -- in other words, let's say in 2004 they have

8    a list of 50,000 clients and in 2007 they show that these

9    same customers have bought, I don't know, a million dollars

10   worth of goods over the last three years.

11             I'm entitled to that, because that means that my

12   customer list, my base is what brought this business to

13   where it is.  The base that they had no part in, in 2004 and

14   received access to in 2004.

15             THE COURT:  I -- no, I hear that, but I'm sort of

16   trying to think what are the documents at issue here.

17             MR. AKSELROD:  I'm concerned about the just the --

18   if this is easy to do by pressing buttons, I mean what are

19   we -- what's the workload here --

20             MR. KOGAN:  My understanding --

21             MR. AKSELROD:  -- we're talking about?

22             MR. KOGAN:  -- is that it is -- I could be wrong.

23   My understanding is that the entire back end is a system.

24   It's not a -- it's not manually done one by one.  It is a --

25   like a database system that all you have to do is do a

54

1    search by when did this client enter our database and then

2    -- that's my understanding.  If I'm incorrect on that, I

3    guess we need to explore how -- what you actually are able

4    to produce and how --

5            THE COURT:  Explore it, but I thought that you

6    were also looking for let's say customer A sends an email

7    saying I'm looking for a pattern about this and, you know,

8    and you want those emails, too.

9            MR. KOGAN:  We gave them all the customer emails

10   that we had.

11           MR. AKSELROD:  We got a lot of that from them.

12   Look, it's --

13           MR. KOGAN:  We had like 30,000 customer emails --

14           MR. AKSELROD:  Yes.

15           MR. KOGAN:  -- that we've had and we gave them

16   over in their entirety, not redacting anything, completely

17   giving them everything we've had.  And communications with

18   the vendors in their entirety.  You know, no redaction

19   whatsoever.

20           No commercially sensitive meaning the clients were

21   -- you know, we had -- everybody had access to that in April

22   of '08.  All of a sudden we're not entitled to it?  I mean,

23   that's really --

24           MR. AKSELROD:  I didn't say you're not entitled to

25   that --

55

1          MR. KOGAN:  I understand, but I'm saying my

2     clients were able to look at it the day before because they

3     were in the business the day before.

4          THE COURT:  Well, that's what happens when people

5     leave businesses, right?  You know --

6          MR. KOGAN:  Or out -- are frozen out of a

7     business.

8          THE COURT:  Or --

9          MR. KOGAN:  That's --

10          THE COURT:  Well, it shouldn't happen when they're

11     frozen out, but --

12          MR. AKSELROD:  If I might, Your Honor.  I mean,

13     what Mr. Kogan produced, these kinds of routine back and

14     forth with the customers and thank you and -- you know, he

15     did produce a lot of that stuff.

16          It's responsive and, you know, we both asked for

17     that kind of thing.

18          Frankly, it's kind of slight in the grand scheme

19     of this case and, you know, I don't know what we've -- if

20     you really want that --

21          MR. KOGAN:  It's important to our client.  We've

22     given you everything we've had in that aspect without any

23     limitation.

24          THE COURT:  I think --

25          MR. AKSELROD:  You know, the day-to-day -- I mean,

56

1    we -- you know --

2              THE COURT:  If he wants it, you know --

3              MR. AKSELROD:  But again -- well, we're going to

4    have to redact the email addresses then.

5              THE COURT:  But that's a burden you're going to be

6    taking on --

7              MR. AKSELROD: Okay.

8              THE COURT:  -- you know.

9              MR. AKSELROD:  Then we'll do it.  We'll do it.

10             THE COURT:  Next issue?

11             MR. KOGAN:  Your Honor, I'm not prepared to

12   address something and I just want to be fair to counsel

13   about that because counsel has given me some documents in

14   the last 10 days or so and I appreciate the production.

15             I'm not prepared to respond to it just because I

16   have been -- I'm getting the client into the office to

17   review some of the issues and concerns about that, but I

18   know that we're not done.

19             I do have interrogatories where there was some

20   response -- I know that I was not -- in my initial glance at

21   the responses to the interrogatories, they're

22   unsatisfactory.

23             They were vague and not specific in their response

24   like for example in -- with regard to documents that I

25   sought on a particular issue, the response was look at CD

57

1    three and CD four, which contains many, many documents and

2    I'm not prepared to go item by item at this point just --

3              THE COURT:  I would rather not do that if -- you

4    know, so --

5              MR. KOGAN:  Okay.  I would like to just make it

6    clear to counsel that I would like to attempt before we

7    bring anything to the Court's attention if we can try to

8    address it and resolve it, that would be great.

9              THE COURT:  Okay.

10             MR. AKSELROD:  Okay.

11             MR. KOGAN:  And I will do it by phone call, Your

12   Honor --

13             THE COURT:  All right.

14             MR. AKSELROD:  Could --

15             MR. KOGAN:  -- without wasting paper or --

16             MR. AKSELROD:  I know focused on the -- just on

17   the -- your briefing the issue of post-divorce monies from

18   your new businesses, but we had a lot of questions on our

19   most recent document request and I would like to know that

20   we're getting a written response to that.

21             It wasn't just about that.  There's a lot of

22   questions on there.

23             MR. KOGAN:  I'm working on an additional

24   production with regard to that, but this -- a substantial

25   portion of it was that.  That was the -- the bulk of it was

1    post-divorce issues.

2                THE COURT:  Okay.  Well --

3                MR. AKSELROD:  I'm entitled to a written response.

4    I would like to have that at least.

5                THE COURT:  Give him a written response.

6                MR. AKSELROD:  Well, just by -- by way -- request

7    number 1, just by way of example, "All documents concerning

8    defendants' ownership or operation or use of any websites or

9    domain names from 2002 to the present."

10               MR. KOGAN:  To the present --

11               MR. AKSELROD:  Yes, but I understand.

12               MR. KOGAN:  So all those demands were -- you know,

13   counsel even -- we've met before then and counsel was saying

14   to me I'm primarily focused on my -- the bulk of my case, my

15   primary interest is from 2008 --

16               THE COURT:  Thousand eight.

17               MR. KOGAN:  -- going forward and I'm going to give

18   you a second document demand with regard to that -- the

19   financials going forward and I understand.

20               MR. AKSELROD:  Okay.

21               MR. KOGAN:  Almost every response has a component

22   of going forward and I -- if you're telling me no, really my

23   focus was from 2002, I understand, but that's not what I

24   understood your primary direction --

25               MR. AKSELROD:  But events pre-divorce are highly

1    probative of, you know, the issues in terms of who owns what

2    and who has rights to websites --

3              MR. KOGAN:  I'll give you a written response to

4    that.

5              MR. AKSELROD:  -- and stuff like that.

6              MR. KOGAN:  That's no problem.

7              THE COURT:  Okay.  All right.  We -- there are

8    still a lot of issues apparently to be worked out in written

9    discovery, and then we have depositions.

10             MR. AKSELROD:  Yes.

11             THE COURT:  There are at least four --

12             MR. AKSELROD:  Yes.

13             THE COURT:  -- correct?

14             MR. AKSELROD:  Yes, sir.

15             MR. KOGAN:  Yes.  And one of them we have to work

16   out logistics for because she's in Israel.

17             THE COURT:  Going to go to Israel and take the

18   deposition?

19             MR. AKSELROD:  I don't know.

20             THE COURT:  Why not?

21             MR. AKSELROD:  I mean, I'm -- I'd love to go.

22             MR. KOGAN:  Nice trip --

23             MR. AKSELROD:  It's expensive, but we'll -- either

24   we'll --

25             MR. KOGAN:  Like to join us?

60

1        MR. AKSELROD:  -- do that or we'll --

2        THE COURT:  I would love to, frankly.

3        MR. AKSELROD:  -- we'll work out a high tech

4  virtual thing or one of us will go, whatever.  We'll work it

5  out.

6        THE COURT:  All right.

7        MR. AKSELROD:  I mean, I believe, you know, this

8  is a case -- and I'm not a long-winded person.  I very

9  rarely take more than a one-day deposition in any case.

10       I don't -- I think Mr. Kogan will agree that these

11  are not one-day -- this is not a one-day deposition case.

12  It's too many years.  It's thousands of documents, four

13  parties, there's language issues.

14       And I also think getting started, maybe taking a

15  day of each of them, will help us focus on our document

16  issues as well because of the sort of relative messiness of

17  the management of the business.  I mean, we have to get

18  started.  You know, we've been going at this for a while.

19       THE COURT:  Okay.  We are coming up on our one-

20  year anniversary in August.

21       MR. KOGAN:  Your Honor, getting started is --

22  there's some part that's really -- we're deceptively far.

23  We really are to -- very close to -- in reality, I just got

24  the tax returns two days ago.

25       THE COURT:  Uh-huh.

61

1      MR. KOGAN:  I've asked for them from day one and

2  -- and that's just the beginning.  That's a partial tax

3  returns.  As far as I'm concerned, there's the individual

4  tax returns which I'm -- you know, I haven't received and I

5  don't know what they're going to show about other income and

6  other alleged expenses whether being deducted in both

7  personal and business returns.

8      In any events, the -- I have very, very incomplete

9  business financial records.  I --

10      THE COURT:  We have a lot of work to do in other

11  words.

12      MR. KOGAN:  Right.  I think that commencing -- you

13  know, doing a deposition tomorrow really is not appropriate.

14      THE COURT:  I don't anticipate you folks doing

15  them tomorrow.

16      (Pause.)

17      THE COURT:  On September the 9th at 2:00, we're

18  going to have a status conference.  I really would like to

19  know at that point that all document issues are done; that

20  you each have a complete set of documents that you need and

21  you're ready to take depositions.

22      MR. AKSELROD:  Okay.

23      THE COURT:  And final pretrial conference,

24  although this was originally scheduled as a final pretrial

25  conference, we will do that on December 22nd at 10:00 a.m.

62

```
 1              MR. AKSELROD:  Okay.

 2              THE COURT:  If prior to the status conference you

 3      still have outstanding discovery issues, I would like a

 4      joint letter laying out issue one.  Describe it; plaintiffs'

 5      position, defendants' position.  Issue two -- so that'll be

 6      -- okay -- August 28th.

 7              MR. AKSELROD:  Okay.

 8              MR. KOGAN:  Your Honor?

 9              THE COURT:  Yes.

10              MR. KOGAN:  I apologize.  We had issued a subpoena

11      to the tax preparer a long time ago, about three months ago.

12              THE COURT:  Uh-huh.

13              MR. KOGAN:  That person, although counsel

14      indicated in a letter a couple days ago that that tax

15      preparer had been instructed to release records, had not

16      responded to the subpoena to date.

17              THE COURT:  Okay.

18              MR. KOGAN:  We would like to receive a complete

19      cooperation on that subpoena if this is a person under their

20      control and if not, do I really -- if I need to, I'll make a

21      motion before the Court to --

22              THE COURT:  I think you should --

23              MR. KOGAN:  -- compel or punish for --

24              MR. AKSELROD:  I don't have an issue with control.

25      You know, what I've -- maybe what's sort of between the
```

63

1    lines here is an issue that was never resolved back months

2    ago that had to do with the issue of personal versus

3    corporate tax returns.

4          We had a conference call with you or a meeting

5    with you many months ago and I stated the law about the

6    higher burden for getting personal tax returns and objected.

7    It was not resolved as far as I recall.  That's number one.

8          Number two is I haven't heard from Mr. Kogan on

9    his position about the same kinds of requests.  You know, we

10   went tit for tat and we said okay, give us your tax --

11   personal tax stuff.  I don't know what their position is on

12   their personal tax stuff either.

13         So, A, we have an objection that was not resolved

14   and, B, I don't know what their position is.  Regarding the

15   corporate stuff, I don't know why it took so long.  We told

16   them to produce it.  It --

17              THE COURT:  Okay.

18              MR. AKSELROD:  -- whatever happened --

19              THE COURT:  Again --

20              MR. AKSELROD:  -- they have it.

21              THE COURT:  -- it's a two-say street on the

22   personal side.  So if you want it, you'll get it, but your

23   side's going to have to give it up, too.

24         Call him or her and say that, you know, the Judge

25   would like this done right away.  You can make a joint call.

64

1      You can -- one of you can make the call.

2                  I mean, I don't think it makes sense for Mr. Kogan

3      to be the one because --

4                  MR. AKSELROD:  Telling him to produce the rest of

5      the corporate stuff if there's stuff missing?

6                  THE COURT:  Yes, and the personal stuff.  I mean,

7      get it out there.

8                  MR. AKSELROD:  Are you --

9                  THE COURT:  Both ways --

10                 MR. AKSELROD:  You're going to produce personal

11     tax records?

12                 MR. KOGAN:  My clients' personal tax records I do

13     not see why those would be relevant in the same way.

14                 THE COURT:  It's a two-way street.

15                 MR. AKSELROD:  We're in the exact same position.

16                 THE COURT:  It's a two-way street.  I'll -- that's

17     all I'm going to say.  What --

18                 MR. AKSELROD:  Do you want to discuss it?

19                 THE COURT:  Are we going to the mat on this?  On

20     this case?

21                 MR. AKSELROD:  We could --

22                 THE COURT:  I want to move on from there.  It's a

23     two-way street.  If you want personal tax returns, you're

24     going to have to give them up.

25                 MR. KOGAN:  With regard to the corporate tax

1    returns, I still -- I just received tax returns.  I didn't

2    receive any underlying records.  I mean, I'm sure the

3    accountant has them.

4             THE COURT:  He's --

5             MR. KOGAN:  I'd like to get them --

6             THE COURT:  Give him a call and get them.

7             MR. AKSELROD:  You'll get them.

8             MR. KOGAN:  Okay.

9             MR. AKSELROD:  I'll tell them -- I don't know what

10   there is.  I've never seen them, but if there's support for

11   the tax returns, you can have --

12            MR. KOGAN:  Well, I presume, I mean, they're

13   saying that there's $100,000 in building improvements.  They

14   can't make that number up.  They must have something that

15   supports building improvements for a hundred thousand

16   dollars.

17            MR. AKSELROD:  Whatever's in his work file, his

18   work papers for the corporation, I don't -- I will tell him

19   to produce.

20            THE COURT:  Okay.

21            MR. AKSELROD:  Okay?  I have no problem with that.

22

23            THE COURT:  Are we going to the mat on this case,

24   or are you going to be able to work this out?

25            MR. AKSELROD:  Well, you know, it's -- we went to

66

1    a mediator in Long Island without success.  He spoke to both

2    of us separately.  It is -- you know, my clients are still

3    going and paying, but it is a very expensive lawsuit.

4          This is a very expensive lawsuit for essentially

5    what are little people who had a reasonably successful

6    family business.  I don't really know.  You know, we haven't

7    talked about it in a long time.  I don't know if we're going

8    to the mat on it or not.

9          MR. KOGAN:  I know that my client -- my clients

10   have tried to -- I believe that mediation would make sense

11   -- still make sense.  I always said to my clients that --

12   and I believe that we're -- they didn't want to proceed with

13   the mediation.

14         In private they communicated to my client that

15   they don't believe they'll ever have to produce any business

16   records.  Maybe after production of the personal records, it

17   would make sense to sit down because everybody will see that

18   everything's on the table.

19         At this point maybe they thought we could hide

20   something or whatever --

21         THE COURT:  Maybe even the specter of having to

22   produce the personal records will get them to reconsider.

23         I would like to know -- I mean, I think you should

24   talk to your folks and in two weeks give me a status report

25   on whether you want to have a settlement conference.  I will

67

1    give you as much time as you need, but I would want people

2    here.

3              MR. KOGAN:  I agree --

4              THE COURT:  I don't want to have, no offense, just

5    -- I don't want it just to be us.

6              MR. KOGAN:  Oh, I think that --

7              MR. AKSELROD:  Guilty.

8              MR. KOGAN:  -- it would be very effective -- no

9    matter what, I think it would be very effective for -- it's

10   -- parties always only -- don't really -- fail to see the

11   complete picture and I think it's always helpful.

12             I think that the Mikhlyns and my clients would

13   benefit from such a conference.  I don't know if counsel --

14   I would consent to that, of course.

15             I don't know if counsel --

16             MR. AKSELROD:  I got to talk to them.  I'm always

17   open to that kind of thing in general, but let's talk to the

18   clients.

19             One last housekeeping thing, Your Honor, if -- I

20   may have missed it.  I don't recall you saying when we would

21   respond to Mr. Kogan's letter brief on the issue of

22   bifurcating --

23             THE COURT:  July 3rd.

24             MR. AKSELROD:  Oh, we got that.  Okay.  I'm sorry.

25   I think we're set.

68

1      THE COURT:  Okay, so send me a letter on whether

2  you want to have a settlement conference --

3      MR. KOGAN:  When would the Court be --

4      THE COURT:  On -- geez, July 3rd is two weeks

5  away, right?  Pretty much.  Wow.  I -- the only time I do

6  not have available this summer is, I'll tell you, the week

7  of July 13th, the week of August 17th, and the week of

8  August 3rd we actually have a trial that day.

9      Although it's a jury trial, so I give my full

10  attention to my juries.  So those are the only three weeks

11  that I would be unavailable this summer.

12      Are your clients going to be in country anytime

13  soon?

14      MR. KOGAN:  Not the person who's abroad, but we --

15  we're quite capable of making the -- making any settlement

16  decisions on that person's behalf.

17      THE COURT:  Okay.

18      MR. KOGAN:  So I have principals here who could

19  participate --

20      THE COURT:  All right.

21      MR. KOGAN:  -- and resolve --

22      THE COURT:  All right, let me know.

23      MR. AKSELROD:  Thank you.

24      THE COURT:  Thank you, gentlemen.

25      MALE VOICE:  Thank you.

69

1          MR. KOGAN:  Thank you, Your Honor.

2          (Proceedings concluded at 11:56 a.m.)

3          I, CHRISTINE FIORE, court-approved transcriber and

4     certified electronic reporter and transcriber, certify that

5     the foregoing is a correct transcript from the official

6     electronic sound recording of the proceedings in the above-

7     entitled matter.

8

9     *Christine Fiore*

10    _____          June 29, 2009

11        Christine Fiore, CERT

12           Transcriber

13

14

15

16

17

18

19

20

21

22

23

24

25