```
           UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK

-----------------------------X  Docket#
MIKHLYN, et al.              :  08-cv-3367(CPS)(RER)
               Plaintiff,    :
                             :
     - versus -             :  U.S. Courthouse
                             :  Brooklyn, New York
BOVE, et al.,               :
               Defendant    :  September 9, 2009
-----------------------------X
```

```
    TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
       BEFORE THE HONORABLE RAMON E. REYES, JR.
           UNITED STATES MAGISTRATE JUDGE
```

**A    P    P    E    A    R    A    N    C    E    S:**


**For the Plaintiff:**            **Eric Wertheim, Esq.**
                                  Val Mandel
                                  80 Wall Street
                                  New York, New York 10005

**For the Defendant:**            **Boris Kogan, Esq.**
                                  **David Binson, Esq.**
                                  Boris Kogan & Associates
                                  277 Broadway
                                  New York, New York 10007


**Official Transcriber:**         **Rosalie Lombardi**
                                       **L.F.**



**Transcription Service:**        **Transcription Plus II**
                                  3589 Tiana Street
                                  Seaford, N.Y.  11783
                                  (516) 358-7352
                                  Transcriptions2@verizon.net


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

## Proceedings

1          THE CLERK:  The Honorable Ramon E. Reyes, Jr.

2  presiding.

3          Civil Cause for a Status Conference, docket

4  number 08-cv-3367, Mikhlyn v. Bove.

5          Counsel for plaintiff please state your name

6  for the record.

7          MR. WERTHEIM:  Eric Wertheim, Law Office of Val

8  Mandel, P.C. for the plaintiffs.

9          THE COURT:  Good afternoon.

10          MR. WERTHEIM:  Good afternoon.

11          THE CLERK:  Counsel for the defendant?

12          MR. KOGAN:  Good afternoon, your Honor.

13          Boris Kogan for the defendants and I have with

14  me, David Binson, my associate and to my right is a law

15  clerk from my office, Yasseou Abeshouse,

16  A-b-e-s-h-o-u-s-e.  Sorry.

17          THE COURT:  It's easy for you to say --

18  apparently not; no.

19          Is the protective order done?

20          MR. KOGAN:  No.

21          MR. WERTHEIM:  Well what I had indicated in my

22  last communication to them and what I am willing to say

23  is if they want to go with the last draft, I'm okay with

24  it.  I made a suggestion but if they want to reject it,

25  as I said in my email a long time ago, I will leave it up

Transcription Plus II        Rosalie Lombardi

3

**Proceedings**

1  to you.  I had one last comment.  It wasn't a demand.

2  I'm willing to get up and say that the last draft of the

3  protective order is it and that's fine.

4          THE COURT:  File it by Friday.

5          MR. WERTHEIM:  Okay.

6          THE COURT:  What else remains?

7          MR. WERTHEIM:  Well I think, your Honor,

8  unfortunately everything remains.  We did not make any

9  progress along the things you directed us to do

10 specifically on June 28.  You issued a few direct rulings

11 as to what we were supposed to do in the way of producing

12 things and some guidelines on how we were supposed to

13 deal with each other.  And it has not been followed.

14          One thing you said was on June 28, that they

15 had to respond in writing to our last document request

16 which was then already a couple of months overdue.  I

17 haven't received that.  It's now about 20 months overdue

18 -- 20 weeks, excuse me, not 20 months.

19          Big sticking point, I think --

20          THE COURT:  Okay.

21          MR. WERTHEIM:  -- is this issue of --

22          THE COURT:  Let's do things one at a time.

23          MR. WERTHEIM:  Okay.

24          THE COURT:  What's the problem with the written

25 response to the document requests?

4

### Proceedings

1          MR. KOGAN:  No problem, your Honor.  Protective

2    order is -- we couldn't get off the ground with the last

3    issue which counsel is now withdrawn -- we don't have to

4    get into it but that's -- without a protective order,

5    they've asked us to produce documents that would be

6    sensitive in nature and I have no problem once we have a

7    protective order in place.

8          THE COURT:  Okay.  The protective order will be

9    in place --

10          MR. KOGAN:  On Friday.

11          THE COURT:  Friday.

12          MR. KOGAN:  Okay.

13          MR. WERTHEIM:  That certainly has nothing to do

14    with the written response, your Honor.

15          THE COURT:  The written response to the

16    plaintiff's document requests.

17          MR. WERTHEIM:  Yes, the second document

18    requests.

19          THE COURT:  By the 16th.  If it's not done by

20    the 16th, a $500 sanction to the attorneys.  Next issue?

21          MR. WERTHEIM:  The next issue is, it's called

22    designs and artwork. The defendants, not us, have

23    asserted copyright counterclaims.  You may recall we've

24    litigated different facets of the whole copyright issue

25    of whether there was late filings, whatever.  But the

5

**Proceedings**

1  bottom line is they asserted copyright claims.  They, in

2  their last pleading which is a while back now, they claim

3  to have a -- you know, a numerous list of copyrights and

4  obviously there are correspondent copyright applications.

5           We had been asking for it for a very long time,

6  going way back in the case.  There didn't seem to be any

7  dispute.  At the last conference in June, counsel got up

8  and said my client is concerned that if we turn things

9  over before they give them theirs, we turn over ours.  My

10 clients will take their images and copy them and then

11 claim that they made them originally.  So you said what's

12 the harm in doing a simultaneous exchange.  That was your

13 order.

14          THE COURT:  Yes.

15          MR. WERTHEIM:  Okay.  We went about doing it.

16 We actually have 100 plus CD-ROMS and the reason why

17 there are so many, and I told him that in writing a long

18 time ago is if you are computer user, you know that

19 graphics and photographs and images take up a lot of

20 space.

21          THE COURT:  Take up a lot of space.

22          MR. WERTHEIM:  Okay.  We told him in July in

23 writing, we have the stuff.  They never got back to us.

24 Actually, truth be told, you told us at the last

25 conference that we should be talking to each other.  And

6

**Proceedings**

1  after an initial meeting, I went to Mr. Kogan's office.

2  They stopped talking to us.  I've left several messages

3  with Mr. Kogan trying to talk about all of these issues.

4  I got no response.  I eventually wrote a letter saying

5  hey, you know, we're supposed to talk.  I sent

6  Mr. Binson an email saying Boris hasn't called me back.

7          I finally wrote to them saying look if we're at

8  an impasse, which we appear to be, you're not talking to

9  us, let's at least write the joint letter about problems

10  that Magistrate Reyes told us to do the last time.  That

11  was ignored.  That's when I finally wrote to you to get

12  this thing done.  And that's when finally came to life

13  about discovery issues.

14          Now getting back to the images, we told them it

15  was ready back in July.  I don't remember what month it

16  was, maybe it was in August, I get an email from

17  Mr. Kogan's associate, Mr. Binson, saying we have to have

18  some kind of agreement now about this exchange and you

19  have to draft it; me.  First of all, I don't even know

20  what's supposed to be in it.  I don't agree that an

21  agreement is needed.  This is governed by the discovery

22  rules.

23          THE COURT:  I can circumvent this.  Wednesday,

24  everybody is coming here and you are bringing your

25  copyright applications, the images, whatever, 100 CD-

Transcription Plus II      Rosalie Lombardi

7

**Proceedings**

1  ROMS, and you're going to exchange them.

2           MR. KOGAN:  Your Honor, I just would like to

3  respond because a lot of things were said which were a

4  gross mischaracterization of what had transpired.

5           THE COURT:  Okay.  You can respond.  I am

6  really -- I'm tired of this.  You guys can't work

7  together.  I don't care who it is.  You're both, in my

8  eyes, all of you, are not doing your jobs or you're doing

9  -- you are over litigating this case.  And I really -- I

10 am not going to have it anymore.  But go ahead, respond.

11          MR. KOGAN:  Your Honor, specifically when

12 Mr. Wertheim brought certain issues up during our meeting

13 in person, we requested certain documents from them.

14 They promised to give us those documents, the financial

15 records of the business.  So far of all the financial

16 records of the business, we have only received -- I'm

17 sorry, we've only received tax returns.  That's the only

18 financial records of the business we've received and --

19          THE COURT:  All right.  This is not in response

20 to --

21          MR. KOGAN:  No, I am just -- I would like to

22 show there's actually a pattern --

23          THE COURT:  I think --

24          MR. KOGAN:  -- the claim that we are not

25 cooperating with them but in reality, he acknowledged

8

**Proceedings**

1   that the real issue here is with regard to the exchange

2   -- simultaneous exchange of documents, there are two

3   concerns that my clients have and he refuses to

4   acknowledge that they are legitimate concerns and refuses

5   to enter into an agreement with that -- in that regard.

6          So while we can come here and exchange

7   documents here -- actually three issues; one is the scope

8   of the exchange, the fact that he is bringing 100 CDs is

9   an indication that they are going to be dumping on us

10   documents that are either irrelevant, immaterial or that

11   he doesn't either -- Mr. Wertheim or his client, doesn't

12   understand what it is that is the subject of this

13   exchange.

14          My clients actually have the original

15   documents, as well as the -- meaning the original

16   designs, the public domain designs, as well as the

17   designs that they created which are a variation on public

18   domain designs.  And all those documents somehow fit into

19   30 CDs.  And his clients don't even have those documents.

20   They don't even have them.  So they couldn't possibly

21   come up with 100 CDs unless they're dumping on us

22   materials that are irrelevant.

23          THE COURT:  Okay.

24          MR. KOGAN:  That's why the scope of the

25   exchange is important to be defined.  And I would like

9

## Proceedings

1   the scope to be all records of whatever nature that prove

2   that they -- that anyone's claim that they have copyright

3   -- copyrightable --

4          THE COURT:  So what's --

5          MR. KOGAN:  -- claim.

6          THE COURT:  So if that's the scope, what's

7   going to prevent him from dumping?

8          MR. KOGAN:  He doesn't --

9          THE COURT:  I mean, I --

10         MR. KOGAN:  That's fine.

11         THE COURT:  Unless you want me to go through

12  every document that each side produces --

13         MR. KOGAN:  I don't; no.

14         THE COURT:  -- I can't stop you from dumping.

15         MR. KOGAN:  I --

16         THE COURT:  If there is dumping, if at the end

17  of the day you get 100 CDs and you go through it and

18  it's, you know, the plaintiff's shopping list from two

19  years ago or nonsense, then you file a motion for

20  sanctions against Mr. Wertheim and you've probably got a

21  good shot of hitting it.  Okay?  So you know, I am not

22  going to sort it out now.

23         MR. KOGAN:  I understand.  But, your Honor, the

24  other issue is the scope is important because I don't

25  want them to come back.  The purpose of the simultaneous

### Proceedings

1  exchange is so that they could not come back the

2  following day and say oh, that's what you meant, you

3  meant documents that prove original design by us.  That's

4  what you meant?  No, that's not what I gave you.  I gave

5  you emails.  I gave you all the emails I had.

6         So I don't want there to be -- I don't want to

7  frustrate the purpose of the simultaneous exchange which

8  is that no one can have a leg up on the other guy by

9  saying well, we're submitting documents which will show

10 that my client's design took public domain designs,

11 modified them with creative elements to create a

12 copyrightable design.

13        They're going to produce nothing of the sort.

14 That's what my clients are -- believe.  Now I don't want

15 them to be able to come back the following day and say

16 oh, now that you've given this, we have some additional

17 documents which will also prove the same thing.  We want

18 it to be a one shot simultaneous exchange.  And I am

19 concerned without a very clear definition of what it is

20 that we're exchanging that they're going to try to get a

21 second bite at the apple.

22        THE COURT:  Well I assume you're exchanging

23 things in response to written discovery requests.

24        MR. KOGAN:  No, that's not --

25        MR. WERTHEIM:  Well, it's both.  It's both.  I

### Proceedings

1  mean that's the original -- the only thing that's unusual

2  about --

3           THE COURT:  What are the 100 CDs?

4           MR. WERTHEIM:  What's on the 100 CDs, these are

5  artwork, the designs, the records showing the digitizing

6  process that were done by people other than her.  And I

7  think it also includes things that Anna Bove did, too.

8           THE COURT:  I've got a solution.  I've got a

9  solution.  It's a one-shot deal.  It's happening on

10 Wednesday in this court.  You don't produce it, it's

11 going to be excluded.

12          MR. WERTHEIM:  Okay.

13          THE COURT:  All right?

14          MR. WERTHEIM:  Yes.

15          THE COURT:  Both sides.

16          MR. WERTHEIM:  Okay.

17          THE COURT:  Okay.

18          MR. KOGAN:  That resolves that, your Honor.

19          MR. WERTHEIM:  By the way, your Honor, this

20 whole idea of --

21          MR. KOGAN:  Lastly -- I'm sorry, I just would

22 like to add one item that I would have wanted an

23 agreement, is I would like it to be clear that these are

24 obviously attorney's eyes only --

25          THE COURT:  We discussed that.

12

**Proceedings**

1          MR. KOGAN:  -- and that we've discussed that

2     last time.

3          THE COURT:  Yes.

4          MR. KOGAN:  And at the end of the litigation,

5     each party gets their CDs back and then no copies are

6     being made.  That obviously has to be part of what I

7     would want to have in an agreement but that has to be the

8     case.  And I wouldn't want to have any ambiguity about

9     that.  I don't want them to afterwards say well we -- at

10    the end of the litigation, we somehow walk away with your

11    documents --

12         THE COURT:  Why --

13         MR. KOGAN:  -- with your records.

14         THE COURT:  At the end of the day, why would

15    you need to keep it?

16         MR. WERTHEIM:  I don't -- I don't -- in fact

17    it's funny you should say that because my last suggestion

18    on the protective order and this is a common thing in

19    litigation, is to have just a general provision that says

20    use anything you get just for the litigation and you get

21    rid of it or turn it back at the end of the case.

22         MR. KOGAN:  That was not discussed, your Honor.

23         MR. WERTHEIM:  That was a suggestion that was

24    objected --

25         MR. KOGAN:  I have it in writing.  The

13

**Proceedings**

1   suggestion was not that.

2         THE COURT:  All right.  It's clear on the

3   record.  Whatever you produce -- well we're talking now

4   mainly about the artwork and the design, all of that?

5         MR. KOGAN:  It's designs, it's all designs,

6   public domain designs and the modified designs which show

7   how these were -- how the designs are being sold by the

8   two respective businesses originated.

9         THE COURT:  All right.  Attorney's eyes only as

10  we discussed at the last conference.  No copies are going

11  to be made without application to the Court.  And at the

12  end of the day, when the litigation is concluded, you

13  will each return to your adversary what was produced.

14        MR. WERTHEIM:  All right.  Your Honor, I have a

15  real problem with at least part of this attorney's eyes

16  only.  It cannot possibly be that you go to Washington

17  and publicly file a copyright application and get a

18  copyright and then say when they turn over their versions

19  of it, it's attorney's eyes only.  I could go to

20  Washington and get this stuff.  It can't be attorney's

21  eyes only.

22        Plus, it's a copyright case and there are

23  issues about who did what, who created what.  How are we

24  supposed to go over this?

25        THE COURT:  Well I assume there are things that

**Proceedings**

1   are going to be produced that were not in the copyright

2   applications, interim steps maybe.

3          MR. KOGAN:  There are but your Honor more than

4   that, their ability to go to Washington or not go to

5   Washington, that's not really the issue.  The -- it was

6   in the last conference, this -- we addressed this issue

7   and attorney's eyes only is appropriate.  It's not

8   appropriate -- the moment that I actually allow them to

9   see these materials, they are going to be able to conjure

10  up a story that they originated.  They're the ones who

11  added the three dimensional component to the fonts.  They

12  are going to come up with a --

13         THE COURT:  But his point is they could do that

14  already by looking at the -- what's filed in the

15  copyright office.

16         MR. KOGAN:  And if they can, let them do that

17  but they're -- they didn't.  They're not going to.  And

18  if they can, if they go to Washington and get them, good

19  luck.

20         MR. WERTHEIM:  How could we litigate this case

21  without each side seeing the artwork that is in dispute

22  (inaudible).

23         (Interposing)

24         MR. KOGAN:  Let's have a hearing on Wednesday,

25  your Honor.  Let's have a hearing on Wednesday and let's

15

**Proceedings**

1   take testimony because they cannot -- right now, they

2   cannot substantiate their claims that they modified these

3   public domain designs to become the designs that they're

4   selling right now because my clients did that.

5          The moment that they review these, they'll say

6   -- they will come up with a story.  Oh, yeah, I added

7   that.  That was my idea to put the green background

8   there.  It was my design -- my idea was to combine these

9   two fonts into one.  Right now they don't know it because

10  they -- they don't know where it came from.  It's all my

11  client's original ideas.

12          MR. WERTHEIM:  I find this to be bizarre,

13  your Honor, that you're going to accept as a premise that

14  my clients are dishonest in some made up way that Anna

15  Bove is concerned about.  They make copyright claims.

16  Artwork and creations are in dispute both ways.  This

17  stuff is publicly filed, copyrighted material.  It has

18  copyright protection.  How could it possibly be

19  attorney's eyes only?  I could not find such a thing when

20  I researched it.  How could you assert a copyright claim

21  when not only is the artwork in dispute in this case, the

22  application process is in dispute based upon what we know

23  from earlier in the case.

24          I don't know that she disclosed or the extent

25  she disclosed the existence of the pre-existing material

16

**Proceedings**

for example, this was based upon.  How could this be

attorney's eyes only?  I just -- I don't understand it.

I don't understand it.  They have -- you know, presumably

they have computer records of her taking original artwork

from some public domain source or a license source,

putting it into the computer, pressing buttons.  Plus the

stuff is being sold on the internet.  They're making it

sound like it's some trade secret in a tank somewhere.

MR. KOGAN:  What is being sold on the

internet --

THE COURT:  Yes, but -- no, no.  I am --

MR. KOGAN:  What is actually being sold on the

internet and, your Honor it's very likely that we're

going to go back to the office today and work on an

application for a TRO or a preliminary injunction

actually because on August 25 --

THE COURT:  Well that's Judge Sifton's problem,

not mine.

MR. KOGAN:  I understand but on August 25, they

took all the designs that we registered and put them on

sale, 50 percent off because it's a fire sale just to

hurt us during the pendency of the litigation.

THE COURT:  Let's --

MR. KOGAN:  So at the end of the day --

THE COURT:  That's not my issue here.

17

**Proceedings**

1          MR. KOGAN:  I understand that.

2          THE COURT:  Let's get back to the attorney's

3    eyes only.

4          MR. KOGAN:  About dishonesty, I just wanted to

5    address what is being -- what is happening meanwhile.

6    They're using the registrations.  The exact designs that

7    we registered are suddenly worthless to them, so they're

8    dumping them.  And they are dumping them at half price,

9    making it difficult for anybody to -- if it's not unfair

10   competition, I don't know what would be.

11         THE COURT:  Let's go back to the issue of

12   attorney's eyes only.  I was under the impression that

13   there may be information that's going to be produced that

14   is not publicly filed with the copyright office.

15         MR. KOGAN:  Some information --

16         THE COURT:  Is that correct?

17         MR. KOGAN:  Some information is publicly filed

18   and some information is not publicly filed.

19         THE COURT:  Okay.

20         MR. KOGAN:  That's correct.

21         THE COURT:  As a legal matter, what right do

22   your clients or your clients have if they filed their own

23   copyright applications to keep attorney's eyes only or

24   confidential what has been publicly filed?  I understand

25   your practical concern but as a legal matter, what right

18

**Proceedings**

1  do they have to say in this litigation only the attorneys

2  can look at what's in the copyright applications?

3  MR. KOGAN:  I think the practical concern is

4  the issue and there is a history of dishonesty here.

5  This is not something that is sudden.  That counsel is

6  appalled and shocked that anybody is saying that -- the

7  whole issue in the case is his clients who are agents of

8  my clients, took over their business.  If this is not

9  dishonesty, I don't know what would be.

10  And we have then they're running a business

11  billing -- claiming that they had to have an offsite

12  warehouse which allowed them to purchase a house in

13  Pennsylvania, a vacation summer home, and that they

14  needed that Pennsylvania summer home as a warehouse and

15  they needed two cars, of course, to transport, I don't

16  know what to where and they needed jewelry, Victoria's

17  Secret stuff, hundreds of dollars of liquor per week for

18  -- this is of course necessary for a design business.

19  And all of that is they've given us the excuse that this

20  sis somehow -- these are business expenses.  They are

21  somehow all deductible, they told that to the IRS as

22  well.  I don't know if anybody's actually going to buy

23  that we may have to submit amended tax returns on that

24  issue.

25  THE COURT:  Here's what we're going to do.

**Proceedings**

1   You're going to produce it on Wednesday, a simultaneous

2   production. For the time being, it's attorney's eyes

3   only. On Friday I want letter briefs of five pages, same

4   time 5 o'clock on the dot, filed by ECF explaining to me,

5   you -- why it should not be attorney's eyes only.  And

6   what I am talking about is the publicly filed

7   information, you know?  To the extent there are documents

8   that were part of the creative process to go from public

9   domain to copyrightable designs that were not part of the

10  publicly filed documents, I am with you that that should

11  not be shown to plaintiffs and vice-a-versa, if there's

12  anything of that nature.

13              MR. KOGAN:  But, your Honor, at the --

14              THE COURT:  But what was publicly filed --

15              MR. WERTHEIM:  The following Friday, after next

16  Wednesday.

17              THE COURT:  Filed -- after this Wednesday, you

18  look at whatever it is, you know, the 30 CDs that you're

19  going to get, you're going to look at the 100 CDs.

20  You're going to say all right.  This stuff that was

21  publicly filed is part of the copyright application,

22  should remain attorney's eyes only because bah, bah, bah.

23  Here's the legal basis to make that argument.  Then you

24  say it shouldn't be.

25              MR. WERTHEIM:  Okay.

20

**Proceedings**

1        MR. KOGAN:  Your Honor, I would just ask that

2   if there would be a ruling at any point that it should

3   not be attorney's eyes only, that must not happen before

4   depositions because their ability to circumvent -- to

5   make up a story is -- they don't have that ability at

6   this moment.  Once they have the access to these public

7   domain designs, which they don't -- at this moment they

8   don't have them, they don't know where it came from, they

9   have no explanation how they could have created these

10  documents.

11       THE COURT:  Yes, but look, you know, it's --

12       MR. WERTHEIM:  There's a simple technical

13  answer to this.  You can hire forensic computer guys to

14  look at the computers to see when, you know input was

15  done on the software that creates the designs.  If you're

16  going to call people a liar, do that if it comes down to

17  it.  I'm not going to be able to go back in time.

18       THE COURT:  Put that in the letter.  Put that

19  in the letter.  If you want that, put that in the letter.

20  I mean, yo know, if -- I side with you on this argument.

21  All it means is that they're going to go down to the

22  copyright -- if they're so dishonest, they're such pieces

23  of crap, they're going to go down to Washington with a

24  list of all of the copyright applications and do it

25  anyway.  You'll still have to confront the lies.

21

## Proceedings

1          MR. WERTHEIM:  And vice-a-versa.  We're

2     producing artwork, too.

3          THE COURT:  I mean it --

4          MR. KOGAN:  Your Honor?

5          THE COURT:  And if they're so dishonest, you're

6     going to be able to cut them up.  You're a good lawyer.

7     Come on.

8          MR. KOGAN:  It hasn't -- all is it that a

9     person needs to do is have a story on how they are the

10    ones who originated -- who designed it.

11         THE COURT:  You've got to have a good story

12    though. You know, there are eight million stories and a

13    lot of them are a bunch of bunk.

14         MR. KOGAN:  Right now they don't have a story.

15    They don't have what to base their fictitious

16    explanations on at this moment.

17         MR. WERTHEIM:  I've got an injunction and you

18    didn't but we don't have a story.

19         THE COURT:  Look, hey, hey come on.  Guys, you

20    know?

21         MR. WERTHEIM:  Okay.

22         MR. KOGAN:  Speaking of an injunction,

23    your Honor, the injunction was that the -- no, that's

24    important your Honor.  That's my -- one of my main issues

25    today was that we will not say that they stole from us.

22

**Proceedings**

1   The Judge -- Judge Sifton did not want anyone to say that

2   the other side stole and we actually had something on our

3   website that said that they -- what they did was illegal

4   and he didn't want that conclusion to be a basis for

5   possibly hurting their business going forward.

6              I have an email here showing that they right

7   now are telling their customers --

8              THE COURT:  If they're --

9              MR. KOGAN:  -- exactly that.  They are

10  telling --

11             THE COURT:  If they violated the injunction,

12  then you need to bring a motion for contempt with

13  Judge Sifton.  I can't --

14             MR. KOGAN:  No, no, the injunction was -- we

15  actually had something on our site and the Judge wanted

16  us to remove it and we were enjoined and we did remove

17  it.

18             Now at this point they are doing exactly the

19  same thing and I will have to move for an injunction.

20  That's another basis.  They specifically say I -- that we

21  worked for them and that we're selling their designs that

22  we stole from them.  That's what they're saying to their

23  customers now.

24             THE COURT:  Bring it to Judge Sifton.  I mean,

25  I -- that's not my -- I got enough to do with my docket.

23

**Proceedings**

1    I -- that's Judge Sifton's call.

2            Look, protective order gets filed Friday.

3    Wednesday, either here or if you can agree on a location,

4    you're going to come and you're going to put your cards

5    on the table, simultaneous production.  The following

6    Friday I am going to get the five page letter briefs on

7    the issue of attorney's eyes only on the artwork.

8            What else?

9            MR. WERTHEIM:  More stuff.  There was the issue

10   of emails.  You may remember that we produced thousands

11   of emails and chats.  They produced a few emails and the

12   story was that either in Anna Bove's case, she left the

13   computer with us and then Polina, the Israeli defendant,

14   her computer crashed, so there's no email.  So it was

15   understood well we have to serve subpoenas on internet

16   service providers.  Okay.

17           One of the big subjects of discussion at

18   Mr. Kogan's office a week or so after we met with you the

19   last time in June was how we're going to go about this.

20   We actually volunteered, even though we were the ones

21   pressing to serve subpoenas because we're looking for

22   emails we didn't get from their side, we actually

23   volunteered the idea that the sort of non-serving would

24   have a review.  We would come up with some method of

25   review to exclude obviously privileged things or you know

24

## Proceedings

1  highly personal sensitive things.  You get to look at the

2  stuff that's coming from the third party before we saw it

3  and vice-a-versa.

4         Mr. Kogan said and put in emails that week

5  saying I want to go talk to my client about this.  I will

6  get back to you.  I have actually an email with me from

7  the following week, him saying I am meeting with the

8  client, Anna Bove, on I think it was a Thursday in July

9  and I'm going to call you on Friday about it.  Never

10  heard from them.

11         That's one of the subject that I was calling

12  Mr. Kogan about and emailing about.  That was one of the

13  open subjects that had to be addressed.  Now it turns out

14  there's been sort of a superseding problem that's going

15  to require either their consent or a court ruling and

16  that is you know, all of these internet service providers

17  being bombarded with, you know e-discovery these days and

18  there's a statute out there, this big statute involving

19  electronic communications and they're really not sure but

20  they think it might be illegal for them to turn over

21  things in response to a subpoena without either agreement

22  or a court order.  There's this like form letter that's

23  come up in the business from Yahoo! and all of these

24  other companies.  We got a bunch of them.

25         So basically, we don't have anything.  There's

### Proceedings

 1  no imminent disclosure from them.  We have to work out

 2  some kind of you know, mechanism to direct them to do it

 3  or to get their stipulation allowing there to be a

 4  production.  I am not sure there's going to be very much

 5  because it seems like they don't save things for a very

 6  long time these days.  But nonetheless, we're at an

 7  impasse about that.

 8          MR. KOGAN:  Your Honor, may I respond?

 9          THE COURT:  Yes.

10          MR. KOGAN:  What he fails to mention is that he

11  actually served a subpoena --

12          MR. WERTHEIM:  Yes.

13          MR. KOGAN:  -- while we were talking.  So

14  instead of -- and the scope of the subpoena is actually

15  all emails, even until yesterday.  It obviously includes

16  emails from my client to me.  It obviously includes all

17  of the emails between them.  Now they're friends, this is

18  just absolutely invasive, absurd -- the fact that his

19  clients are husband and wife and happen to live in the

20  same household, but by the way, I would be entitled to

21  the same thing, no -- what privilege would they have if

22  they email each other or text each other during the day,

23  I would be able to look at that according to that theory.

24  That doesn't make sense.

25          MR. WERTHEIM:  I gave you the (inaudible).

26

## Proceedings

1      MR. KOGAN:  After April of 2008, they're not

2   entitled to look at our communications because I was

3   already on board as an attorney.  Shortly after that, I

4   believe in May, there's a lot of communications that are

5   in preparation for the litigation.  He's not entitled to

6   look at those emails, not now, not ever.

7        Now obviously there are issues in the

8   litigation about intent and about what the business was,

9   how they -- what the -- the main question here is what

10   was the parties' intent.  We have four participants here

11   and my clients' version is that they worked for us and

12   their version is that we were partners, all four were

13   partners.

14        You can't look at emails after the business --

15   after they split up in order to try to prove what the

16   original intent was.  So they can't claim that there was

17   a purpose for reviewing my client's emails after the date

18   of separation.  It doesn't make -- there's no basis for

19   it.  It's invasive.  There is no argument for that

20   production.  This is not a Phillip Morris case where

21   emails, inter-company emails are --  you know, are being

22   sent and we're trying to find out did they know, did they

23   not know certain information at a certain time.  This is

24   all after the fact.  He wants to get discovery of emails

25   after the fact and that is really -- that's been his

27

**Proceedings**

1   agenda all along, I understand that, to pressure my

2   clients into settlement by being so invasive but it is

3   really inappropriate.  And that is really the objection

4   here.

5          I have no problem with the procedure that

6   allows for review of the emails until the date of

7   separation and we were trying to obtain information from

8   Yahoo! and Microsoft about what they actually have and

9   what would they charge for the production of the

10  documents so that we could figure out what the cost would

11  be in order to let's say that we would obtain the

12  documents, review them, redact them, and submit to the

13  other side.  We wanted to engage in that and we received

14  a subpoena that included a date that is until now.  They

15  want to see the emails that were sent yesterday.

16          MR. WERTHEIM:  Your Honor, may I?

17          THE COURT:  Wait.  So your issue is the date.

18  That's it.

19          MR. KOGAN:  Just the date.  And the rest is a

20  procedure,  I think it's a fair procedure. We will

21  subpoena all of the records or all of our clients emails.

22  They'll subpoena their clients emails.  We'll each

23  respectively review our own clients emails to either

24  redact or take out the ones that are not business-

25  related.  And the business-related emails predating April

28

**Proceedings**

1   of 2008, let's say through March 31, 2008; all those

2   would be subject.  After that date they would not be

3   subject to such a review and production.

4          MR. WERTHEIM:  May I, your Honor?

5          THE COURT:  Yes.  You know they have you down

6   as Mr. Akselrod in the transcript.

7          MR. WERTHEIM:  I raised this with your deputy.

8   It's something -- you know what happened?  In the very

9   earliest stages of this case, our associate, Daniel, file

10  the papers.

11         THE COURT:  All right.

12         MR. WERTHEIM:  Then I made a notice of

13  appearance and I can't get my  name on anything these

14  days.  He's the man.  So --

15         THE COURT:  Maybe you don't' want your name on

16  anything these days.

17         MR. WERTHEIM:  He owes me, I guess if I am

18  doing okay.

19         THE COURT:  All right.

20         MR. WERTHEIM:  Your Honor, this whole idea of

21  post-separation and it not mattering post-separation,

22  this is kind of an old theme that we've discussed earlier

23  in this case.  The reality is that the focus of the

24  lawsuit from our end is events that occurred after April

25  of 2008.  The focus of their lawsuit and they've said

29

**Proceedings**

1  this early on in the case is what's occurred before.

2  They claim that you know there was an imbalance of

3  compensation or my clients took too much money when they

4  were working in the business together.

5        THE COURT:  I have an easy solution to this.

6  Whatever is deemed relevant is going to be deemed

7  relevant by Judge Sifton, whether at a trial or at a

8  summary judgment motion.  If there's a privilege

9  assertion to be made, attorney/client, work product,

10  joint defense, whatever, that's -- you assert the

11  privilege to those types of documents regardless of when

12  they happened.  You produce everything and then when we

13  get ready for whatever motion practice, you can make your

14  relevance arguments to Judge Sifton.

15        MR. KOGAN:  Your Honor, does that mean that I

16  am going to be subpoenaing their chat -- husband and wife

17  chat records which I will be and everybody in that

18  household because I will do the same thing that they're

19  doing and I don't believe that that's appropriate.  I

20  don't think that there's any claim -- there isn't even an

21  argument that they could be relevant.

22        Counsel is saying that the focus of his lawsuit

23  is whatever happened after March of '08.  What is exactly

24  the lawsuit he is claiming, that my clients left his

25  business and started another business.  Why are my

**Proceedings**

1   clients records, communications, relevant?  How could

2   they conceivably --

3          THE COURT:  They could say --

4          MR. KOGAN:  There's no argument for --

5          THE COURT:  They can say things at any point in

6   time and those things are statements, admissions.  And

7   they could talk about prior events.  The could predict

8   future events.  They could -- you know, relevance --

9          MR. KOGAN:  There couldn't possibly be an

10  argument for their admissibility even at such a later

11  time and in communication, emails, between parties after

12  the fact.

13         THE COURT:  I've made my ruling.  You know, if

14  -- I've made my ruling.  It's all fair game for the

15  purposes of discovery for relevance at trial, that's not

16  my call.  That's Judge Sifton's call.

17         MR. KOGAN:  Your Honor, I would like to make

18  the motion now then because I believe that that is not

19  something that my client should be exposed to.

20         THE COURT:  Make what motion?

21         MR. KOGAN:  To preclude all -- for a protective

22  order.

23         THE COURT:  I can't do that.  It's not my --

24  it's an interesting issue and I always struggle it,

25  whether a magistrate judge who is not the trier of fact,

31

**Proceedings**

1  not the trial judge, not going to decide a summary

2  judgment motion or a motion to dismiss has the authority

3  to tie the hands of a district judge by making rulings on

4  motions to preclude.  And I know magistrate judges do

5  that but it's an awkward thing.

6          I'm going to tell the district judge, okay,

7  you're going to make this decision on summary judgment

8  motion but you can't look at this evidence because it's

9  irrelevant, unlikely to lead to the discovery of

10  admissible evidence.  You know, it's a hard thing to do.

11          Subpoena the records.  If something is in

12  admissible, that's for Judge Sifton to rule.  If it's

13  irrelevant, that's for him to rule.

14          MR. WERTHEIM:  And just so I am clear, okay, I

15  understand the ruling.

16          THE COURT:  Both ways.

17          MR. WERTHEIM:  Both ways.

18          THE COURT:  Both ways.

19          MR. WERTHEIM:  Okay.  Can defendant be

20  directed, and I guess we'll have to do the same thing, to

21  indicate their consent to Yahoo!, et cetera.

22          MR. KOGAN:  We will not consent, your Honor.

23          THE COURT:  I'll --

24          MR. KOGAN:  My client will not be consenting to

25  this.  I know now that my client will not consent to

32

**Proceedings**

1  this.

2          MR. WERTHEIM:  We need an order, your Honor.

3          THE COURT:  Produce -- listen, produce -- you

4  want to get his -- their emails, you want to get their

5  emails.

6          MR. KOGAN:  I don't want to get their emails.

7  I want them not to be -- to do this where this is no --

8  it's just done to harass and they know that there is no

9  argument --

10          THE COURT:  It's their cost.  How is it --

11          MR. KOGAN:  No, not to cost.  It's done to

12  harass because they want to reveal the personal emails.

13  They want to review personal emails from my clients after

14  the date that the business --

15          THE COURT:  Do we know the volume of the

16  emails?

17          MR. WERTHEIM:  Well, you know, all I can tell

18  you, your Honor, is that you know the greatest volume is

19  stuff we've already produced without a fight.  We've

20  produced --

21          THE COURT:  That's not the question I asked.

22          MR. WERTHEIM:  No, I don't.

23          THE COURT:  Answer the question; do you know

24  the volume?

25          MR. WERTHEIM:  I don't know the volume because

**Proceedings**

1  it's their email communications.

2          THE COURT:  Okay.

3          MR. WERTHEIM:  It's only, we're talking about a

4  year maybe.

5          THE COURT:  You said you tried to find out from

6  the providers.

7          MR. KOGAN:  We tried to find out.

8          MR. WERTHEIM:  No, the providers --

9          MR. KOGAN:  But we were not able to find out,

10  your Honor.

11          MR. WERTHEIM:  I don't think the providers keep

12  things as far back as a year, so I am not even sure how

13  much we're going to get to tell you the truth.  We're

14  hoping to get a good picture but I don't think it's going

15  to be--

16          THE COURT:  If you don't want to subpoena them,

17  that's fine.  That's your call.  Get me the subpoenas and

18  I will take a look at them and I will so order them if

19  appropriate.

20          MR. WERTHEIM:  Okay.

21          THE COURT:  And I want them by Wednesday.  And

22  we'll follow the procedure of prescreening by the non-

23  requesting party.

24          MR. KOGAN:  And if want to make that motion

25  before Judge Sifton?

## Proceedings

1      THE COURT:  You need to have a transcript

2  produced of this conference and you have, I think it's

3  ten days to appeal a discovery ruling by a magistrate

4  judge.

5      MR. KOGAN:  No, I mean --

6      THE COURT:  Oh, the --

7      MR. KOGAN:  -- a motion before Judge Sifton to

8  -- a motion for a protective order and I could make the

9  motion, your Honor is saying that you're not comfortable

10  ruling on something that Judge Sifton might -- that might

11  restrict the scope of documents that eventually would be

12  ruled on by Judge Sifton.

13      THE COURT:  Yes.

14      MR. KOGAN:  So I am asking that --

15      THE COURT:  I mean, you could make that right

16  up until the time of trial, I mean the motion in limine.

17      MR. KOGAN:  I understand.  I would like to make

18  that motion -- I would like to make that motion before

19  Judge Sifton now so that we dispose of this issue prior

20  to having to produce these records which -- a motion in

21  limine is ordered to -- so that the

22      THE COURT:  Let's -- look, let's take it one

23  step at a time.  There may be nothing.  There may be no

24  emails, no chats.  So it will be a motion --

25      MR. KOGAN:  No, my client says that there are

35

## Proceedings

1   emails and my clients are communicating on a regular

2   basis.  One of my clients is in Israel, one is here.

3            THE COURT:  About -- it's got to be about

4   this --

5            MR. WERTHEIM:  The business.

6            MR. KOGAN:  They're talking every day.

7   Obviously from April of '08 my clients were frozen out of

8   a business.  Of course they talked about it but this was

9   all in preparation for this litigation.  It's all about

10  this.  We're in constant contact.  There are emails going

11  from me to my clients.

12           THE COURT:  Well, but -- yes, but those are

13  going to be --

14           MR. WERTHEIM:  They communicate with --

15           THE COURT:  Those are going to be --

16           MR. WERTHEIM:  Right, but I email to one client

17  who is here.  The other -- that client emails to the

18  client who is in Israel.  Now they're communicating and

19  that's not going to be privileged and it doesn't make any

20  sense.  That's obviously in preparation for the

21  litigation.

22           THE COURT:  There is no -- what -- well you

23  then say a joint defense privilege.

24           MR. WERTHEIM:  There was no lawsuit yet.  I

25  couldn't even -- I don't understand that.  There was no

36

**Proceedings**

1   lawsuit.

2           THE COURT:  You make an argument --

3           MR. WERTHEIM:  We filed the lawsuit --

4           THE COURT:  My point is the time period is

5   ultimately irrelevant.  What's relevant is is there a

6   valid privilege to be asserted -- that can be asserted

7   regardless of the time period.  If your argument is

8   anything after April 1, 2008, regardless of substance,

9   regardless of who the sender was and who received or who

10  forwarded it in the email chain, anything after April 1,

11  2008 should not be produced.  I'm rejecting that

12  argument.  I don't think it follows legal -- I think

13  things can happen subsequent to the freezeout that are

14  relevant -- things can be said and things can happen

15  subsequent to the freeze out that are relevant to the

16  claims that are asserted or the defenses that are

17  asserted.

18          If after Yahoo!, Verizon, whoever else produces

19  the emails and the chats and you look through them and

20  you say okay, here's one from me to Ms. Bove, that's

21  attorney/client, here's work product, here's joint

22  defense and you list them and those do not go over, if

23  there's something that was not initiated by you, not a

24  question that you posed to one of your clients to ask the

25  other one to help you defend the case, it's just them

### Proceedings

1   talking, yeah, we froze them out or we -- whatever, you

2   know, whatever it was, and no privilege can be asserted,

3   I don't see why that shouldn't be produced.  Whether at

4   the end of the day Judge Sifton lets it in as substantive

5   evidence is for him to decide.

6            MR. KOGAN:  And if I make -- if I file it --

7            THE COURT:  So if you want to make the motion

8   to Judge Sifton, I would suggest you do it after you take

9   a look at the emails because there may be very little. I

10  mean he's not getting anything that is privileged, he's

11  not.

12           MR. KOGAN:  Okay.  So the subpoena first of

13  all, it wouldn't be his subpoena, it would be --

14           THE COURT:  No, no.  He's going to -- what the

15  -- I thought the process that you guys agreed to --

16           MR. KOGAN:  He's going to subpoena the

17  documents and give them over to me.

18           THE COURT:  He's going to subpoena.  I would

19  suggest -- I was going to suggest, just to stick it to

20  both of you, you're going to subpoena Yahoo!.  Yahoo! is

21  going to produce the documents here.  You're going to

22  come here and look at them.  Or it -- you know, if you

23  can start to cooperate and all take a deep breath.

24  You'll serve the subpoena.  I'll sign it.  I will so

25  order it.  It will go to Yahoo!.  Yahoo! will send us the

### Proceedings

1   documents.  We'll take them and send them to you to your

2   office.  You'll review them and say okay, this is

3   privileged, that's privileged, this is not, whatever.

4   Then you make your application to Judge Sifton saying

5   Judge Reyes said this is your issue to decide.  He was

6   uncomfortable ruling on the preclusion of non-privileged

7   post-April 1, 2008 communications.  Judge, this should

8   not come in because X.  And that's before he sees it.

9   You know?  And I don't think you -- well, you can maybe

10  make the argument I need to see it, attorney's eyes only

11  to make an argument to you, Judge Sifton but you'll talk

12  to him about that.

13           MR. WERTHEIM:  Okay.  And we'll produce

14  privilege logs to the extent that a privilege applies --

15           THE COURT:  Sure.

16           MR. WERTHEIM:  -- like it always did.

17           THE COURT:  Sure.

18           MR. WERTHEIM:  Okay.

19           THE COURT:  I mean I don't know how much --

20  what the volume is.  If it's thousands and thousands of

21  pages, you know, then you can --

22           MR. WERTHEIM:  I don't think there's any chance

23  of that unfortunately.

24           THE COURT:  Well you've produced thousands of

25  emails.

39

**Proceedings**

1          MR. WERTHEIM:  Right.  But they claim not to

2 have from that period.  I don't think we're getting from

3 Yahoo! or MSN things from 2005 and 2006 but hopefully we

4 will.

5          MR. KOGAN:  I guess we'll find out.

6          THE COURT:  Yes.

7          MR. KOGAN:  I mean, I am not aware of a

8 limitation in time at all.

9          THE COURT:  I don't know what the practices are

10 in the industry and whether they vary by provider how

11 long they keep these things.

12          MR. WERTHEIM:  There is this one broad subject

13 that was not entirely resolved the last time.  It was

14 partly resolved and it has to do with financial

15 disclosure from both sides.  And I think to some extent

16 you left it to Mr. Kogan to decide what scope he was

17 willing to agree to with the understanding that it's a

18 two-way street.

19          THE COURT:  Yes.

20          MR. WERTHEIM:  And that had to do with the

21 various arguments the parties have made about what was

22 business and what was "personal."  If you recall, you

23 specifically ordered that they had to do financial

24 disclosure from the period I think it was -- I'm losing

25 my sense of -- was it '04 to '06 or was it '02 to '04,

40

### Proceedings

1  but excluding things like showing, you know -- buying

2  dresses or something from your bank account but you had

3  to produce at least the financial picture and bank

4  records from the business before we were involved.  That

5  was established, okay?

6          Then the issue was going forward and my

7  position was and I said this the last time I put it in

8  writing but forget about the distinctions between

9  personal and business, I thought everybody should produce

10  everything and that included both tax documents and, you

11  know, the financial records.  And I don't think we

12  entirely resolved that.  And I don't know here Mr. Kogan

13  stands on that.  And that's one of the things I wanted to

14  resolve when I was making my phone calls is where do we

15  stand with that.

16          THE COURT:  Hold on.

17          MR. WERTHEIM:  It came up a couple of times

18  throughout the discussion on June 18.

19          THE COURT:  I'm going to go back to the emails.

20  If you find emails that are post-April 1, 2008 that have

21  absolutely nothing to do with this litigation, the

22  business relationship, obviously those aren't to be

23  produced.  They're not privileged, per se, but Polina

24  could be emailing Anna and saying --

25          MR. KOGAN:  How's your mother's health.

Transcription Plus II        Rosalie Lombardi

41

**Proceedings**

1        THE COURT:  How's your mother's health.  Or

2   like I said last time, talking about their trip to

3   Cancun.

4        MR. WERTHEIM:  Okay.  There are a couple of

5   things that I would say and this came up the last time

6   too that are relevant that might not be obvious to you,

7   for example, and that is for example, we -- it's our

8   position -- they've taken the position that Polina never

9   left and Polina and Anna have been in this business

10  continually through the present whereas we have both

11  emails and information that Polina went off at least for

12  a while and got involved in another business, I think

13  maybe with her mother.  I don't remember.  To the extent

14  there's comments about Polina talking about doing

15  different things and therefore substantiating our story

16  that she left the company, that's a point of contention

17  between us, that's relevant.  That's an issue in the

18  case.  Okay?  Or there's things, emails to the effect of

19  you know, where have you been?  I haven't been able to be

20  in touch with you for months.  That's sort of contrary to

21  the idea of a continuity of their business relationship.

22  That's been a point of contention in the case from the

23  beginning.

24        So I just want to be careful about, you know,

25  when you say just the business.  There are things that

42

**Proceedings**

1  might not appear to be about the business but are very

2  sharp points of contention in this case, that the girls

3  in fact were not together in business for some period of

4  time or Polina went off on her own and was doing another

5  business, supporting out story about how she got bought

6  out at some point, for example.  There are things that

7  are relevant.

8         MR. KOGAN:  I don't know what to say.  I mean

9  it's a -- they could come up with explanations why they

10  want documents and -- or emails and I guess when we look

11  at them we could determine whether there's any basis to

12  produce those. I am -- I don't even know if there is such

13  an email that discusses but I can just say --

14         THE COURT:  I will take it under consideration.

15         MR. KOGAN:  I'm sorry?

16         THE COURT:  Take it under advisement.

17         MR. KOGAN:  And --

18         THE COURT:  Then, you know, if you see

19  something that's arguably fits within these categories

20  and if Mr. Wertheim articulates any other subcategory of

21  documents that he thinks -- or emails or chats, whatever,

22  that he thinks bear on the claims, you know --

23         MR. KOGAN:  Okay.

24         THE COURT:  -- err on the side of producing it.

25  They're attorney's eyes only.

43

### Proceedings

1     MR. WERTHEIM:  Okay.

2     MR. KOGAN:  Your Honor, I just wanted to

3   mention that one of the similar issues is that we know

4   that both plaintiffs, both Vadim and Inga were working

5   elsewhere when they claimed to be -- to have been running

6   -- in '04, for example, they clearly had other -- they

7   were -- in '05, as well, after the establishment of this

8   entity in New York, they were both working elsewhere and

9   we've requested -- we've actually served a subpoena on

10   one of those -- on a former employer of Inga's in order

11   to get the payroll records from that time and so, we are

12   certainly going to be --

13     THE COURT:  It's a two-way street.

14     MR. KOGAN:  Right.  If he's --

15     THE COURT:  No question.  All right.

16     MR. KOGAN:  And as far as those subpoenas, one

17   of the problems that we have and they don't have is since

18   my client lived in their home, they know exactly what

19   email address that she was using.  We have no idea about

20   what email addresses they're using.  And we would be

21   entitled to a list of those email addresses.

22     THE COURT:  I thought you didn't want the

23   emails though.

24     MR. KOGAN:  Well I am going to -- if he is

25   going to engage in that, I am certainly going to expose

44

### Proceedings

1  him to the same risk that this might be a very unpleasant

2  for his client as well and you know, what's good for the

3  goose --

4          THE COURT:  I don't know why wouldn't, I

5  mean --

6          MR. KOGAN:  Because it's not admissible and

7  even if it were relevant, it wouldn't be admissible.  And

8  how would it be admissible, your Honor?  It's hearsay,

9  communication between the parties on an --

10          THE COURT:  It may or may not be hearsay.  I

11  mean it's --

12          MR. KOGAN:  It is --

13          THE COURT:  First of all, they're admission --

14  if it's a party, it's an admission and it might not --

15  even if it wasn't, it might not be hearsay.  Hearsay is

16  something offered for the truth of the matter asserted.

17  I mean if you're offering something because it was said,

18  whether or not it was true or not, you know, I would --

19  if he is going to do it to you, not that I am one for tit

20  for tat but to leave no stone unturned, I would go for

21  it.

22          MR. KOGAN:  Your Honor, our --

23          MR. WERTHEIM:  I believe you have all our email

24  addresses, but whatever.

25          THE COURT:  Have you produced all of the email

**Proceedings**

1 addresses that were used by your clients during the time?

2          MR. WERTHEIM:  I don't even recall off the top

3 of my head, we had massive interrogatories served on us,

4 but we produced completely the chats and emails from the

5 whole multiple period of time, so --

6          MR. KOGAN:  No, no, no.  I mean we're talking

7 about anything that happened from April of '08 on;

8 nothing was produced by them from April of '08, nothing

9 at all.  So they're -- we're not -- we are now talking

10 about emails that -- and communications that we're

11 talking about personal email addresses that we used for

12 communications.  So I would like a list of those so I

13 could subpoena them by Wednesday.  Your Honor has

14 requested it by Wednesday.  We produced all of the

15 subpoenas that we would like your Honor to so order.

16          THE COURT:  I will give you some flexibility on

17 that but --

18          MR. WERTHEIM:  I would also want yours too

19 because I don't know all the email addresses you would

20 use --

21          MR. KOGAN:  You have them.

22          THE COURT:  But --

23          MR. WERTHEIM:  -- post separation?

24          MR. KOGAN:  Those were all our emails.

25          THE COURT:  Weren't they in the subpoenas that

**Proceedings**

1   I saw?

2          MR. WERTHEIM:  They were email addresses that I

3   am aware of from when we were in business together.  But

4   what Mr. Kogan -- we're talking now about the post-

5   separation period.  I don't know what email addresses

6   they've adopted after we went our separate ways.  We're

7   both in the same boat in that regard.  I'm not sure what

8   all their email addresses are since then.  They could

9   have had other email addresses all of that time.

10          MR. KOGAN:  And, your Honor, it's been much

11  more than 20 weeks that we have requested a list of all

12  of their bank accounts, business and personal bank

13  accounts.

14          THE COURT:  Right.

15          MR. KOGAN:  And they refused to produce those.

16  They refused to produce any business financial records

17  other than the tax returns and one file from Quick Books.

18          MR. WERTHEIM:  That's totally --

19          MR. KOGAN:  That's all we got is a file from

20  Quick Books and the tax returns.  We've subpoenaed the

21  accountant and we got a letter from the accountant saying

22  I've got nothing.  No underlying records whatsoever;

23  that's what the accountant claims which I think that's

24  far-fetched and that doesn't make any sense.

25          MR. WERTHEIM:  The letter I got from the

47

**Proceedings**

1  accountant that was copied to says they produced

2  everything they had. So I don't know what you're talking

3  about.

4        MR. KOGAN:  And that's exactly it.  They gave

5  us tax returns.  That's all they gave us.  The accountant

6  produced only tax returns and nothing else.  It's

7  impossible for that to be the case.  It's impossible that

8  they don't have any business records.  No business

9  financial records have been produced.

10        We've subpoenaed one bank account and we got

11  those records, so we got one bank account, Gotham Bank.

12  We got tax returns and we got one Quick Books file.  When

13  we were meeting in my office I said it doesn't make

14  sense.  You have more records.  Would you please speak to

15  the accountant so I don't have to make some kind of a

16  motion in response to that a couple of weeks later, I got

17  a letter saying I don't have anything else from the

18  accountant.

19        THE COURT:  How could he --

20        MR. WERTHEIM:  What am I supposed to do?

21        THE COURT:  If he prepared -- you tell him --

22        MR. WERTHEIM:  I did in writing and I copied

23  them and they wrote a letter -- the accountants wrote a

24  letter which I have with me to them and to us saying I

25  turned over everything I have.

48

### Proceedings

1      THE COURT:  Take this message back to him.

2      MR. WERTHEIM:  Uh-huh.

3      THE COURT:  All right?  If he prepared a

4  corporate tax return for these folks, a business tax

5  return, he's got to have some underlying documents.

6      MR. WERTHEIM:  Okay.

7      THE COURT:  Otherwise, if he signed it as a tax

8  preparer, he's committing fraud on the IRS.  He's got --

9  he made the numbers up then.  There's got to be something

10  supporting numbers.  I've got records for my taxes.  I've

11  got files all over the place showing all of my charitable

12  contributions, and this and that and everything.  There

13  have to be records by definition.

14      MR. WERTHEIM:  I'm prepared to say anything to

15  them that helps.

16      THE COURT:  And tell him that -- if he says all

17  he's got is the tax returns, and he never had any

18  documents, then he is going to come into court and put

19  that under oath.

20      MR. WERTHEIM:  Your Honor?

21      THE COURT:  And I'll send the transcript to the

22  IRS and then he'll be -- and they'll do what they have to

23  do.

24      MR. WERTHEIM:  Your Honor, by the way, speaking

25  of financial records and this came up earlier -- I mean I

Transcription Plus II      Rosalie Lombardi

49

**Proceedings**

1   am really shocked to hear this.  We have produced

2   thousands of pages of financial records, bank accounts,

3   PayPal statements that are least hundreds if not

4   thousands of pages.  I mean PayPal was a central

5   financial institution, if you will, in this case.  I

6   don't understand this.  They're the ones who didn't

7   produce financial records.  That's what I just raised

8   before when we get off in to their complaints.  We're

9   supposed to be exchanging, you know, bank records and

10  financial documents.  There was an open question of how

11  personal, you know, Mr. Kogan's willing to go because he

12  has asked for, for example, personal tax records and I

13  have said okay, if you want to get them, you've got to

14  give them.  And you've said the same thing.

15          You've already directed them to produce those

16  things, like I said from '04 to '06, we didn't get them.

17  We have really not received financial disclosure from

18  them.  We have produced methodically financial disclosure

19  and I will itemize it for you if you want.

20          MR. KOGAN:  These are --

21          MR. WERTHEIM:  I will make it part of the

22  submissions that are due next week, the financial --

23          MR. KOGAN:  And I have the list of bank

24  accounts, personal and corporate.

25          MR. WERTHEIM:  You're going to give me yours?

Transcription Plus II        Rosalie Lombardi

### Proceedings

1      THE COURT:  Guys, come on.  How can you keep

2  doing this after I have told you, you know, time and time

3  again it's a two-way street?  Whatever you're asking for,

4  you've got to give up.

5      MR. WERTHEIM:  Absolutely.

6      THE COURT:  Whatever you're asking for, you've

7  got to give up.  That's the way I do it.

8      MR. KOGAN:  I thought that was clear, your

9  Honor, the last time and all we had to do was enter into

10  a protective order and that was ruled on already.

11      THE COURT:  That's going to be done Friday.

12      MR. WERTHEIM:  Right.

13      THE COURT:  And if that's all that it takes,

14  you should get everything next week, okay?  And if you

15  don't have it by the end of next week, you'll let me

16  know.

17      MR. KOGAN:  Okay. Your Honor.  Can I go over

18  the issues that we have with their --

19      THE COURT:  Yes, please.

20      MR. KOGAN:  Their response to the

21  interrogatories are abysmal.  Just basically, I will give

22  an example.  We request details about income and

23  expenses, specifics, that's interrogatories 7, 8, 8(c),

24  8(d).  And the response is take a look at CDs A -- 1, 2,

25  3 and 4, referring to four CDs.  And none of those CDs

51

**Proceedings**

1  make any reference to the information that we're looking

2  for.  We do not have the records of the income and

3  expenses that they're claiming to have produced.

4          Then we ask for a list of bank accounts and

5  credit card accounts which now counsel acknowledges that

6  they never produced that list.

7          THE COURT:  You're going to get it.  Let --

8          MR. KOGAN:  And the interrogatories --

9  consistently, the interrogatories --

10          THE COURT:  Okay.

11          MR. KOGAN:  -- always say look all over the

12  place --

13          THE COURT:  No.

14          MR. KOGAN:  -- and give me nothing.

15          THE COURT:  Doesn't --

16          MR. KOGAN:  They give nothing specific.

17          THE COURT:  Not in cases that I handle.  The

18  case law is clear, at least in my mind, when you answer

19  an interrogatory by reference to documents, you have to

20  state the specific document.  It can't be documents 1

21  through 50,000, unless documents 1 through 50,000 are the

22  documents that are responsive.

23          MR. KOGAN:  I am just --

24          THE COURT:  If you have voluminous financial

25  records that have income and expenses, you know, that's

**Proceedings**

1   the way you do it.  You don't see CD 1, CD 4 and CD 5.

2   That's just -- that's not the way it's done.

3        MR. KOGAN:  And another example is that we've

4   asked in interrogatory 11 for documents -- they asked --

5   we asked for -- in the complaint they claim that the

6   parties agreed that the business would be run from the

7   US.  That's the statement in the complaint.  We've asked

8   to amplify that and to tell us what -- where -- who,

9   what, where, when and how.  And the response is -- and

10  what documents support that?  The response is again, look

11  at four different CDs.  And we've asked -- it's a very,

12  narrow, specific question.  Where did the parties agree

13  that the business would be run from the US?  And the

14  answer is like that all over the place.  That's how the

15  interrogatories are.  So I don't accept the

16  interrogatories --

17        THE COURT:  Knowing my philosophy, and I'll

18  hear you out but if that was the response, you know, the

19  documents that are responsive are in CDs 1, 2, 3 and 4,

20  you know, I think you should go back and say okay, it's

21  document -- I assume they're bates stamped within the CD-

22  ROMs; say document A000153 through whatever.

23        MR. WERTHEIM:  Let me --

24  may I?   THE COURT:  Okay.

25        MR. WERTHEIM:  May I?

Transcription Plus II      Rosalie Lombardi

53

**Proceedings**

1          THE COURT:  Sure.

2          MR. WERTHEIM:  Let me just note an objection

3    and we have to deal with this stuff.  We're going to get

4    to the point.  The problem I have with what's going on

5    right now and it's the same thing that happened at the

6    last conference is --

7          THE COURT:  Wasn't raised with you previously?

8          MR. WERTHEIM:  Well not only -- I mean, I am

9    here just like the last time because they stopped

10   communicating with me.  I call.  I left another message.

11   I sent an email. I wrote a letter to them before writing

12   to you saying let's jointly, right -- they completely

13   ignored.  And now I have to come in and dance on my toes

14   here today about things that I don't even know about and

15   it's inappropriate.

16          We're supposed to be talking about these

17   things.  I tried to talk -- I'm not in a position to make

18   -- you know, there are interrogatories with subparts.

19   It's like 120, okay?  Violated the rules to begin with.

20   Nonetheless, the ones that are discretely answerable with

21   something reasonably discrete, I answered them.  The

22   problem is a lot of them are phrased in a way that asks

23   us to write novels essentially.

24          For example, how -- showing that the business

25   was supposed to be run from the United States, well

54

**Proceedings**

1  there's four years of emails and chats showing that the

2  business was run from our house in the United States.

3  Which ones am I supposed to pick?  There's not going to

4  be a single email that says you know we're going to run

5  the business from the United States.  There's a whole

6  record of thousands of days of communications showing

7  that the business was run from the United States.

8          Am I going to put in a hundred page answer,

9  writing each email every day, showing their understanding

10  and action?

11         THE COURT:  No, but you could say see CDs 1, 2,

12  3 and 4 and in particular, documents -- you know, point

13  them to a couple of the key documents, you know?  I mean

14  you've --

15         MR. KOGAN:  Your Honor, it --

16         THE COURT:  But --

17         MR. KOGAN:  It's subterfuge.  In reality, we

18  didn't ask was the business run from the United States.

19         MR. WERTHEIM:  The agreement to run the

20  business.

21         MR. KOGAN:  Right.  And they know that that's

22  what we asked and they know that they're not answering

23  the question.  And counsel is sitting here now and he

24  knows what he is talking about because he knows

25  specifically what I am talking about and he still doesn't

55

**Proceedings**

1   want to answer the question.

2          THE COURT:  All right.  Look, look --

3          MR. KOGAN:  So I don't think that that's fair.

4   And the misrepresentation that counsel is making is just

5   something I have to address.  Never, ever did he say

6   let's sit down and got over and prepare a list of issues

7   and then we'll do what the Magistrate instructed us to

8   do.  That was not what happened.

9          What happened was knowing my concerns, knowing

10  that I am concerned about disclosure of document of the

11  emails post April of '08, he goes ahead and subpoenas

12  them and then I write to him and I say, please instruct

13  them not to respond until we resolve the issue with the

14  magistrate which was what I did when he -- when I

15  subpoenaed his client's personal bank records.  And he

16  asked me not to do anything about it until it's resolved

17  by your Honor.  And I instructed them, don't produce

18  until it's resolved.

19         I asked him for the same courtesy and I got

20  none.  And that's really what's happening here.  They're

21  being very aggressive.  It's like a divorce case that's

22  handled by two -- by a couple that's getting divorced

23  with -- I really don't appreciate that.  I don't like to

24  litigate in this way and I would like it to be fair but

25  they're -- the way that they're addressing these issues

### Proceedings

1  is by attacking in every possible direction and an

2  absolute lack of courtesy as far as I am concerned when I

3  have asked, please just instruct them not to respond

4  until we resolve it and the answer was no.

5        MR. WERTHEIM:  No, the answer was in writing

6  and I have it in my folder here.  Okay?  You stopped

7  communicating with me, so I was dealing with David; all

8  right?  Did you answer my phone calls?

9        MR. KOGAN:  Oh, someone from my office --

10        MR. WERTHEIM:  Did you answer my phone calls?

11        MR. KOGAN:  Phone calls?  One phone call.

12        MR. WERTHEIM:  No, two phone calls.

13        MR. KOGAN:  And we answered it in writing.  We

14  answered it --

15        MR. WERTHEIM:  I told David in writing that the

16  internet service providers were not giving us documents.

17        THE COURT:  All right.

18        MR. KOGAN:  That was --

19        THE COURT:  Hold on.

20        MR. KOGAN:  His response is I am not going to

21  get the documents anyway, so I will not instruct them.  I

22  will not -- I am not going to get the documents anyway,

23  so I will not issue any kind of instruction to them in

24  the meanwhile.

25        THE COURT:  All right.

57

### Proceedings

1          MR. KOGAN:  That's what his response was.  I

2   won't help you because I am not getting any response

3   anyway.  What's the difference.  But I --

4          THE COURT:  Here's what we're going to do.

5          MR. KOGAN:  My issue is the characterization

6   that somehow that we are at fault for not making --

7          THE COURT:  Here's what we're going to do.

8   Here's what we're going to do going forward.  Any

9   discovery dispute that I have to resolve, the losing

10  attorney pays $100, $125, $150, $175 going up.  No end;

11  all right?  That's the rule.  That's not incentive -- the

12  attorney, not the client.

13          If that's not incentive enough for you to

14  cooperate, I can't think of anything else.  Maybe I

15  should just start at a higher number, start at $500 and

16  go up. But here's what we're going to, $100, $125, $150,

17  increments of $25 along the way up.  Especially egregious

18  discovery violations, you can ask for increased penalties

19  but going forward, loser pays.

20          What type of -- what were we talking about, the

21  bank records?

22          MR. WERTHEIM:  The one unresolved -- the

23  unresolved issue to me that we had talked about the last

24  time and again I think it was sort of left --

25          MR. KOGAN:  It was my issue, your Honor.

Transcription Plus II      Rosalie Lombardi

58

**Proceedings**

1      THE COURT:  It was your --

2      MR. KOGAN:  It was not his issue.  It was my

3  concern.

4      THE COURT:  We were talking about the

5  interrogatories responses.

6      MR. KOGAN:  Interrogatories and also -- right.

7      THE COURT:  Redo them with the understanding of

8  my philosophy.  Cite to specific documents.  All right.

9  If you get -- you had a long list of interrogatories that

10  you received with subparts, you should have filed a

11  motion for a protective order saying they've violated the

12  rules, I am not responding to this.

13      MR. WERTHEIM:  Like you said, if there are

14  open-ended ones and there are because the ones that could

15  allow discrete answers, I gave.  I mean if -- I will cite

16  key documents but I want to be able to say look, I am not

17  ruling out that there is, you know, inferences to be

18  drawn from any of the other thousands of -- you know,

19  there are four years of almost daily communications,

20  chats.  It's immense.

21      THE COURT:  Yes, but --

22      MR. WERTHEIM:  And a lot of the answers to what

23  they're saying are -- there are no agreements in this

24  case.  We're a family business.  So a lot of what you're

25  going to learn comes from the whole course of conduct

59

**Proceedings**

1   between them.  That's the problem.

2         MR. KOGAN:  So that means that it would be a

3   40-day trial?  Realistically, he can't send me looking in

4   a pile of thousands of emails.  That's just not the

5   reality.  He knows what he tends to rely on at trial and

6   he can't be vague about his responses.

7         THE COURT:  But you didn't -- that's not the

8   specific question that you asked that led to this --

9         MR. WERTHEIM:  I gave you what you asked for.

10        MR. KOGAN:  I asked to amplify the complaint

11   and the allegations that were made in the complaint were

12   very specific.

13        THE COURT:  Go back.  Do it again.

14        MR. WERTHEIM:  Okay.

15        THE COURT:  If you can't respond specifically,

16   tell him why you can't respond specifically.  In the

17   supplemental written interrogatory response, identifying

18   the specific documents or explaining the inability to do

19   so.

20        MR. WERTHEIM:  Could you give me something in

21   writing telling me precisely which interrogatory

22   responses you have trouble with?

23        MR. KOGAN:  All of them.  They -- this is

24   consistently, if you look at every single interrogatory

25   that refers to four CDs.  Virtually every single

60

## Proceedings

1  interrogatory begins with that response.

2          THE COURT:  If in going back you think you have

3  answered specific interrogatories sufficiently, and you

4  don't want to revise it, that's your call.  If then

5  Mr. Kogan brings a motion to compel --

6          MR. WERTHEIM:  Okay.

7          THE COURT:  -- and he wins, $100 bucks.  If he

8  loses, he's paying $100 bucks.

9          MR. WERTHEIM:  Okay.

10          THE COURT:  All right?

11          MR. WERTHEIM:  Yes.

12          MR. KOGAN:  I have other issues.

13          THE COURT:  Yes, please.

14          MR. KOGAN:  The list of bank -- with all due

15  respect to counsel who claims to have produced voluminous

16  financial business records, what we received -- yes, we

17  didn't receive PayPal, that was -- we did receive PayPal

18  records.  We received one bank -- one business bank

19  account which we subpoenaed and we received tax returns.

20  And we received one Quick Books file.

21          And when we met in my office, I said it's

22  impossible that there is only one Quick Books file from

23  2004 until 2008.  Quick Books generates -- first of all

24  at the end of the year, you have to close out a year.  I

25  know that they -- Quick Books opens up another year for

61

**Proceedings**

1   you.  So for every year there's a separate file.  There

2   are a lot of financial business records that they have,

3   they have on their computer and they haven't produced and

4   they said well, no, they're all subsumed in one file.

5   And that's just not the truth.

6          So if I have to do forensics on their

7   computers, I may have to do that.  I don't think it needs

8   to go that route.  I think I am entitled to see business

9   records.

10          THE COURT:  Go back to them.  Give them the

11   same warning that I gave the accountant.  Not the same

12   one but a similar one.  If there are more documents,

13   produce them.  If nothing else is produced, and Mr. Kogan

14   can make a good showing that there should be more

15   documents, I am going to have his computers sent to a

16   forensic computer person and if he finds more documents,

17   not only will they pay for that forensic examination but

18   they will be sanctioned.

19          MR. WERTHEIM:  Okay.

20          MR. KOGAN:  The list of those bank accounts and

21   credit card accounts would allow me to subpoena them.

22   Without that list, I can't subpoena.  I need that list.

23          Aside from the actual whatever other financial

24   business records they have on their own computers, just a

25   list would allow me to do that.  So on Friday, we will

62

**Proceedings**

1  have a protective order in place.  There is no reason why

2  you couldn't get a list --

3          THE COURT:  You asked for the list in your

4  interrogatories?

5          MR. KOGAN:  I believe I asked for it in

6  interrogatories.  Yes, I definitely did.

7          THE COURT:  And it was not responded to?

8          MR. KOGAN:  No.

9          THE COURT:  Okay.  So I assume after Friday you

10  will get the supplemental interrogatory response which

11  lists the bank accounts.  Okay?

12          MR. WERTHEIM:  And I expect the same thing from

13  them, as well.

14          THE COURT:  Two-way street.

15          MR. KOGAN:  And your Honor previously when we

16  were here, I raised the request for customer records and

17  your Honor ruled that I am entitled to that.  Now they're

18  taking the position that they're -- what the Court said

19  specifically is that I cannot get the -- they can redact

20  the email address of the customer.  Fine.  But we are

21  certainly entitled to the account records which means the

22  communication with the client.  What they have is on

23  every single client, there is a file when orders were

24  made, what was ordered by the client -- by the customer.

25          And at the time, during the last conference, I

63

**Proceedings**

1 explained to the Court why this would be relevant because

2 if in 2004 my client had say 50,000 and that's

3 approximately the right number, 50,000 customers who were

4 on an email list and they were receiving -- they were

5 active customers, I would be able to track how these

6 customers were the ones that were the core of the

7 business and others were added one, and these are the

8 ones who ordered such and such throughout the years.

9        I am entitled to that information in discovery

10 and certainly on relevance and admissibility and all

11 that. And now they're taking the position that they will

12 not give us those documents, the client account records.

13 That's a position that they've taken.

14        MR. WERTHEIM: I'm a little confused. We went

15 over this issue the last time and you said we can redact

16 out the email addresses, that you can identify the

17 clients and if possible, you can produce them in such a

18 way to show the increase monthly or quarterly base of,

19 you know, the customer base. And we said we will. I'm

20 not technological. My client has done this. And we're

21 going to produce it.

22        I don't -- I have no idea what the fight

23 Mr. Kogan is talking about. This is an old issue that

24 was ruled upon already. You told us what to do.

25        THE COURT: Maybe --

64

### Proceedings

1    MR. KOGAN:  So as long as it's clear that we're

2  getting not just the list, an incremental list on August

3  of '05, we have 100,000 and on August of '06, we have

4  125,000, that's not what I am interested in.  I want the

5  account records and I didn't hear counsel acknowledging

6  that and that's the issue, the actual records.

7    MR. WERTHEIM:  We (inaudible) the last time.

8  The Judge didn't rule that.

9    MR. KOGAN:  Okay.  So I am not -- this is the

10  issue, your Honor.  He's speaking out of both sides of

11  his mouth and it's sickening.

12    THE COURT:  Stop.

13    MR. KOGAN:  I am appalled.

14    THE COURT:  Stop. Everybody stop.

15    MR. KOGAN:  It's this dishonesty that -- when I

16  am bringing up an issue and he is saying it was ruled

17  upon.  There is no issue.  We've agreed to produce.  No,

18  the issue that I pointed out is really an issue and he's

19  just trying to somehow not acknowledge that he doesn't

20  want to produce --

21    THE COURT:  And I have ruled on it; right?

22    MR. WERTHEIM:  You ruled on; yes.

23    THE COURT:  And it's going to be produced.

24    MR. WERTHEIM:  The way the Judge said.  The way

25  the Judge said.

65

## Proceedings

1          MR. KOGAN:  Your Honor, these games are just

2   not --

3          MR. WERTHEIM:  What's wrong with that?  This is

4   really offensive, your Honor.

5          THE COURT:  I don't even remember what way I

6   said but --

7          MR. KOGAN:  But, your Honor, whether or not the

8   account -- the underlying account records have been

9   discussed, we've certainly produced them in thousands of

10  emails with customers.  We've produced that.  Why should

11  they not have to produce that?  Is it anymore privileged

12  than my client's communications past 2008?

13         THE COURT:  I'm just looking at the transcript

14  to see --

15         MR. WERTHEIM:  Email list, somewhere around

16  page 35 perhaps.

17         MR. KOGAN:  Your Honor, on page 53 there's a

18  reference to -- yes, that's the discussion on page 53,

19  the underlying records.  That's what I requested.

20         THE COURT:  Okay.

21         MR. WERTHEIM:  Yes, page 52, your Honor, you

22  speaking at the top of page 52.

23         "The Court:  Snapshots to show how the customer

24  list has grown with the names of the customers and redact

25  the email addresses."

66

**Proceedings**

1          THE COURT:  Okay.  Hold on.

2          MR. WERTHEIM:  Your Honor on page 56 is where

3     the issue is concluded.  Do you want the day-to-day,

4     every communication with the email address?

5          THE COURT:  Yes.

6          MR. KOGAN:  Yes.

7          MR. WERTHEIM:  Everything?  Okay.

8          THE COURT:  Yes, you will get it.

9          MR. KOGAN:  Okay.  This is what frustrates me,

10    your Honor.  That -- and why is there a breakdown in

11    communication because it's clear that this was --

12          THE COURT:  Look, I am not --

13          MR. KOGAN:  -- addressed before.

14          THE COURT:  I'm not --

15          MR. KOGAN:  And they take positions that are

16    contrary to that and for aggressive litigation, I

17    understand but this is just -- it's beyond that.

18          THE COURT:  I hear the allegations going both

19    ways; all right?

20          MR. WERTHEIM:  You weren't even talking to me.

21    What position did I backslide on?

22          THE COURT:  Okay.  Stop.

23          MR. WERTHEIM:  I don't want to be called a liar

24    in open court.

25          THE COURT:  Stop.

67

**Proceedings**

1          MR. WERTHEIM:  It's offensive.

2          THE COURT:  Both of you, stop.  Okay?  Just, I

3     mean -- what's your next issue?  I really don't like to

4     figure out who is the bad guy.  I have a hard enough time

5     doing that with my sons.

6          MR. WERTHEIM:  Your Honor, I don't really --

7          MR. KOGAN:  I don't want to go the route of I

8     am actually -- I am not happy to hear that the Court is

9     saying -- when your Honor says $100 penalty, I don't want

10    to penalize Mr. Wertheim.  I am sure that he is a

11    gentleman and we've had good interactions, as well.  What

12    I don't understand is that there are times when it's -- I

13    cannot understand how -- I have it in writing from

14    Mr. Wertheim that they will not produce the underlying

15    records.  And a moment ago in court in front of your

16    Honor he said that he will not produce the underlying

17    records, only a list of progression of how the numbers

18    increased from an email list of 10,000 to 50,000,

19    whatever it is.  A moment ago that was what was said.  So

20    it's not about lying or not lying.  It's simply about one

21    issue.

22          If we're going to have a regular, normal

23    communication, this cannot happen that a moment ago one

24    thing was said and now I don't want to be called a liar,

25    a moment ago you took that position.  You said it was in

Transcription Plus II          Rosalie Lombardi

68

## Proceedings

1   the transcript.  It was not in the transcript.  Instead

2   of saying you're right, I was wrong.  I apologize.  I

3   took a position that was contrary to what I had -- I

4   misunderstood it, that never happens and he's always

5   right all the way to the end.

6           THE COURT:  You're lucky I am not Judge Peck in

7   the southern district.  You guys would have been -- both

8   would have been writing checks already.  I mean, I've

9   litigated cases in front of him.  He's a great judge.  He

10  has no patience for things like this.  I have more

11  patience, maybe that's my fault but stop.

12          MR. WERTHEIM:  We might not be here -- we might

13  not have even had to come here and spend money if you

14  didn't stop talking to me. That's what is so weird about

15  this.  We had one meeting and you disappeared.

16          THE COURT:  Is this a broken record?  We're

17  going back and forth.

18          MR. WERTHEIM:  Okay.

19          THE COURT:  Mr. Kogan, what else is bothering

20  you?

21          MR. KOGAN:  The document responses that counsel

22  produced, we obviously disagree about it but the core of

23  my issue is really addressed in terms of my document.

24  The document responses were inadequate.  They were

25  inadequate because primarily there are two areas in the

Transcription Plus II      Rosalie Lombardi

### Proceedings

1  document responses, one of them has to do with the origin

2  of the designs which I think we're addressing by the

3  simultaneous production.  And the other issue is the

4  business records which are two issues, the business

5  records which the accountant may have and the business

6  records that the client may have.  And I think we

7  addressed those categories.  And they're just subparts of

8  my issue with the inadequate document response.

9        I am assuming that there is no deadline that's

10  been set by the Court for a production of those documents

11  and I would like there to be a deadline.  I know that I

12  have a deadline to respond to his document demand within

13  -- by next Wednesday, I believe.  I have a week.

14        THE COURT:  Yes.

15        MR. KOGAN:  I think that they should have the

16  same time.

17        THE COURT:  Two-way street.

18        MR. WERTHEIM:  I have a problem with that.

19        MR. KOGAN:  By Wednesday they should produce --

20        THE COURT:  What's the problem?

21        MR. WERTHEIM:  The problem with that is

22  Mr. Kogan was told on June 28 -- June 28, more than two

23  months ago, to give me the written response to the

24  document request.  I am being barraged here for the fist

25  time about perhaps legitimate complaints that Mr. Kogan

70

**Proceedings**

1  refused to communicate with me about in the last two

2  months.  And I --

3              THE COURT:  When do you need --

4              MR. WERTHEIM:  You know if we're talking about

5  actually producing more documents, and responding to a

6  very voluminous interrogatory request, I need more than

7  until next Friday, especially since we have to brief

8  something and I have to provide subpoenas to the Court.

9              After all, Mr. Kogan has not imposed a deadline

10 on himself to produce documents, the two-way street

11 documents including things that he was told to produce on

12 June 28, like --

13             THE COURT:  Let's --

14             MR. WERTHEIM:  -- when am I getting my stuff?

15             THE COURT:  Let's re-evaluate all the deadlines

16 right now.  We have a final pretrial conference on the

17 22nd of December.  I'll start my holidays off well.

18 Discovery is closing when, Miriam?

19             THE CLERK:  (Inaudible).

20             THE COURT:  December 9?  Okay.  Excuse me.

21             (Off the record)

22             THE COURT:  Assume that discovery will conclude

23 the day of the final pretrial conference on the 22nd of

24 December.  We can set dates now for the disclosure of

25 documents and all of that or you can reach agreement as

71

## Proceedings

1   you converse following this conference and let me know

2   what dates you've picked.  You are going to have to

3   figure out when the depositions are going to be and all

4   of that.  Maybe you will have to travel to Israel to do

5   some depositions.  Maybe you won't. I don't know.  What

6   do you want to do?  Do you want me to pick dates for you?

7              MR. KOGAN:  I think that would be good,

8   your Honor.

9              THE COURT:  Okay.  We'll work backwards.

10  December (sic) 30, all documents have to be produced.

11             MR. WERTHEIM:  December?

12             THE COURT:  September 30.

13             MR. WERTHEIM:  Outside date; okay.

14             THE COURT:  I'm sorry, September 30.  I was

15  looking at September but December stuck in my mind.  This

16  Friday we're still going to get the protective order.

17             MR. WERTHEIM:  This Friday.

18             THE COURT:  This -- next Wednesday, we're still

19  going to have the simultaneous production of the images.

20  All other documents, bank records, emails, all of that by

21  the 30th of September.  Of course you're going to give me

22  the subpoenas --

23             MR. WERTHEIM:  Which --

24             THE COURT:  -- next Wednesday. And I guess it's

25  the 18th, we're going to get the letters on the

72

**Proceedings**

1   attorney's eyes only issue on the copyright stuff.

2          MR. WERTHEIM:  Could we just have it, some kind

3   of rough fairness, the same date whether it's September

4   30 or not, for Mr. Kogan's written response to my second

5   document request?  And my updated interrogatory

6   responses?

7          THE COURT:  Sure.

8          MR. WERTHEIM:  Do you want September 30 for

9   that Boris, or something earlier?  You tell me.  I don't

10  know if you've made any headway on that.

11         MR. KOGAN:  Your Honor, the 18th is Rosh

12  Hashana eve and --

13         THE COURT:  Okay.  That's all right.  I was

14  wondering about the holidays and how they're going to

15  effect it.  Well that following week is -- are there

16  holidays, too?

17         MR. KOGAN:  Yes.

18         THE COURT:  Some of the --

19         MR. KOGAN:  Once we begin that holiday season

20  it's a total of three weeks of being in and out.

21         THE COURT:  Okay.

22         MR. KOGAN:  Actually it's four weeks.

23         THE COURT:  So you have no problem with the

24  dates, the 16th, for the things that we scheduled for

25  them.

73

**Proceedings**

1          MR. KOGAN:  No, the 16th is not a problem.

2          THE COURT:  All right.

3          MR. KOGAN:  The 18th, if we could just have a

4   date in the following week would be okay.

5          THE COURT:  Okay.  The 25th.

6          MR. KOGAN:  On the 25 for the letter briefs on

7   the copyright issue.

8          THE COURT:  And still on the 30th, the

9   documents and including written responses.  So you should

10  have all of the documents by the 30th.  That will leave

11  You three months to do depositions.  You should be able

12  to do it.  Don't expect anymore time because you're

13  unlikely to get it.  All right?

14         MR. WERTHEIM:  Okay.  Go home.

15         THE COURT:  Stop with the letters.  Pick up the

16  phone.

17         MR. WERTHEIM:  I did.

18         THE COURT:  Be -- you know, I am not -- I am

19  serious about the hundred bucks and going up in

20  increments.  Don't give me reason to have to make you

21  write checks.  It's distasteful to me but hopefully it

22  will get you to -- if it's the clients that are driving

23  some of this, they're going to get sanctioned.

24         MR. WERTHEIM:  We'll make it clear to them.

25         THE COURT:  Make it clear to them.

74

## Proceedings

1          MR. WERTHEIM:  Yes.

2          THE COURT:  You know, this divorce atmosphere

3    has to end.  Maybe I should order them all to go to group

4    counseling or something.  All right.  Have a good day,

5    gentlemen.

6          MR. WERTHEIM:  Thank you, your Honor.

7          MR. KOGAN:  Thank you.

8               (Matter concluded)

9                    -o0o-

75

# C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **9th** day of **September** , 2009.



Rosalie Lombardi
Transcription Plus II