```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3      -------------------------------X
                                       :
 4      MIKHLYN, et al.,               :
                                       :   08-CV-3367
 5                   Plaintiffs,       :
                                       :
 6                   v.                :
                                       :   225 Cadman Plaza East
 7      BOVE, et al.,                  :   Brooklyn, New York
                                       :
 8                   Defendants.       :   November 2, 2009
        -------------------------------X
 9

10          TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
             BEFORE THE HONORABLE RAMON E. REYES, JR.
11               UNITED STATES MAGISTRATE JUDGE

12
        APPEARANCES:
13
        For the Plaintiffs:        ERIC WERTHEIM, ESQ.
14                                 Val Mandel, P.C.
                                   80 Wall Street
15                                 New York New York  10005

16      For the Defendants:        BORIS KOGAN, ESQ.
                                   Boris Kogan & Associates
17                                 277 Broadway
                                   Suite 701
18                                 New York, New York  10007

19                                 TUVIA ROTBERG, ESQ.
                                   Levisohn Berger, LLP
20                                 61 Broadway
                                   32nd Floor
21                                 New York, New York  10006

22
        Court Transcriber:         RUTH ANN HAGER
23                                 TypeWrite Word Processing Service
                                   211 N. Milton Road
24                                 Saratoga Springs, New York 12866

25


        Proceedings recorded by electronic sound recording, transcript
        produced by transcription service
```

2

1   (Proceedings began at 10:37 a.m.)

2            COURT CLERK:  Civil cause for a motion, docket

3   number 08-CV-03367, Mikhlyn v. Bove.

4            Counsel for plaintiff, please state your name for

5   the record.

6            MR. WERTHEIM:  Eric Wertheim, Val Mandel, P.C., for

7   the plaintiffs.

8            MR. KOGAN:  Boris Kogan from Boris Kogan &

9   Associates for the defendants.

10           MR. ROTBERG:  And Tuvia Rotberg of Levisohn Berger

11  [unintelligible] for the defendants.

12           MR. KOGAN:  And I have Joseph Vibbs [Ph.], my law

13  clerk as well.

14           THE COURT:  Good afternoon, gentlemen.

15           MR. KOGAN:  Good afternoon.

16           THE COURT:  All right.  Can someone -- I asked you

17  to bring some documents so I could see what it is we're

18  arguing about.  Could I see?

19                    [Pause in the proceedings.]

20           MR. ROTBERG:  There's some extra stuff in here, Your

21  Honor, [inaudible] cover letter from Mr. Kogan providing the

22  simultaneous exchange and the number of the different types of

23  documents that were in the production.

24           THE COURT:  Can I see a copy of what you

25  [inaudible]?

1        MR. ROTBERG:  These are samples of [inaudible]

2  design images and public-owned images on which they are based

3  and the [inaudible] on files that go with the creation of

4  defined product.

5        THE COURT:  Thank you.  Okay.  I want to deal with

6  the defendant's submissions first just so I understand what it

7  is exactly I'm looking at.  The first stapled set of documents

8  it's got a "C" written in the top right-hand corner and a

9  little Post-It that says "Poppy's Lace.  These are the

10 finished" --

11        MR. ROTBERG:  What you see on the front cover is the

12 finished design product.

13        THE COURT:  Okay.  So page 1, page 2, that's the

14 finished.

15        MR. ROTBERG:  Whatever you see in color is the

16 finished product.

17        THE COURT:  I got it.

18        MR. ROTBERG:  What you see in black and white is the

19 public-owned domain image on which it was based.

20        THE COURT:  Okay.  Okay.  I see.  I see.  Okay.  I

21 gotcha.  Now, just so I know these color images they're

22 computer-generated?

23        MR. ROTBERG:  Yes, they are.

24        THE COURT:  All right.

25        MR. ROTBERG:  If I can direct your attention to "E"

4

1   that's associated with this.

2          THE COURT:  Okay.  All right.

3          MR. ROTBERG:  If you go through the pages in "E"

4   that essentially is the process of how it goes about getting

5   the finished design, each one of those are not finished.

6   They're work in progress and it takes a lot of iterations

7   to -- till she got to exactly how she wants it.  Just, for

8   example, this collection took one and a half years to put

9   together.  Each one of these public domain images were found

10  in different sources that are not -- it's essentially a

11  compilation of public-domain images.  And then for each image

12  there is a lengthy process in which she, you know, designs it,

13  she color tweaks it and is finally happy with the finished

14  product.

15         THE COURT:  Okay.  So just focusing on "E" that

16  first page, I understand that this is part of the creative

17  process to get to the final image.  But what this document

18  itself -- is this an email or --

19         MR. ROTBERG:  Yes, that's instructions to the

20  digitizers telling them exactly how she wants her -- you know,

21  her -- how she pictures her design looking at specific

22  instructions for them to carry out.

23         THE COURT:  All right.  Now, Exhibit C, I'll call

24  them exhibits.  I don't know that they are that.  The finished

25  images and the public domain images this -- were they both

5

1 submitted to the PTO?

2          MR. ROTBERG:  The [inaudible], yes, they were.

3          THE COURT:  Yeah.  I'm sorry.  I'm -- the Copyright

4 Office, yes.

5          MR. ROTBERG:  Yes, for each administration they

6 showed the previous -- the previous and public domain image.

7 They said what their addition was and they showed the finished

8 image obviously as the deposit copy.

9          THE COURT:  Exhibit E, though, those emails that

10 shows the creative process that's not so --

11          MR. ROTBERG:  That's not included.

12          THE COURT:  Okay.  And just looking on page 2 of

13 Exhibit E there's a color image.  Is that -- does that relate

14 to the prior email, the September 2, 2005?

15          MR. ROTBERG:  I'm not sure.

16          THE COURT:  But --

17          MR. ROTBERG:  But I think the significance of that

18 image just shows how it's an early stage image.  If you look

19 at a final product it looks nothing like that.

20          THE COURT:  The "final product" being?

21          MR. ROTBERG:  Being the -- you'll find it exactly.

22          THE COURT:  I see it.  Different colors.

23          MR. ROTBERG:  Right.

24          THE COURT:  And borders change, you know, book --

25 okay.  I gotcha.

6

1         MR. ROTBERG:  Exactly.  So that's really the

2    creative process.

3         THE COURT:  Now, all right.  Okay.  What is "F"?

4    "C," I don't have a "D."  All right.  I guess there have been

5    different -- they given to me in diff -- in -- not in

6    sequential order.  I assume that's for -- that's for some --

7    that's a purpose -- it was a purpose behind it, correct.

8         MR. ROTBERG:  Yes.  "F" is really more of the same.

9    It's discussions with [unintelligible] but over at the very

10   end it shows how Ana took on the finished product and kept it

11   into an icon for your web site.  On the last page you see on

12   the instructions that she gives on web site in order to create

13   the image the way she intended it to look.

14        THE COURT:  All right.  And then "G" is part of a

15   copyright application or no?

16        MR. ROTBERG:  "G" is an entirely different

17   collection.  What this is going to show is that this

18   collection is actually -- was not taken from the public

19   domain.  This is just a brain child of Ana Bove and it just

20   shows the steps taken in order to come out with the finished

21   result.  And if you see this began in 2003 -- or 2002 and was

22   not completed until 2004 --

23        THE COURT:  Had -- oh, you got back.  I see drafts

24   and sketches 2002, 2003.  Okay.  Now, turn to "A."  Little

25   chipmunks and cute cats and stuff.

7

1          MR. ROTBERG:  Okay.  To the left --

2          THE COURT:  Preexisting.

3          MR. ROTBERG:  Preexisting.  Right.  Those are all

4    Russian postcards that Ana collected over the years.  And to

5    the right you'll see how she -- based on those postcards how

6    she interpreted them and kind of created a design off them

7    based on them or inspired by them.  So, for instance, the

8    first one to the left, the squirrel with the mushroom you'll

9    see it to the right.  You'll see it on the stocking.  That's

10   her indicia of pub -- or the preexisting postcard and the same

11   is true for the rest.

12         THE COURT:  Now, what was the purpose of her

13   creating this document itself?

14         MR. ROTBERG:  Just to show a side-by-side comparison

15   for your sake.

16         THE COURT:  Oh, so this is not a document that

17   existed?

18         MR. ROTBERG:  No.

19         THE COURT:  So this is prepared just for me?

20         MR. ROTBERG:  Exactly.

21         THE COURT:  Okay.  Do you have a copy of this?

22         MR. WERTHEIM:  I don't -- it seems to us that at

23   least if I'm clear at least some of this is not -- was not

24   part of the original production.  For example -- I don't know.

25   Don't tell us but one of these, for example, has a comment

8

1   apparently from Ana that says, "The design was accomplished

2   without preexisting works and is 100 percent author work

3   performed prior to 2004."

4           THE COURT:  Okay.

5           MR. WERTHEIM:  Mikhlyns keep using it up to the time

6   being.  You know --

7           THE COURT:  But --

8           MR. WERTHEIM:  It's "G," Exhibit G, second page.  I

9   don't think we got that but they can tell me otherwise.  It

10  sounds like this was produced -- I'm not entirely sure.  It

11  looks like some of this was just produced for today and it's

12  not the stuff in the production we're arguing about.

13          THE COURT:  Well, I'm not -- I mean, I'm not the

14  trier of fact, so really no need to make arguments --

15  substantive arguments to me.  But what we looked at so far,

16  "C," I assume is part of the production.

17          MR. WERTHEIM:  Your Honor, to my knowledge all of

18  these are part of the production.  The words that were typed

19  up on the top of "G" may not have been part of the production.

20  I don't think that they were intended for that.  They don't

21  show authorship.  Those words in and of themselves on top

22  of --

23          THE COURT:  Don't -- I just want to -- don't argue.

24  Nobody argue, all right?  I just want to find out what it is

25  I'm looking at, so as far as you understand everything was

9

1   part of the production or only some?

2           MR. WERTHEIM:  With the exception of --

3           THE COURT:  What was read.

4           MR. WERTHEIM:  -- what Mister -- and what

5   Mr. Rotberg said was prepared for Your Honor.

6           THE COURT:  Okay.

7           MR. WERTHEIM:  At the top of Exhibit --

8           THE COURT:  G.

9           MR. WERTHEIM:  -- A.

10          THE COURT:  A.

11          MR. WERTHEIM:  That page was signed with --

12          THE COURT:  Gotcha, gotcha.

13          MR. WERTHEIM:  -- side by side comparisons.

14          THE COURT:  And it's the -- all right, so we've --

15  I've looked at "F."  I've looked at "E."  These are more

16  emails and digitized images.

17          MR. WERTHEIM:  "G" is -- "G" works are entirely

18  Ana's brainchild.

19          THE COURT:  Her -- yeah.  And it was produced for

20  me.  "B" is more of the preexisting and final images.  "D" --

21  I don't read Russian, but it looks like the same.  Got the

22  same -- "H," similar.  "I" similar.  Okay.  And what is "J"?

23  Is that taken from the web site or --

24          MR. ROTBERG:  Yeah.  "J" I believe was also created

25  for the purposes of today.  Don't quote me on that.  Not 100

10

1  percent sure on that.  But as I understand it, "J" goes to
2  show that the web site was created in 2002 and these are
3  different examples of banners and icons that are still on the
4  web site.  All that remained all in 2002 when Ana first
5  created it.
6          THE COURT:  All right.  Okay.  Let's table that for
7  a moment and let me look at what the plaintiffs have
8  submitted.  First I have what looks like an email chain and
9  then some more emails and then looks like a copyright report.
10 I don't know what you call it, what the term-of-art is.  And
11 then some embroidery pass -- patterns and pictures and more of
12 the same.  Certificates of registration, eBay printouts,
13 letters.  All right.
14          MR. WERTHEIM:  They are additional --
15          THE COURT:  Um-hum.
16          MR. WERTHEIM:  There are some copyright assignments.
17          THE COURT:  Yeah.
18          MR. WERTHEIM:  And an reported partnership agreement
19 between Polina and Ana, one page.
20          THE COURT:  What does this have to do with the -- I
21 mean, the reason why I'm here is just -- well, why I'm here is
22 to figure out what, if anything, should be attorney's eyes
23 only.
24          MR. WERTHEIM:  Right.
25          THE COURT:  So you'll explain to me what the

11

1   relevance of the assignments is.

2          MR. WERTHEIM:   The relevance is they were among the

3   many types of documents that were designated as attorney's

4   eyes only by the defendants.   They produced 52 CD-ROMs, copies

5   of 137 copyright registrations and said everything is

6   attorney's eyes only including assignments, things from the

7   web site.   I think there's even an email from our web site in

8   there to customers.   You know, I don't know why that is.   It's

9   just all kinds of categories that don't even fit into the

10  rationale that was raised originally when this first came up

11  two conferences ago.   I don't understand why assignments.

12  Just textual documents or an agreement or for that matter the

13  copyright registrations, many of which they just printed off

14  the web at the last minute on the September 16th deadline, the

15  production deadline.   They've been designated as attorney's

16  eyes only as well.   I don't know what the justification for

17  that is.

18          THE COURT:   Is it the defendant's contention that

19  all of the 52 CD-ROMs should be attorney's eyes only?

20          MR. ROTBERG:   Yes, Your Honor.

21          THE COURT:   Why?   I mean, if there are documents

22  that their clients signed or looked at, I mean, what is the

23  basis?   I can understand that going through 52 CD-ROMs page by

24  page could be and probably is a burdensome with a small "b"

25  process but --

1          MR. WERTHEIM:  They've produced over 100.  I

2   understand that.  Believe me, Your Honor.  I do understand

3   that.  The reality, though, is that while there may be some

4   documents that their clients have they actually claim that

5   they have all of it.  They claim that their clients -- they're

6   claiming in one of the letters to Your Honor in "B" letter

7   that was the subject of this issue the claim is that we've

8   submitted the same things.  So if they have everything that

9   we've given them then why bother the Court with this issue?

10   If they have it all, the clients can look at their own version

11   of the same documents and let us keep these as attorney's eyes

12   only.  We believe that they don't have them.

13          THE COURT:  Well, but what's the -- that makes no

14   sense either because if they have it then it can't -- you

15   can't --

16          MR. WERTHEIM:  They don't have it, Your Honor.  That

17   claim is false.

18          THE COURT:  All right.  Then fine.  Then fine.

19          MR. WERTHEIM:  It's not true.  They don't have all

20   the intermediary steps.  They don't have the original public

21   domain design.

22          THE COURT:  But that's a different issue.  The

23   intermediary steps I'm with you on that.  That -- you know,

24   that can be attorney's eyes only because it disposes -- it

25   discloses the creative process that wasn't produced to the

1  Copyright Office.  It's, you know, something that she -- or

2  they had in confidence with their consultants who helped them

3  digitize and that I could see.  But to produce 52 CD-ROMs and

4  say it's all attorney's eyes only I think that's over-

5  reaching.  Is there, you know, how do we resolve it other than

6  going through page by page in figuring what was -- what is

7  part of the creative process that was not previously

8  disclosed?

9        MR. WERTHEIM:  Your Honor, if I might -- well, first

10  of all, I want to clarify something.  I think here might be a

11  misunderstanding.  Maybe there is, maybe there isn't about the

12  scope of this.  I want to be clear on this.  I'm not sure.

13  Maybe I have a misunderstanding.

14        THE COURT:  It's probably on my part.

15        MR. WERTHEIM:  This is not about designs of recent

16  vintage or things that are in process where I'm trying to let

17  my client peek under the rug to see what Ana is doing.  I

18  think there may have been a suggestion of that in some of the

19  prior letters of discussions.  This is -- at least for

20  purposes of attorney's eyes only.  We're really only focused

21  on that body of completed out there on the web site, out on

22  our web site designs that were created starting in 2002, let's

23  say, and were created and put out in the world no later than

24  spring of 2008.  Two springs ago when the parties had their

25  rupture.  This is not trying to take a sneak peek at stuff

14

1  that isn't out there yet.  Okay.  That's number one.

2         All the designs themselves, the final designs, the

3  exact designs that are on each party's web site both parties

4  have other designs because I know Ana has been creating other

5  stuff and our client has been creating other stuff and I don't

6  begrudge creating new artwork or anything like that.  I'm not

7  sure if you had that as an impression that there's something

8  sensitive or in process.

9         THE COURT:  No, but even images or artwork that was

10  created and that's the subject matter of the lawsuit there is

11  a creative process.

12         MR. WERTHEIM:  Right.  Let me mention -- let me talk

13  about the creative process.  Okay.  To the extent -- for

14  purposes of competitive unfair advantage, let's say, okay,

15  this is a nonissue here because we have all of the final

16  things which are a combination in most instances of some

17  preexisting work and additions that were either done by the

18  Chinese or at Ana's suggestion or in some cases by other

19  family members.  Is anything worth copying from them?  My

20  clients [inaudible] -- we have it.  Okay.

21         Now, I'm telling you what my problem is.  It's a

22  serious practical problem and I think it's one they have, too.

23  Okay.  Have a massive amount of information to go through

24  about this process.  It's a copyright dispute.  How were these

25  things made?  Was any particular item they're referring to

1  copyrightable?  Does it reflect a contribution that gives you

2  authorship or co-authorship (a) I don't even have the very

3  expensive software to look at many of the things that they

4  produce.  They're in the same boat because your order was I

5  think a two-way street until this was resolved.  The clients

6  have the special software and a lot of these are in certain

7  format that you need just to look at them.  So either I'm

8  going to have to go plant myself in my client's office and

9  occupy one of their computers for days on end at lawyer time

10  looking at this and they're going to have to do the same thing

11  or else I'm going to get their help.

12          The second thing is they know what these emails mean

13  in the sense of being involved in the process.  They

14  understand what the instructions mean to the digitizer or we

15  don't do this business.  I need them to help me explain this

16  great mass of doc -- you know, documentation that's on many

17  disks to understand how this stuff got created.  Okay.

18          Also you refer to Ana's communication with what you

19  term "consultants."  That outside contract from China was

20  hired by our company, ABC All Consulting.  We hired them.  We

21  paid them and in fact recently they signed all their

22  copyrights and whatever they did in connection with these

23  designs to us.  Okay.  So, you know, there's a real question

24  of who can claim what in terms of rights here.

25          The second thing is, you know, turning from the law

1    of trade secrets which we discussed at length in our letters,

2    you know, among other things a big point in the case law is

3    efforts at secrecy.  Well, there was no secrecy here.  We

4    have -- I did not say we had all this stuff, as Mr. Kogan

5    said.  We have all the final designs.  That's what their part

6    of the lawsuit is about.  The final designs are identical.

7    They're on our web site.  They're on web site.  People out in

8    the world can copy them if they want to.  As far as the other

9    things like emails with the Chinese digitizers who hired and

10   paid and the original public domain artwork we have some of

11   it, not all of it.  I can't give you the percentage.  We have

12   a lot of it.  There's an overlap.  I'm not sure why we don't

13   have all of it.  It may be fortuitous, but the point is a very

14   important thing in the case law is effort at secrecy.

15          Well, they were living in our house, doing this

16   stuff in our house and we had access to most of this and we

17   had most of it.  As far as the Chinese digitizers no effort

18   was made to bind them to secrecy to these emails that were

19   sent.  I could get it from them possibly.  There has to be an

20   effort at secrecy to claim a trade secret.

21          THE COURT:  These were I think relatively moderate,

22   maybe proper characterization is moderately sophisticated

23   businesspeople.  You know, their efforts at keeping things

24   secret, you know, hiring a computer company to do computer

25   work for you without, you know, signing an iron clad

1  confidentiality agreement, I can understand that.  I mean,

2  then living in someone else's house that -- who is part of the

3  business, you know, I can understand that, too.  They were all

4  going to keep it secret.  You know, the -- what I'm struggling

5  with is if there -- even with old designs if there is an

6  indication of the creative process that was not disclosed to

7  your clients previously you could say, okay, I have the

8  finished image, I have the original image and then I have a

9  series of emails that take you to step one, step two, step

10  three, step four, step five.  Boom, you got your final product

11  that your clients didn't know about to reveal that now could

12  very well be revealing if not, you know, trade secret

13  something akin to that.

14          MR. WERTHEIM:  Your Honor, I don't -- I really don't

15  understand how it's a trade secret, I must say.  What am I

16  going to do -- what is my client going to do with an email

17  from 2000 -- we have, by the way -- I'm not in a position to

18  say most of them.  We had many of these because we were copied

19  on them.  We were working a business deal.  I produced them to

20  the other side.  It's not 100 percent identical but I produced

21  them.  Okay.  We had them.  We were party to these

22  communications.  You know, there's been this reference to the

23  creative process -- the creative process but that's not the

24  issue for trade secret purposes.  The real question is if we

25  take an email to a Chinese contractor from 2005 that said, you

1  know, make the black line a little less thick or this black-

2  and-white pen-and-ink drawing of a flower make this one purple

3  is that really a trade secret?  What is my client going to do

4  with that in 2009?  I mean, the ultimate file product that was

5  put on the market, I have that.  My client has it.  We're

6  selling it on our web site.  If they want to say, you know,

7  that's really good, let's derive something from that, just do

8  it.

9          THE COURT:  Then why do you need it?

10         MR. WERTHEIM:  What is the val --

11         THE COURT:  Why do you need this information?

12  You're both making arguments that, you know, you're fighting

13  to fight.

14         MR. WERTHEIM:  No, that's not true.  I'm very --

15  it's entirely practical on our side and nothing to do with

16  competition.  I want my clients to help me understand how

17  these things came to exist for purposes of the copyright

18  issues.  Who did what?  What was really the creative process?

19         THE COURT:  But you can --

20         MR. WERTHEIM:  How much did the people in China do?

21         THE COURT:  How can you not do that?

22         MR. WERTHEIM:  Because --

23         THE COURT:  Yourself because a lot of this --

24         MR. WERTHEIM:  There's two reasons.  There's two

25  reasons.  There's 50-plus disks.  It's going to take God knows

19

1  how many attorneys hours for both sides to do that without the

2  assistance of their clients.  I don't have this very expensive

3  software that I need to look at this stuff.  Why can't I have

4  their help?  I mean --

5           THE COURT:  Can you show me -- you have their "E" --

6  their Exhibit E?

7           MR. WERTHEIM:  I'm sure I do.  Yes.

8           THE COURT:  That looks like an email from Ana to

9  the company.

10           MR. WERTHEIM:  Um-hum.  Right.

11           THE COURT:  The digitizing company.  Can you show me

12  any examples of where your clients were copied on one of

13  these?

14           MR. WERTHEIM:  I've produced -- well, they obviously

15  didn't bring to court the ones that my clients were in on but

16  we produced at least dozens if not hundreds of them.  Okay.  I

17  have them.  I could submit them under cover letter if you want

18  to.  We produced a ton of it.  Obviously they've cherry picked

19  and produced very lengthy ones.  I mean, I don't recognize --

20           THE COURT:  Well, there's -- you know, in the --

21           MR. WERTHEIM:  It's also no -- there's no --

22           THE COURT:  -- attorney/client --

23           MR. WERTHEIM:  -- banner part also to show you who

24  got the emails.

25           THE COURT:  Yeah.

1          MR. WERTHEIM:  You may well have had this one.  I

2    don't know.

3          THE COURT:  In the attorney/client email there's

4    subject matter weight, right?  You disclose confidential

5    communications on issue "X" to a nonparty.

6          MR. WERTHEIM:  Right.

7          THE COURT:  You waive issue "X."

8          MR. WERTHEIM:  Sure.

9          THE COURT:  That's it.  It's done.

10          MR. WERTHEIM:  Sure.

11          THE COURT:  And the same argument could be made

12    here.  If along the way Ana sent to the digitizing company and

13    to plaintiffs these types of things and a dozen, two dozen,

14    hundreds, whatever it is, why are we fighting about this?

15          MR. WERTHEIM:  I don't know.

16          THE COURT:  Cat's out of the bag.

17          MR. WERTHEIM:  I don't know.  There was no -- not

18    one single iota, crumb of secrecy at the time either vis-a-

19    vis -- again, the Chinese, our people, we were family.  We

20    were working together.  Had a ton of this stuff.

21          THE COURT:  It -- that's different issue.  That's a

22    different issue.  I said previously I think, you know, they

23    were trying to -- they were operating a business.  They had --

24    it was a, you know, it was a closed group of people.  They

25    were dealing with one outside comp -- they were trying to keep

1  it under wraps but now they're trying to shield some of the

2  information from the very same people who had it previously.

3          MR. WERTHEIM:  And still have much of it.

4          THE COURT:  So it's not necessarily -- it was more

5  of a practical issue.  Why now should we say, okay, you saw it

6  at one point but now you can't see it anymore?

7          (Voices simultaneous.)

8          MR. ROTBERG:  That's the truth.  The truth is that

9  they never saw it.  They were not part of the creative

10  process.  They received some of the emails and whatever emails

11  they received they didn't erase.  It's not like they had

12  access and the access disappeared.  They have every single

13  email that they ever had, nobody ever reached into their

14  computers and modified their passwords like they did to my

15  client but they actually had everything they ever had.  The

16  entire hard drive is intact and Mr. Wertheim doesn't need my

17  assistance in order to understand.  His own client's creative

18  process, nonexistence but he doesn't need my client's

19  assistance, doesn't need my client's documents.  He can sit

20  down with his own client, with his own client's hard drive,

21  with his own client's software, and understand whatever his

22  client did and continue to lack the understanding about how

23  the process really worked and what actually happened from the

24  moment that the doc -- that the public domain designs were

25  located, assembled, and then modified with the creative

1  process in order to make this final product.  He has the final

2  product that we concede, that he has the public -- the final

3  result whatever is on their web site, whatever is on our web

4  site --

5          THE COURT:  But if he has all the emails, too, I

6  mean, then --

7          MR. ROTBERG:  Whatever emails he has, he has but

8  those emails that he has he doesn't need to look at my copy of

9  the email in order for him to understand something if indeed

10  that is what he is claiming.  He believes that he needs to

11  look at my 52 disks in order to understand his client's

12  creative process.  That claim is in and of itself inconsistent

13  and absurd.  He doesn't need to look at my client's process in

14  order to understand his client's process.

15          MR. WERTHEIM:  That's not even what I'm asking.

16  That's totally --

17          (Voices simultaneous.)

18          MR. ROTBERG:  In any event --

19          MR. WERTHEIM:  I don't understand.

20          MR. ROTBERG:  That has been a -- Your Honor, we're

21  going back here.  It's been ruled in the previous time that

22  the creative process, those domain -- those images that are

23  part of the creative process are not going to be revealed to

24  the clients.  That's the only reason that we have them.  My --

25          MR. WERTHEIM:  Yeah, but you designated all the 52

23

1  CD-ROMs as attorney's yes only.  That seems to me not a good-

2  faith basis to do that.  I mean, if --

3      MR. ROTBERG:  Your Honor, the question was simply a

4  simple question.  Your Honor asked whether -- I've asked that

5  everything should be categorized as attorney's eyes only.

6      MR. WERTHEIM:  And I said no.

7      MR. ROTBERG:  Until for -- everything that -- all of

8  my client's proof of ownership and all of their client's proof

9  of ownership of the designs.  That's what I've asked it should

10  be categorized as attorney's eyes only.

11      THE COURT:  Here's what we're going to do.  If you

12  want to maintain the attorney's eyes only designation to any

13  of the documents you're going to have to go through and

14  separately identify each page from the 52 CD-ROMs that have

15  only things similar to the first page of Exhibit E which shows

16  the creative process.  If any of those documents turn out to

17  have been previously produced to a copy -- you know, cc's,

18  whatever to the plaintiffs then whatever protection they have

19  will evaporate.

20      (Voices simultaneous.)

21      MR. KOGAN:  Mr. Rotberg would like to add part of

22  the response.

23      MR. ROTBERG:  Yeah, I just had a technical response

24  to what Mr. Wertheim said before.  Although all the finished

25  images are on the web site anybody has access to them.

24

1   There's nobody who buys an image.  Someone who buys an image

2   off the web site gets a CD-ROM of the image, they can't take

3   that disk and manipulate the image in any way.  It's done.

4   It's fixed.  It's blocked.  That is not the same for all these

5   images that are work in process.  Those digital files can be

6   manipulated and can be used to create other images.  Just

7   taking an example, looking at "F" for example.

8          THE COURT:  Okay.

9          MR. ROTBERG:  The second page where the great

10  pattern image that is in process digital file.  If the

11  plaintiffs got ahold of that file they can take that image and

12  manipulate it in any way they want.

13         MR. WERTHEIM:  We have the digital files.  We're not

14  a member of the public.  We're not just somebody -- a customer

15  working on the web site.  We have the same thing you have.

16  You know --

17         MR. ROTBERG:  Your Honor, and again, if they have it

18  why do they need it from us?  It's specious and [inaudible] --

19         THE COURT:  All right.  Here's what you're going to

20  do.  If you want to main -- you can't just make blanket

21  attorney's eyes only.  That's not how it works.  Okay.  If you

22  have particular documents that you want to maintain as

23  attorney's eyes only you have to separately identify them

24  document by document.  If it's a -- if it's a series of emails

25  along the lines of Exhibit E, first page, so be it.  If it's a

1   work in process digital image along the lines of what you've

2   discussed in "F" so be it.  You have to identify it document

3   by document and we're going to take it from there.  Everything

4   else is not.

5            MR. ROTBERG:  Your Honor, alternatively one

6   possibility is for us to produce a print image which would not

7   be -- perhaps I'd have to check with my client if that would

8   be -- if that would provide them the protection that they

9   seek.

10            THE COURT:  Well, but you've already --

11   you've already -- they're already on the CD-ROMs, right?

12            MR. ROTBERG:  I already have them on the CD-ROM but

13   that's not in the print image.  On the CD-ROM is an original

14   file that was being manipulated with that software.  That they

15   definitely don't have.  They can represent -- counsel can

16   represent whatever he wishes, but I'm advised by my client

17   that the reality is that they don't have them.  That's why

18   they're fighting so hard to get them.  And the rep -- and the

19   claim that we don't need them in 2009.  Of course they need

20   them because that's the business.  That is what they're

21   able -- if they are able to get those images that are -- the

22   software will be able to produce new designs off of those

23   designs.  They don't have them now and they want to get their

24   hands on them so that they can produce additional designs.

25            THE COURT:  So if -- but if they have the --

1  everything you've produced along these lines is on 52 CD-ROMs.

2  Is that's correct?

3            MR. KOGAN:  That's right.

4            THE COURT:  All right.

5            MR. KOGAN:  At least in hard copy.

6            THE COURT:  Hum?

7            MR. KOGAN:  I'd be happy to get hard copies.

8            MR. WERTHEIM:  I didn't ask for disks.

9            THE COURT:  Okay.  These works in progress images do

10  they have a particular --

11            MR. WERTHEIM:  Extension?

12            THE COURT:  Extension.

13            MR. WERTHEIM:  I think that there are a variety of

14  them.  It's more than one type.

15            THE COURT:  Okay.

16            MR. WERTHEIM:  Digital.

17            THE COURT:  You know.  Why don't you find the full

18  extent of those and then iden -- and say, look, anything with

19  a file extension dot 123 dot ABC -- whatever the work in

20  progress images are -- those are attorney's eyes only.  If the

21  emails -- emails you've got to break out because you can't

22  just say anything with an email extension because it may be an

23  email that doesn't disclose the creative process.  You can

24  then take the extensions for the images and print them out.

25            MR. WERTHEIM:  If I can get that, I'm fine with

1  that.  If that's the issue now because, you know, it's been --

2           THE COURT:  No, I think it's two separate things.

3  It's -- the only thing that I'm saying is attorney's eyes only

4  is any documents that lay out the creative process along the

5  lines of the email that we looked at, number one.  Number two,

6  any work in progress image because I take seriously the

7  concern that those can be manipulated, not that your clients

8  would do that but we're trying to protect people's work

9  product.

10          So they tell you here are all the emails.  They list

11 them out one by one.  Those were attorney's eyes only.  Here

12 are the file extensions for the works in progress.  Those you

13 can print out and then show your client.  What she's saying is

14 not a problem as long as they don't have the file itself.

15          MR. ROTBERG:  I have to check with my client if it's

16 possible to simply scan these and then use them in the same

17 way.  I have to check that, Your Honor.  I'm coming up with an

18 idea that might simplify things but I do have to check,

19 though, with my client.  I don't want to --

20          THE COURT:  All right.  Yeah.

21          MR. ROTBERG:  -- rely on something that's inaccurate

22 in the event my client clarifies.

23          MR. WERTHEIM:  Couple of things, Your Honor, before

24 we leave for which hopefully is soon.  First of all, can we

25 further ask given that we're still in sort of flux about the

1   scope of any of the attorney's eyes only protection to have

2   them convert the files that are in that specialized format so

3   we can look at them, the ones that are in specialized format

4   for specialized software that only our clients have, can they

5   be converted to some -- or printed out -- either converted or

6   printed out so we can see them because I can't look at them.

7   They're some kind of special form that's connected with this

8   software that they use.  It's very expensive.

9          THE COURT:  Why can't your clients install the

10   software on your computer?

11          MR. WERTHEIM:  Because I think that'd be a copyright

12   violation.

13          THE COURT:  Do they have a license?

14          MR. WERTHEIM:  I don't think they can take -- it's a

15   very expensive software.

16          THE COURT:  Do they have a license?

17          MR. WERTHEIM:  They can't just make a copy of it and

18   send it to us.

19          THE COURT:  No, I'm not saying they can make a copy

20   and send it to them.  They can take the software -- a box with

21   the software in it, walk over to your office.  I assume they

22   have a license since they bought it.

23          MR. WERTHEIM:  Their one version of it, yeah.  I

24   don't know what you mean by a "box."  Go ahead and put it on

25   our computer?  I don't know if they're allowed to do that.

1          THE COURT:  Maybe you can put it on -- you know,

2    like you get iTunes you can put it on up to five computers.

3          MR. WERTHEIM:  Your Honor, it could be --

4          THE COURT:  That's your license.  I mean, I don't

5    know.

6          MR. WERTHEIM:  On a laptop or whatever it is I'm

7    sure that there's a way.  This is a logistical problem that

8    everybody faces with original -- if I didn't have the software

9    that used .pdfs it's my problem.  I have to get that and I'm

10   sure that their client can provide a version of the software

11   to them, install it on a computer and uninstall it as soon as

12   the review process is complete and the case is over.  They can

13   uninstall the software.

14         THE COURT:  Look into it.

15         MR. WERTHEIM:  I'm not so sure of it.

16         THE COURT:  Look into it.  If it's a problem you'll

17   let me know.

18         MR. KOGAN:  Couple of clarifications, Your Honor.

19         THE COURT:  Could they -- understand this for a

20   minute.  How many of these work-in-progress images are we

21   talking about?  Any idea?

22         MR. ROTBERG:  Hundreds.

23         THE COURT:  At all -- all throughout the 52 CD-ROMs

24   so --

25         MR. ROTBERG:  I think they're isolated to -- you

30

1  know, by category among specific CDs.

2          THE COURT:  All right.  The other thing I was

3  thinking is maybe a controlled printout.  You go to your

4  clients with the particular CD-ROMs that are identified.  Here

5  are the works-in-progress files.  You say, show me how to

6  print off one of these works in progress; they say, here's how

7  you do it.  These clicks.  You say, okay, now go along your

8  way.  Pop the CD-ROMs in, open the software package, print

9  them off, then you have them.  I mean --

10          MR. ROTBERG:  I will look into the possibility of

11  us -- of my client printing that -- printing those images.

12          THE COURT:  All right.

13          MR. KOGAN:  I guess it would be helpful if you -- if

14  there are specific ones that you want.  I mean --

15          THE COURT:  They want it all.

16          MR. KOGAN:  We've been sued on 200-plus sets of

17  copyright besides.  I mean, I'm not -- there's no ones we

18  favor more than others.  I mean, my clients are being sued for

19  copyright violations with very massive volume of designs.  I

20  don't know how I'm supposed to spot check it.

21          THE COURT:  The short answer is they want it all.

22          MR. ROTBERG:  So, Your Honor, what about the

23  claim -- two -- I have two questions.  They're -- there was a

24  briefing that we submit was submitted five page -- up to five

25  pages of a [inaudible] with regard to designs that we

1    wanted -- the deposit images.  That was not discussed and

2    ruled on at this point.

3            THE COURT:  Well, what are deposit images?  Is there

4    some -- I wanted to see what a deposit image is.

5            MR. KOGAN:  I believe it's -- yeah, we have some

6    from them.

7            THE COURT:  They're not pack --

8            MR. KOGAN:  I think in "E."  Actually -- well, yeah,

9    you know, that one sheet that we submitted to the side-by-side

10   representation.

11           MR. ROTBERG:  The front of Exhibit A?  Hold on.  The

12   squirrel with the mushroom.

13           THE COURT:  Um-hum.

14           MR. ROTBERG:  All those things to the left, all the

15   postcards would be considered deposit images and the same

16   thing with -- for Exhibit C.  Each one of the black-and-white

17   images would be considered a deposit image.

18           THE COURT:  That's an image that you deposit with

19   the Copyright Office when you seek a registration?

20           MR. ROTBERG:  Correct.

21           THE COURT:  Okay.

22           MR. WERTHEIM:  Your Honor, as far as the deposit and

23   the final design submitted to the Copyright Office I mean the

24   law in this is black and white.  We've been sued.  And even if

25   we weren't sued we're entitled to this.  Not only are we

1  entitled to this as a matter of being part of the public

2  there's actually a special provision in the copyright --

3  actual litigant in a copyright case where we'll actually get a

4  copy of the deposit.  You know, I think this -- you know,

5  we've been dealing with this delicate issue of interim

6  illustrations and that's fine.  We'll follow your case of

7  action.  There's just no good-faith basis in addition to the

8  fact that --

9          THE COURT:  Well, I think --

10          MR. WERTHEIM:  -- we don't have the designs.  For

11  designating the original public domain work --

12          THE COURT:  I thought I did deal with it.  I mean, I

13  said the only thing that's attorney's eyes only is the

14  interim --

15          MR. WERTHEIM:  Okay.

16          THE COURT:  -- crea -- you know, the emails that

17  we're talking about that show, you know, enlarge this, put a

18  purple border here, do this, do that.

19          MR. WERTHEIM:  Okay.

20          THE COURT:  That's all on -- ruling as attorney's

21  eyes only.  Everything else is not.

22          MR. WERTHEIM:  Okay.

23          MR. ROTBERG:  Your Honor, if it's not going to be

24  attorney's eyes only I ask that the images that we -- we have

25  submitted to the Court with the assumption that it would be

1   attorney's eyes only digital files and those digital files are

2   not something that they had and not something that they have

3   now and we want to replace those with print copies.  If we're

4   going to give them some -- we don't have to give them that

5   which we have a digital file in digital format.  There is

6   value to that and we don't want to give them -- at the minimum

7   if the Court is going to rule right now that they are not

8   going to be attorney's eyes only it would not be right for

9   them to have the digital file, which is from our client's

10  computer, which they can go ahead and manipulate and work with

11  both for the digital designs for the deposit images which

12  we've given them digital files.  So we'd like those to

13  remain -- the digital files to remain attorney's eyes only and

14  if they don't want to look at them, fine.  We'll replace them

15  with print copies if that is acceptable to the Court.  There's

16  no reason for them to require the -- a file that a computer

17  can manipulate.  There is just no basis for that claim that

18  they need to have that in order to defend their case.

19          THE COURT:  Why do you need the digital files?

20          MR. WERTHEIM:  I never asked for the digital file.

21  I don't know -- I don't need the digital files.

22          THE COURT:  Fine.  So --

23          MR. WERTHEIM:  I don't.  I [inaudible] --

24          THE COURT:  The ruling is we will replace -- the

25  digital files will remain attorney's eyes only the --

34

1              MR. WERTHEIM:  Both ways.

2              THE COURT:  -- both ways and you both have to

3    produce hard copies to each other of the deposit images.

4              MR. WERTHEIM:  We don't have any copyrights so we

5    don't have deposit images.  We didn't file for copyright

6    registrations.

7              THE COURT:  Then why were you asking both ways?

8              MR. WERTHEIM:  Because we produced twice as many

9    disks with digital --

10             THE COURT:  Well, I was --

11             MR. WERTHEIM:  -- images.  I don't want digital

12   stuff.  If that argument is valid --

13             UNKNOWN SPEAKER:  [Inaudible] asking --

14             THE COURT:  No, no, not.  The assertion was for

15   digital versions of deposit images, right, to remain

16   attorney's eyes only.

17             MR. WERTHEIM:  Okay.

18             THE COURT:  Not --

19             MR. KOGAN:  And the final -- the final product in

20   the event that his clients don't have the final product in the

21   digital format that we're providing I don't want to give them

22   that which exists only on my client's --

23             THE COURT:  All right.  Deposited images -- those

24   are --

25             MR. KOGAN:  That's everything that we have in the

1  Copyright Office.

2          THE COURT:  Two separate -- okay, but those are two

3  separate titles.  It's a deposit image and a final image.  Is

4  that what it's called?

5          MR. KOGAN:  Yeah.

6          THE COURT:  All right.  The digital versions of

7  those will remain attorney's eyes only.  You will produce

8  paper copies of them.  You don't have those.

9          MR. WERTHEIM:  I have -- no, I don't have copyright

10  deposits.  I do have -- we have produced digital files but I

11  just want the same protection.  If they want printouts of

12  things --

13          THE COURT:  Digital files of what?

14          MR. WERTHEIM:  Of designs.  I don't know what they

15  have.  I don't know if they have digital files of every design

16  that we produce.  We produced twice as many disks as they did.

17          THE COURT:  Any problem with that?  They -- the

18  argument is they've created their own works that are not --

19  they have not sought copyright protection for and they've

20  given you the digital files of those.  Is that it?  Is that

21  what you're saying?

22          MR. WERTHEIM:  All I'm saying is I want to do what

23  you're proposing.  I will print out the designs we've produced

24  on the disks and you can show your client the printouts, not

25  the disks, not the digital versions as you refer to them so --

1           MR. ROTBERG:  I'm not sure that they're claiming --

2  we're only talking here about the --

3           THE COURT:  We're talking about protecting people's

4  creative process and to guard against someone -- what another

5  party has created and then manipulating it digitally into

6  something else and then hawking it on the street.  Okay.

7  Whether it's copyright protected or not is not a concern of

8  mine.

9           MR. WERTHEIM:  Your Honor, one first step I think

10 may be appropriate perhaps is to return to the documents

11 exchanged digitally without leaving a copy and replacing it

12 with paper production only and at which point only those

13 documents which are in part of the creative process, whether

14 it be emails or work in progress, those documents are

15 separate new production which will be given as attorney's eyes

16 only and we each can choose what we believe is work in

17 progress or --

18          THE COURT:  You can do it however you want.  The

19 particulars are not my concern.  My concern is the over-

20 arching principles that you're going to apply.  Let's

21 reiterate them one more time.  Deposit images, final images,

22 non-copyrightable images of creative works or non-copyrighted,

23 I should say, because it's -- they're probably copyrightable

24 but they haven't gone through that step yet.  Those were

25 attorney's eyes only.  Emails or other documents that show the

1   creative process from getting from public image -- public

2   domain image to a final copyrightable image or not those

3   emails or other documents are attorney's eyes only.

4   Everything else is fair game, non-attorney's eyes only.

5   However, if you want to work out the details whether it's --

6   you each send back the CD-ROMs that you received and way to

7   receive a paper shipment in -- and other CD-ROMs with the

8   attorney's eyes only documents or you just want to send each

9   other a printout of the attorney's eyes only documents -- no,

10  a printout of the images so you then can show those to your

11  clients you can do that.  Is it clear?  All right.

12          MR. WERTHEIM:  Couple things.  You know, one of the

13  things I mentioned in our letter is, oh, you know, this is a

14  massive production both ways.  And although here and there's

15  exhibits here they put the -- you know, the original

16  underlying preexisting work alongside the final design in

17  connection with their copyrights or copyright applications, we

18  didn't get it that way.  There's like a separate area or a

19  separate subfolder on the disk that says "preexisting work"

20  and then somewhere else there's the registrations and then

21  maybe somewhere else there's the designs.  This is a lot of

22  stuff and I think we ought to get it together because I don't

23  want to have to spend 100 hours figuring out what image goes

24  with which application.

25          THE COURT:  Well, the rules are clear.  You produce

1  documents either in an easily understandable format or as they

2  were kept in the regular course of business.  I don't know.

3  Apparently you're saying it's not an easily understandable

4  format although you may disagree.  You may say, yeah.  They've

5  got a file with the preexisting artwork.  They've got a file

6  with the copyrighted images.  They've got a file with this

7  that's produced in categories and they can easily match it up

8  or you can say that's the way Ana did it.  I don't know.

9          MR. ROTBERG:  I would suggest just creating one

10  document that -- that there's a guide where everything can be

11  found easily on the disks.

12          THE COURT:  Well, I don't think that's the problem.

13  I think you --

14          MR. WERTHEIM:  I'm okay with that.

15          THE COURT:  You can --

16          MR. WERTHEIM:  He provides -- if he provides a road

17  map that says, you know, this file in the disk that says

18  preexisting work if file number nine goes with final image

19  number 12 on another disk and the --

20          THE COURT:  Is that what you're proposing?

21          MR. WERTHEIM:  -- copyright, I'll do that.  It's

22  okay with me.

23          THE COURT:  Or are you proposing a more general --

24          MR. WERTHEIM:  I was thinking something more

25  general.

1            THE COURT:  Yeah.  That's what I -- yeah.

2            MR. WERTHEIM:  [Inaudible] helpful.

3            THE COURT:  He's going to say that you will produce

4    52 CD-ROMs with however many files within which individual --

5    excuse me, however many folders which -- within which

6    individual files were kept.  Folder X has whatever type of

7    documents in it.  Folder Y has whatever documents in it.

8            MR. WERTHEIM:  I already have that.

9            THE COURT:  He's -- yeah, he's not talking about,

10   okay, file three should be linked with file 65 should be

11   linked with file 637.

12           MR. WERTHEIM:  It's like a 5,000-piece puzzle --

13           THE COURT:  I understand that and --

14           MR. WERTHEIM:  -- that's been thrown on the floor.

15           THE COURT:  I understand that and when -- you know,

16   when the -- they have the Duke conference in May to consider

17   revising the civil -- Federal Rules of Civil Procedure maybe

18   they should take up the issue of how people produce documents

19   but the Federal Rules currently say you produce them one or

20   two ways as they're kept in the ordinary course of business or

21   you put them in a subject-by-subject category and something

22   that's easily understood.  They --

23           MR. ROTBERG:  We're facing the same difficulties --

24           THE COURT:  I don't know how they were kept.  I

25   don't know how they were produced.  I don't have the

1  information in front of me and I think, you know, unless you

2  can reach an agreement that says you're all going to reshuffle

3  your documents and put them in easily digestible format you're

4  sort of stuck for the time being with how it's been produced.

5          MR. WERTHEIM:  Well, I mean, since they've filed and

6  received copyrights they must have put this stuff together as

7  part of their application.  It had to be together.

8          THE COURT:  Well, that --

9          MR. WERTHEIM:  Over the course of their business.

10          THE COURT:  You could print out a file from one

11  folder, print out a file from another folder, print out a file

12  from the third folder, stable it together, mail it to the

13  Copyright Office.  Doesn't mean that it's all maintained in

14  one file, one folder on the computer.  I -- you need to -- you

15  maybe need to take a deposition of Ana or whoever the

16  custodian of records is to figure out how she kept this stuff.

17  I can't order them to, you know, go back and produce it a

18  certain way.  I really don't believe I have that authority.

19  Couple more things.

20          MR. WERTHEIM:  Well, this is a turn in a different

21  direction, Your Honor, but maybe you can avoid another one of

22  our conferences.

23          THE COURT:  I doubt it.

24          MR. WERTHEIM:  That for several weeks.  We've been

25  trying to schedule a deposition.  You know, you had said the

41

1  last time very firmly that deposition season begins October

2  1st and ends at the end of December and although we haven't

3  been exactly butting heads --

4       THE COURT:  Have any depositions been held?

5       MR. WERTHEIM:  Nothing has been held.  We've been

6  trying to get them scheduled.  We had -- I had said -- I mean,

7  we had served our deposition notices of the two party

8  defendants long before they did, but nonetheless we wrote to

9  them like two or three weeks ago and I said, look, despite us

10  having done that I'm willing to go, you know, on and off.

11  We'll do take your first witness, one of the two girls, then

12  you'll take one of ours, then another girl, then, you know,

13  the other individual plaintiff party.  We also served a couple

14  other deposition notices.

15       I mean, the one -- the one logistical problem is

16  Polina who's in Israel, a party defendant.  In our first

17  communication about this -- I don't know two or three weeks

18  ago early on in the scheduled deposition season -- I said,

19  look, we're going to go to Israel unless you want to work

20  something out about bringing her here.  Okay.  We got a

21  communication that said, we want to bring her here.  Okay.

22  Fine.  Bring her here but then more recently they said, well,

23  there can only be one day.

24       THE COURT:  Okay.  Here's what we're going to do.

25  You're going to submit a iron-clad deposition schedule by the

42

1  end of this week.  If you don't, we're going to hold all the

2  depositions in the courtroom -- excuse me, the jury room on

3  dates that I select.

4          MR. WERTHEIM:  Okay.  A joint schedule.

5          THE COURT:  Joint schedule.  I'm going to forego the

6  issue of the sanction that I promised you for the party who

7  loses because I think actually you both won and lost a little

8  bit, so the -- a draw, so to speak.  But it's still out there.

9  Anything else?

10          MR. ROTBERG:  Your Honor, I just want to say that we

11  have not -- like counsel said, we have not been butting heads

12  with regards to the depositions.  There were a couple of

13  issues where we were still trying to work out differences and

14  we have been trying to accommodate each other in our

15  respective clients in that matter.  I am still perturbed by a

16  certain gaps in the document disclosure and while counsel has

17  tried to explain in the letter why the accountant never had

18  any single document at all ever, the accountant only saw some

19  QuickBooks apparently reports and that's how the account --

20  their accountant prepares tax returns.  So therefore, their

21  accountant has no documents to give me other than the tax

22  returns.  And some other things.  I did not come prepared to

23  argue this issue.

24          THE COURT:  Take -- take his deposition.

25          MR. ROTBERG:  Yeah.  I would like to do that, Your

43

1   Honor.

2          THE COURT:  And then if he gives you that answer

3   send it to the U.S. Attorney's Office.  I don't think that's

4   gap if they still do according to gap.  Got to have -- you've

5   got to have documents, right?  So --

6          MR. ROTBERG:  And I -- there are other -- I'm not

7   prepared to discuss this today but, Your Honor, I do have some

8   serious gaps in discovery and I have some documents that

9   counsel has pointed out to me that he is missing and I've been

10  able to assemble some of those.  I will have a set of

11  documents -- a couple inches of documents over to counsel by

12  the end of this week.  I have yet to see any tax returns for

13  the individuals from before 2008.  I can't imagine that they

14  never submitted tax returns where incomes --

15         THE COURT:  It's another one for the U.S. Attorney's

16  Office.

17         MR. ROTBERG:  Many six figures issues.  I'm -- I

18  have a lot of concerns.  I am sure that if we continue to

19  cooperate in the way that we have with regard to the

20  depositions I believe that we could work this out.  I'm not

21  trying to ambush counsel.  I have a list in my office that is

22  much more than I brought up.  I don't want to get into it

23  right now because I'm not prepared to discuss all the various

24  issues.

25         THE COURT:  Okay.

44

1          MR. ROTBERG:  And I think that if we continued the

2    spirit of cooperation we might be able to work it out.

3          THE COURT:  Don't let it fester.  If you can work it

4    out, fantastic; if you can't, don't leave it to the last

5    minute because I could see this impacting depositions so --

6          MR. WERTHEIM:  Can I ask for something to help the

7    atmosphere a little bit, Your Honor, in terms of how this goes

8    between us?  You know, first of all, just in terms of how we

9    deal with other if you might -- well, first of all, I'm going

10   to note my objection as I do at every conference to this

11   violation of Rule 37 where we come in here and things come out

12   of the blue that I haven't heard about for a long time.

13         MR. KOGAN:  [Inaudible] depositions up, Your Honor.

14         MR. WERTHEIM:  It's a scheduling matter.

15         THE COURT:  Oh, come on.  Come on, come on.  Look,

16   look.  We're here, you know.

17         MR. KOGAN:  If someone is on -- is pointing out Rule

18   37 I think that counsel [inaudible] --

19         MR. WERTHEIM:  No, let me -- just in terms of the

20   atmosphere between us, Your Honor, if you might maybe this is

21   just advisory.  I don't know.  For months and months when we

22   would try to communicate, writing, telephone strangely all we

23   hear from is counsel's paralegal Yossi [Ph.] sitting there,

24   the bearded gentleman.  We don't get communications from

25   lawyers from the last month.  We only write to him.

1   Regardless of the issue it's the strangest thing and it is not

2   helping the resolution of discovery issues for us to get the

3   silent treatment from lawyers.  You said a long time ago we

4   were supposed to talk.  Not only do they not talk they don't

5   even write.  I don't know if this is intended as an insult or

6   they're not getting paid or what the problem is but it's not

7   helping the resolution of discovery that a paralegal appears

8   to be managing their lawsuit for the last two or three months.

9   It's not helping.  We're supposed to communicate with each

10  other, as you said a long time ago.  We do it; they don't do

11  it.

12              MR. ROTBERG:  Rule 37, Your Honor?

13              THE COURT:  Give me one second.

14              MR. KOGAN:  It's not a motion.

15              THE COURT:  I need to look at something.  We

16  currently have a final pretrial conference of December 22nd,

17  correct?

18              MR. WERTHEIM:  Um-hum.

19              THE COURT:  And that's the only other conference we

20  have currently scheduled.  Discovery closes, I would assume,

21  either that day or shortly before then.  All right.  Here's

22  what you do.  If you feel -- you both cooperate.  Don't -- no

23  offense, but don't filter conversations through paralegals.

24  They might be the world's best paralegals but they have no

25  authority to make a decision.

46

1          MR. ROTBERG:  Mr. Eschaus [Ph.] is actually a law

2    clerk, not a paralegal.

3          THE COURT:  Okay.

4          MR. ROTBERG:  He's admitted in other jurisdictions

5    so I just --

6          THE COURT:  All right.

7          MR. ROTBERG:  -- wanted to say that --

8          THE COURT:  Well, if he's not admitted in this

9    district -- jurisdiction you can't bind your client.

10          MR. ROTBERG:  I understand and know the --

11          THE COURT:  I'm sorry.

12          MR. ROTBERG:  -- [inaudible] and did not --

13          THE COURT:  No offense intended.

14          MR. ROTBERG:  He did not sign any stipulation --

15          THE COURT:  But --

16          MR. ROTBERG:  -- any way appear -- and --

17          THE COURT:  Talk to -- decisionmakers make the

18    conversation.

19          MR. WERTHEIM:  It's a little bit difficult to talk

20    to counsel when the microphone is off and Your Honor is out of

21    the room when personal insults are drawn across and I believe

22    other members of the court staff overheard how counsel was

23    just -- I was appalled by this kind of conduct but if we have

24    to address it, then --

25          THE COURT:  Look --

47

1          MR. WERTHEIM:  -- we have to address it.  Then, Your

2  Honor, I have never -- I -- in my -- in the last 14 years that

3  I have been an attorney I have never had someone behave in

4  this kind of fashion towards me and I'm appalled.  I do not

5  have --

6          THE COURT:  Please, please.

7          MR. WERTHEIM:  -- to speak to someone who will throw

8  personal insults at me when this is -- we're supposed to act

9  as gentlemen and treat each other with courtesy and the kind

10  of dishonesty and the kind of personal verbal attacks that

11  have been headed here --

12          THE COURT:  If --

13          MR. WERTHEIM:  -- are just inappropriate and I will

14  not keep quiet about this.  When Your Honor was out last time

15  and between -- in between the times we were on the record in

16  front of everybody here and I think where a dozen or so

17  observers out here --

18          THE COURT:  I don't -- look, I --

19          MR. WERTHEIM:  This is just --

20          THE COURT:  I don't want to hear any more about the

21  inability to deal with each other civilly.  I will say this.

22  I am not extending discovery.  Okay.

23          MR. WERTHEIM:  Okay.

24          THE COURT:  If -- I suggest you both keep a record

25  of every phone call, every letter, everything.  If at the end

48

1  of the day discovery is not complete and you can prove to me

2  that it's the other side's fault, I will recommend to Judge

3  Sifton -- Sifton, right?

4        MR. WERTHEIM:  Yes.

5        THE COURT:  That judgment be entered for violation

6  of the Court's discovery orders.  I'll do that and then you've

7  got to cooperate.  So create your record and if you can

8  satisfy me that the other side is dragging its heels,

9  whatever, then they'll have a problem.  You've got work to do

10  so get it done.

11        (Proceedings concluded at 3:43 p.m.)

12                    *  *  *  *  *  *

49

1          I certify that the foregoing is a court transcript

2     from an electronic sound recording of the proceedings in the

3     above-entitled matter.

4

5

6     _____

7                                    Ruth Ann Hager

8     Dated:   November 2, 2009

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25